UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                                          Chapter 11

**AC I INV MANAHAWKIN LLC,**              Case No.:  14-22791 through
**AC I MANAHAWKIN MEZZ LLC, and**                          14-22793 (RDD)
**AC I MANAHAWKIN LLC,**                  (Jointly Administered)

                                  Debtors.
--------------------------------------------------------X

## EXHIBIT TO BIDDING PROCEDURES – FORM ASSET PURCHASE AGREEMENT

**DATED:**      New York, New York
                January 16, 2015

                              **ROBINSON BROG LEINWAND GREENE**
                                **GENOVESE & GLUCK P.C.**
                              **Attorneys for the Debtors**
                              875 Third Avenue, 9th Floor
                              New York, New York 10022
                              Tel. No.:  212-603-6300

AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement"), made as of January ___, 2015, by and between **AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 (hereinafter referred to as "Seller") and _____, a _____, having an address at _____ (hereinafter referred to as "Purchaser").

W I T N E S S E T H:

1.      Agreement to Sell and Purchase: Description of Property.

Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained, all right, title and interest of Seller in and to (a) those certain lots, pieces or parcels of land, commonly known as the Manahawkin Commons Shopping Center, located in the County of Ocean, Township of Stafford, State of New Jersey, as more particularly bounded and described in Schedule A attached hereto and hereby made a part hereof (collectively the "Land"), together with (i) the building(s) any and all other improvements erected thereon (the building and such other improvements being hereinafter collectively referred to as the "Improvements"), (ii) the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (iii) any rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iv) development rights, if any, appurtenant to the Land or any portion thereof, and (v) any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land or any of the Improvements by reason of change of grade or closing of any street, road or avenue, it being understood and agreed that Seller will execute and deliver to Purchaser on the Closing Date (as hereinafter defined) or thereafter (which obligation shall survive the Closing (as hereinafter defined), upon reasonable written request, all proper instruments for the conveyance of such right, title and interest and for the assignment and collection of any such awards or payments, without representation or warranty by or recourse to Seller, (b) all fixtures, machinery, tangible personal property and equipment, excluding furniture, furnishings, equipment and other personal property of Tenants (as hereinafter defined) used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements at the date hereof, (c) the interest of the landlord in and to all Leases (as hereinafter defined) of all or any portion of the Land and the Improvements, and all security deposits held by Seller thereunder on the Closing Date, and (d) transferable permits and licenses, if any, held solely for use in connection with all or any portion of the Land and the Improvements.

All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement (including, without limitation, the Building and Improvements erected on the Land or any part thereof) are hereinafter sometimes collectively referred to as the "Property".

2.        Exceptions to Title; Title Matters.

2.1        The Property is sold and shall be conveyed subject to the following matters (the "Permitted Exceptions"):

2.1.1    All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the date of the Closing (as hereinafter defined), subject to adjustment as hereinbelow provided.

2.1.2    All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "Laws and Regulations").

2.1.3    All covenants, restrictions, agreements, reservations, and rights of record and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property (collectively, "Rights").

2.1.4    The state of facts set forth on those surveys listed on Schedule B attached hereto and made a part hereof and any further state of facts accurate surveys since said latter dates may show provided that such further state of facts do not materially interfere with the use and enjoyment of the Property, and such state of facts personal inspections of the Property may reveal (collectively, "Facts").

2.1.5    Rights of tenants and other occupants of the Property and of parties to any collateral agreements affecting tenancies of the Property or other statutory tenants, as set forth on Schedule C attached hereto and made a part hereof (collectively, "Tenants"), under the terms and conditions of all leases and other occupancy agreements or by law for any space at the Property and/or any collateral agreements affecting tenancies at the Property in effect at the date hereof and at the date of Closing, and all renewals, replacements and amendments thereof not prohibited hereunder (collectively, "Leases").

2.1.6    All service, maintenance, union, supply and other contracts in connection with the Property, set forth on Schedule D attached hereto and made a part hereof (collectively, "Contracts").

2.1.7    All violations of building, fire, sanitary, environmental, housing and similar Laws and Regulations whether or not noted or issued at the date hereof or at the date of the Closing (collectively, "Violations").

2.1.8    Consents by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

2.1.9   Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property.

2.1.10  Variations between tax lot lines and lines of record title.

2.1.11  Standard conditions and exceptions to title contained in the form of a title policy or "marked-up" title commitment employed by the Title Company (as hereinafter defined).

2.1.12  Any financing statements, chattel mortgages, encumbrances or mechanic's or other liens entered into by, or arising from, any financing statements filed on a day more than five (5) years prior to the Closing and any financing statements, chattel mortgages, encumbrances or mechanics' or other liens filed against property no longer on the Property.

2.1.13  Any lien or encumbrance (including, without limitation, any mechanic's and materialmen's lien) removal of which is the obligation of a Tenant pursuant to the related Lease.

2.1.14  Any other matter which the Title Company (as hereinafter defined) may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Property and/or that no prohibition of present use or maintenance of the Property will result therefrom, as may be applicable.

2.1.15  The matters described in <u>Schedule E</u> attached hereto and made a part hereof.

2.2    Purchaser agrees, promptly upon the execution of this Agreement, at its sole cost and expense, to cause title to the Property to be examined by any reputable title insurer licensed to issue title insurance in the State of New Jersey and acceptable to Seller in Seller's sole discretion (the "<u>Title Company</u>") and to direct the Title Company to deliver copies of such title report (the "<u>Title Report</u>") to Seller's attorney(s) simultaneously with the delivery of same to Purchaser, but in no event later than fourteen (14) days from the execution of this Agreement. Purchaser further agrees that not later than seven (7) business days from the receipt of the Title Report, Purchaser will furnish to Seller's attorneys a specification in writing (the "<u>Title Report Objection Notice</u>") of any exceptions to title to the Property set forth in the Title Report or otherwise known to Purchaser which Purchaser believes are not covered by the exceptions to title set forth in Section 2.1 hereof.  Purchaser acknowledges and agrees that Purchaser's failure to deliver the Title Report Objection Notice to Seller on or prior to such seven (7) business days period shall constitute Purchaser's irrevocable acceptance of the Title Report and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein.  If, after giving such notice to Seller, Purchaser learns, through continuation reports or otherwise, of any title defect(s) which Purchaser claims are not covered by Section 2.1 above, Purchaser shall give notice thereof to Seller immediately after the date Purchaser learns of same.  Purchaser

acknowledges and agrees that **TIME IS OF THE ESSENCE** with respect to all time periods set forth in this Section 2.2.  For the purposes of this Agreement, the capitalized term "Business Day" means any day of the year on which banks are not required or authorized by law to close in New York City.

2.3    If, at the Closing, Seller fails or is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser, to reasonable adjournments of the Closing Date one or more times, for a period not exceeding ninety (90) days in the aggregate, to enable Seller to convey such title.  If Seller does not so elect to adjourn the Closing, or if Seller has not adjourned the Closing Date for an additional period and is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser may terminate this Agreement by written notice delivered on or promptly after the date scheduled for the Closing, in which event the Escrow Agent (as defined in Section 3.3.1 below) shall repay to Purchaser the Deposit (as hereinafter defined) made by Purchaser, together with any interest earned thereon.   This Agreement shall thereupon be deemed canceled and become void and of no further effect, and neither party shall have any obligations of any nature to the other hereunder or by reason thereof, except those provisions which shall survive such termination.  If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms.  Seller shall not be required to take or bring any action or proceeding or to take any other steps to remove any defect in or objection to title or to fulfill any condition or to otherwise comply with this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

2.4    Notwithstanding anything in Section 2.3 above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price (as hereinafter defined) or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed (as defined in subsection 8.1.1 below) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement.

2.5    The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge, with interest and penalties, may at the option of Seller be allowed to Purchaser out of the balance of the Purchase Price if official bills therefor with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof.

2.6    If the Property shall, at the time of Closing, be subject to any liens such as for judgments or transfer, franchise, license or other similar taxes or any encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of Closing, either (a) Seller uses all or a portion of the Purchase Price to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing instruments in recordable form sufficient to satisfy and discharge of record such liens and encumbrances, together with the cost of recording or filing such instruments, or (b) the Title Company will otherwise issue or bind itself to issue a policy which will insure Purchaser against collection thereof from or enforcement thereof against the Property.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

4

If a request is made, Purchaser agrees to provide at the Closing separate certified or official bank checks, as requested, aggregating the amount of the cash to be paid to Seller at that date, to facilitate the satisfaction of any of such liens or other defects, and the existence of any thereof shall not be deemed defects in or objections to title if Seller shall comply with the foregoing requirements.

2.7    Notwithstanding anything to the contrary contained in this Agreement, the fact that the Property does not have a certificate or certificates of occupancy (or, if there be such certificate(s), that there exist any variances between such certificate(s) and the actual state of use(s) of the Property) shall not be deemed to be an objection to title.

3.    <u>Purchase Price and Payment</u>:

3.1    The total purchase price payable to Seller for the Property is _____ MILLION _____ HUNDRED THOUSAND ($_____) DOLLARS (the "<u>Purchase Price</u>").

3.2    The Purchase Price is payable as follows:

3.2.1    _____ ($_____) DOLLARS, (the "<u>Deposit</u>"), simultaneously with the execution and delivery of this Agreement, by federal funds wire transfer to an account at such bank or banks as designated by Robinson Brog Leinwand Green Genovese & Gluck, P.C. ("Escrow Agent").

3.2.2    The Deposit shall be held by Escrow Agent and disbursed in accordance with the terms and provisions of this Agreement. Any interest earned on the Deposit shall not be deemed to be part of the Deposit, but shall be paid to the party entitled to receipt of the Deposit. Subject to Section 5.1 below, the Deposit shall be non-refundable (except in the event of a breach of this Agreement by Seller).

3.2.3    The balance of the Purchase Price at the Closing (as hereinafter defined) of title to the Property as set forth in Section 4 herein, in immediately available funds by federal funds wire transfer to such payee(s) and to such account(s) as designated by the Seller.

4.    <u>Closing</u>.

4.1    The closing of the transaction contemplated hereby (the "<u>Closing</u>") shall occur at 10:00 AM on or before the fourteenth (14th) day following the Bankruptcy Court's approval of Seller's Plan of Reorganization and the issuance of the Sale Order, as provided in Section 28 below, (the actual date of the Closing being herein referred to as the "<u>Closing Date</u>"), subject to Seller's right to adjourn such date as set forth in Section 2.3 hereof. **TIME SHALL BE OF THE ESSENCE WITH RESPECT TO PURCHASER'S OBLIGATIONS ON THE CLOSING DATE.**

4.2    The Closing shall occur at the offices of Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

5.      "As-Is" Condition of Property; Acknowledgements of Purchaser.

5.1     Before entering into this Agreement, Purchaser has made such examination of the Property, the condition thereof (including, without limitation, all structural, mechanical and environmental matters), the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary.  In entering into this Agreement, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Agreement, whether or not any such representations, warranties or statements were made in writing or orally.  Except as expressly set forth in this Agreement, Seller makes no representations or warranties with regard to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser.  In connection therewith, Purchaser acknowledges that it is relying exclusively upon its own independent investigation and evaluation of every aspect of the Property.

5.2     Purchaser hereby acknowledges, represents, warrants and agrees as follows:

5.2.1   Except as may otherwise be expressly set forth in this Agreement, Purchaser is purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions and defects.  Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same.  Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts, Leases, Contracts and Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof.  Purchaser has performed all such investigations and reviews of the Property, Laws and Regulations, Rights, Facts, Leases, Contracts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property.  Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers and Purchaser is fully satisfied that the Purchase Price is fair and adequate consideration for the Property, and by reason of all the foregoing, Purchaser assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the Property.

5.2.2   Seller hereby disclaims all warranties of any kind or nature whatsoever (including warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property.  Purchaser acknowledges that, except as otherwise expressly provided in this Agreement, Purchaser is not relying upon any representation of any kind or nature made by Seller, or any of its employees or agents with respect to the Property, and that, in fact, no such representations were made except as expressly set forth in this Agreement.

5.2.3   Seller makes no warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Land (or any parcel in proximity

thereto) or in any water on or under the Property.  Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined).    The term "<u>Hazardous Materials</u>" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f)  radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation.    The term "Environmental Laws" shall mean all Federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Clean Water Act, 33 U.S.C. §§ 1251 <u>et seq.</u> (1972), the Clean Air Act, 42 U.S.C. §§ 7401 <u>et seq.</u> (1970), the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 <u>et seq.</u>, the Toxic Substances Control Act, as amended, 15 U.S.C. §§ 2601 <u>et. seq.</u>, the Hazardous Material Transportation Act, as amended, 49 U.S.C. §§ 5101 <u>et. seq.</u>, and all state and federal common law relating to nuisance and trespass.

5.2.4    Purchaser acknowledges that Purchaser has had an adequate opportunity to make such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property.  Such inquiries and investigations of Purchaser shall be deemed to include but shall not be limited to the review of any Leases and contracts pertaining to the Property, the physical components of all portions of the Property, the existence of any wood-destroying organisms on the Property, such state of facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions and regulations of the City, County and State where the Property is located and the value and marketability of the Property.  Purchaser, in purchasing the Property, has relied solely upon the tests, analyses, inspections and investigations that Purchaser makes, or has had the right to make, and opted not or otherwise failed to make, and not in reliance upon any alleged representation made by or on behalf of Seller except the express representations set forth herein.  To the extent any provision of a Lease contradicts or otherwise provides information contrary to any representations or schedules herein, Purchaser shall be deemed to have relied solely upon the provision of the Lease and the representations and the schedules shall be deemed modified by the provision of such Lease.

5.2.5   Without in any way limiting the generality of the preceding paragraphs, Purchaser specifically acknowledges and agrees that it hereby waives, releases and discharges any claim it has, might have had or may have against Seller with respect to the condition of the Property, either patent or latent, environmental matters, its ability or inability to obtain or maintain building permits, either temporary or final certificates of occupancy or other licenses for the use or operation of the Property and/or certificates of compliance for the Property, the actual or potential income or profits to be derived from the Property, the real estate taxes or assessments now or hereafter payable thereon, the compliance with any environmental protection, pollution or land use laws, rules, regulations or requirements, and any other state of facts which exist with respect to the Property.

6.   <u>Apportionments</u>.

6.1   Real estate taxes based upon the most current tax rates and assessor's valuation and annual municipal or special district assessments (on the basis of the actual fiscal tax years for which such assessments are paid), lienable water and sewer rentals, sums paid to or paid or payable by Seller under the Contracts, license, permit and inspection fees and rentals, sales tax and other sums paid to and received by Seller under the Leases shall be apportioned as of the Closing Date between Purchaser and Seller.

6.2   Rent, including, without limitation, fixed rent, prepaid rent and additional rent, shall be apportioned as of the Closing Date in accordance with the provisions of this Section. With respect to any rent arrearages arising under the Leases for the period prior to the Closing Date, Purchaser shall pay to Seller any rent or payment actually collected after Closing which is designated as applicable to the period preceding the Closing Date.   All rent under the Leases collected by Purchaser after Closing that is not so designated shall be applied first to the month of the Closing, then to unpaid rent accruing prior to the Closing Date, then to the current month's rent, and then to unpaid rent accruing on or after the Closing Date.   During the twelve (12) month period following the Closing, Purchaser shall use good faith commercially reasonable efforts to recover any rent (or other Tenant charges) arrearages in respect of the period prior to the Closing Date, provided that Purchaser shall not be required to incur any material cost or commence any legal proceeding in connection therewith.   Seller (upon notification to Purchaser) shall be entitled to sue a Tenant, before and/or after Closing, for any delinquent rent (or other Tenant charges) due to Seller (and not previously paid to Seller) under a Lease, so long as such suit does not seek a termination of such Lease or eviction of such Tenant.

6.3   All leasing commissions and Tenant costs with respect to Leases (and renewals, extensions or expansions thereof) payable after the Closing Date shall be the responsibility of Purchaser and Purchaser shall indemnify, defend and hold Seller harmless with respect thereto.

6.4   As of the Closing Date, Seller may perform a reconciliation of Seller's collections of Tenant charges compared to the actual expenditures and obligations associated therewith. Where the Leases contain Tenant obligations for taxes, common area expenses, operating expenses or additional charges of any other nature, and where Seller shall have collected any portion thereof in excess of amounts owed by Tenants for such items with respect to the period prior to the Closing, then there shall be an adjustment and credit given to Purchaser on the

Closing Date for such excess amounts collected, if any.  Purchaser shall apply all such excess amounts to the charges owed by Purchaser for such items for the period after the Closing Date and, if required by the Leases, shall rebate or credit the Tenants with any remainder and Purchaser shall indemnify, defend and hold Seller harmless with respect to any sums as to which Purchaser received a credit at Closing.  At Closing, Purchaser shall give Seller a credit equal to the aggregate amount payable by Tenants after Closing on account of taxes, common area expenses, operating expenses and additional charges of any kind with respect to periods prior to Closing.  If the amount of any payments relating to operating expenses, common area charges, real estate taxes and assessments or other payments to be received by Purchaser after the date of Closing from a Tenant under any of the Leases on account of periods prior to Closing and on account of sums which are attributable to expenses incurred by Seller for periods prior to Closing, cannot be precisely determined at the time of Closing, Seller and Purchaser shall, in good faith, reasonably estimate such sums subject to reconciliation as hereinafter provided.

6.5    Amounts payable under the Contracts and other operation and maintenance expenses and other recurring costs shall be apportioned as of the Closing Date.

6.6    Real estate taxes shall be apportioned on the Closing Date.  If the tax bill for the real estate tax year in which the Closing occurs has not been issued on or before the date of the Closing, the apportionment of taxes shall be computed based upon the most recent assessor's valuation and tax rates available.  If, on the date of Closing, bills for the real estate taxes imposed upon the Property for the real estate tax year in which Closing occurs have been issued but shall not have been paid, such taxes shall be paid at the time of Closing.

6.7    Any portion of any payments received by Purchaser after the date of Closing under any of the Contracts that relates to periods prior to Closing shall be determined by Purchaser upon receipt of such payment and shall immediately be paid by Purchaser to Seller.

6.8    From the Closing Date until such time as Seller shall have received in full all sums which are potentially payable to it as provided in this Section, Purchaser shall provide Seller a monthly accounting of all sums received and/or paid by Purchaser under any of the Leases or Contracts.

6.9    On behalf of Seller and Buyer, the Title Company shall prepare a preliminary Closing Statement on the basis of the Leases, Contracts, real estate taxes and other sources of income and expenses for the Property, and shall deliver such preliminary Closing Statement to the parties for approval prior to the Closing Date.  All apportionments and prorations provided for in this Section to be made as of the Closing Date shall be made, on a per diem basis, as of midnight of the day immediately preceding the Closing Date.  The preliminary Closing Statement and the apportionments and/or prorations reflected therein shall be based upon actual figures to the extent available.  If any of the apportionments and/or prorations cannot be calculated accurately based on actual figures on the Closing Date, then (other than with respect to determination of real estate taxes that shall be computed as set forth above) they shall be calculated based on Seller's and Purchaser's good faith estimates thereof, subject to reconciliation as hereinafter provided.

6.10    If there is an error on the preliminary Closing Statement or, if after the actual figures are available as to any items that were estimated on the preliminary Closing Statement (including, without limitation, real estate taxes that were computed in accordance with Clause (vi) above), it is determined that any actual proration or apportionment varies from the amount thereof reflected on the preliminary Closing Statement by more than ten percent (10%), the proration or apportionment shall be adjusted based on the actual figures as soon as feasible but not later than ninety (90) days after the Closing Date, unless such party seeking adjustment shall have delivered proof of claim along with written request therefor within said ninety (90) days after Closing Date.  Either party owing the other party a sum of money based on such subsequent proration(s) shall promptly pay said sum to the other party.

6.11    At Closing, Seller shall deliver or cause its property manager to deliver to Purchaser (or give Purchaser a credit for), without consideration, all security deposits then held by or for Seller under the Leases.  Purchaser will cause the security deposits to be maintained after Closing in accordance with the requirements of applicable law and shall indemnify and defend Seller from, and hold Seller harmless from, all claims of Tenants with respect to the security deposits actually delivered to Purchaser or for which Purchaser received a credit at Closing.

6.12    Seller shall use reasonable efforts to obtain readings of the water and electric meters on the Property to a date no sooner than ten (10) days prior to the Closing Date.  At or prior to Closing, Seller shall pay all charges based upon such meter readings.  However, if after reasonable efforts Seller is unable to obtain readings of any meters prior to Closing, Closing shall be completed without such readings and upon the obtaining thereof after Closing, Seller shall pay the charges incurred prior to Closing as reasonably determined by Seller and Purchaser based upon such readings

6.13    Purchaser shall timely pay, after the Closing Date, and shall indemnify, defend and hold Seller harmless with respect to all installments of leasing commissions and Tenant costs which become due and payable after the Closing Date.  Such Tenant costs include, without limitation, tenant improvement costs and if the lease so provides moving costs, design costs incurred by the tenant, lease buyout costs and similar tenant inducement costs provided for in the Leases.

7.    <u>Representations and Warranties of the Parties</u>.

7.1    Seller warrants, represents and covenants to and with Purchaser that the following are true and correct on the date hereof:

7.1.1    Seller is a limited liability company in good standing under the laws of the State of Delaware and has the requisite power and authority to enter into and to perform the terms of this Agreement.  Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller.

7.1.2    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

7.1.3    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, except the approval of the Bankruptcy Court as provided in Section 28 below.

7.1.4    Seller is not a party to any Contracts in respect of the Property except as set forth on Schedule D attached hereto and made a part hereof.

7.1.5    Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Property.

7.2    Purchaser warrants, represents and covenants to and with Seller that the following are true and correct on the date hereof:

7.2.1    Purchaser is a_____ duly organized or formed and in good standing under the laws of the State of its organization or formation and has the requisite power and authority to enter into and to perform the terms of this Agreement.  Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2.2    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser, except the approval of the Bankruptcy Court as provided in Section 28 below.

7.2.3    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.3    Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Seller nor Broker (as hereinafter defined) nor any representative nor any purported agent or representative of Seller or Broker have made, and neither Seller nor Broker

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof.  Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller and Broker have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the current or future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, local or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for residential purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation (g) the ownership or state of title of any personal property on the Property, (h) the presence or absence of any Laws and Regulations or any Violations, (i) the compliance of the Property or the Leases (or the rents thereunder) with any rent control or similar law or regulation, (j) the ability to relocate any Tenant or to terminate any Lease, and (k) the layout, leases, rents, income, expenses, operation, agreements, licenses, easements, instruments, documents or Contracts of or in any way affecting the Property.  Further, Purchaser acknowledges and agrees that neither Seller nor Broker are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller or Broker or any broker, employee, agent, consultant or other person representing or purportedly representing Seller or Broker.  The provisions of this Section 7.3 shall survive the Closing.

8.    <u>Closing Deliveries</u>.

     8.1    At or prior to the Closing, Seller shall make or cause to be made the following deliveries:

     8.1.1    Seller shall execute, acknowledge and deliver to Purchaser a statutory form of bargain and sale deed (without covenants against grantor's acts), sufficient to convey fee title to the Property subject to and in accordance with the provisions of this Agreement, in the form attached hereto as <u>Schedule F</u> and made a part hereof (the "<u>Deed</u>").

     8.1.2    Seller shall execute, acknowledge and deliver to Purchaser an assignment, expressly made without representation or warranty by or recourse to Seller all of Seller's right, title and interest as landlord or otherwise under each of the  Leases, and of any security deposits actually held by Seller, in the form attached hereto as <u>Schedule G</u> (the "<u>Assignment of Leases</u>").

8.1.3    Seller shall execute and deliver to Purchaser notices to the Tenants under the Leases advising them of the sale of the Property, and the assignment to Purchaser of such Leases.

8.1.4    Seller shall execute, acknowledge and deliver to Purchaser, an assignment, expressly made without representation or warranty by or recourse to Seller, of all of Seller's right, title and interest in and to any Contracts, in the form attached hereto as <u>Schedule H</u> affecting the Property (the "<u>Assignment of Contracts</u>").

8.1.5    Seller shall execute, acknowledge and deliver to Purchaser a bill of sale in the form attached hereto as <u>Schedule I</u>, expressly made without representation or warranty by or recourse to Seller, conveying and transferring to Purchaser all right, title and interest of Seller in and to all fixtures, machinery, equipment, articles of personal property and improvements in the nature of personal property attached or appurtenant to, or located on, or used in connection with the use or operation of, or used or adapted for use in connection with the enjoyment or occupancy of, the Property, specifically excluding, however, any personal property of Tenants (the "<u>Personal Property</u>").

8.1.6    Seller shall deliver to Purchaser all keys to such portions of the Property which are in Seller's possession or control.

8.1.7    Seller shall deliver to Purchaser a certificate, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code.

8.1.8    Seller shall deliver to Purchaser a consent of its manager and/or members authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder.

8.1.9    Seller shall execute, acknowledge and deliver any transfer tax returns required to be executed by Seller to consummate the transactions contemplated hereunder.

8.1.10    Seller shall deliver a copy of all of the Leases and Contracts in Seller's possession.

8.2    At or prior to the Closing, Purchaser shall make caused to be made the following deliveries:

8.2.1    Purchaser shall pay the balance of the Purchase Price required pursuant to subsection 3.2.3 hereof.

8.2.2    Purchaser shall deliver to Seller: (a) if Purchaser is a corporation, copies of Purchaser's (i) certificate of incorporation, (ii) by-laws, (iii) resolutions of its board of directors authorizing the transaction contemplated by this Agreement and (iv) a good standing certificate dated not more than fifteen (15) days prior to the Closing Date, (b) if Purchaser is a limited partnership, (i) copies of Purchaser's certificate of limited partnership, (ii) resolutions of the general partner authorizing the transaction contemplated by this Agreement, (iii) consents of

Purchaser's partners, if required under Purchaser's agreement of limited partnership and (iv) a good standing certificate dated not more than fifteen (15) days prior to the Closing Date, (c) if Purchaser is a limited liability company, Purchaser's (i) certificate of formation, (ii) operating agreement, (iii) good standing certificate dated not more than fifteen (15) days prior to the Closing Date, (iv) any consents of Purchaser's members required under the operating agreement to the transaction contemplated herein and (v) resolutions authorizing the transaction contemplated herein, which documents shall be accompanied by a certification signed by a secretary, assistant secretary, managing member, or general partner, as the case may be, certifying that such copies are true, complete and correct.

       8.2.3   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Assignment of Leases.

       8.2.4   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Assignment of Contracts.

       8.2.5   Purchaser shall execute, acknowledge and deliver to Seller any transfer tax returns required to be executed by Purchaser to consummate the transactions contemplated hereunder.

       8.3   Seller and Purchaser, at the Closing, shall prepare, execute and deliver to each other, subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments and material monetary terms of the transaction contemplated hereby, (b) a release and indemnification of the Escrow Agent, and (c) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement

9.    Conditions to the Closing Obligations.

       9.1   Notwithstanding anything to the contrary contained herein, the obligation of Seller to close title in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Seller, at its election, evidenced by written notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

       9.1.1   Purchaser shall have executed and delivered to Seller all of the documents, shall have paid all sums of money and shall have taken or caused to be taken all of the other action required of in this Agreement.

       9.1.2   All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the date of the Closing.

       9.2   Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the

conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

9.2.1    Seller shall have executed and delivered to Purchaser all of the documents required of Seller under this Agreement.

9.2.2    All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, except to the extent the facts and circumstances underlying such representations and warranties may have changed as of the Closing; provided, however, that if on the Closing Date any such representations and warranties are not true and correct in all material respects, Purchaser shall in any event be required to close hereunder and pay the Purchase Price to Seller unless the breach(es) of any representations and warranties will have, in the aggregate, a "material adverse effect" provided that in such event, Seller shall be entitled, at its option and in its sole discretion, to pay to Purchaser such amount on account of such breach(es) as will cause the same to no longer have a "material adverse effect", in which event Purchaser shall be required to close hereunder.  As used herein, a "material adverse effect" shall be deemed to have occurred if by reason of such misrepresentation the fair market value of the Property is decreased by more than ten percent (10%) of the Purchase Price. For purposes hereof, a representation or warranty shall not be deemed to have been breached if the representation or warranty is not true and correct in all material respects as of the Closing Date by reason of changed facts or circumstances which pursuant to the terms of this Agreement are permitted to have occurred or are beyond the control of Seller.

9.2.3    Seller shall have undertaken good faith, reasonable efforts to obtain estoppel certificates executed by [**insert names of "major" Tenants**] (the "Required Estoppels"), such estoppels to be in the form required under the respective Leases for such Tenants, and if no form is stipulated, then in such form as is reasonably acceptable to Seller's counsel.  Seller shall not be obligated to spend any funds in connection with obtaining the Required Estoppels.  The failure of Seller to obtain any Required Estoppels shall not be a breach of this Agreement by Seller or a failure of a condition to Purchaser's obligation to close title.  In the event that Seller has been unable to obtain any Required Estoppels, Purchaser shall be obligated to purchase the Property and close title, and Seller shall deliver its own certificate ("Seller's Certificate") to Purchaser in lieu of any Required Estoppels which Seller did not obtain.  In the event that after Closing, Seller receives a tenant estoppel certificate from a Tenant which did not previously deliver an estoppel certificate, Purchaser shall accept such estoppel certificate in place of the Seller's Certificate.

10.    Limitation on Liability of Parties.

10.1    In the event Purchaser shall default in the performance of Purchaser's obligations under this Agreement, Seller's sole and exclusive remedy shall be, and Seller shall be entitled, to retain the Deposit with the interest earned thereon as and for full and complete liquidated and agreed damages for Purchaser's default, and Purchaser shall be released from any further liability to Seller hereunder, except that such provisions contained herein as otherwise expressly survive termination of this Agreement shall survive.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

10.2    Subject to the provisions of Section 2.3 hereof, in the event Seller shall default in the performance of Seller's obligations under this Agreement and the Closing does not occur as a result thereof, Purchaser's sole and exclusive remedy shall be either (i) to instruct the Escrow Agent to pay to Purchaser the Deposit with the interest earned thereon, if any, and Seller shall be released from any further liability to Purchaser hereunder, except that such provisions contained herein as otherwise expressly survive termination of this Agreement shall survive or (ii) to seek specific performance, Purchaser hereby specifically waiving any and all other rights and remedies in equity or at law, including, without limitation, a suit for damages.

11.    <u>Fire or Other Casualty: Condemnation</u>.

11.1    Seller agrees (a) to maintain its present property insurance policy including fire and extended coverage and (b) to give Purchaser reasonably prompt notice of any fire or other casualty occurring at either Property of which Seller obtains knowledge, between the date hereof and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.

11.2    If prior to the Closing there shall occur (a) damage to the Property caused by fire or other casualty or (b) a taking by condemnation of any portion of the Property, neither party shall have the right to terminate its obligations under this Agreement by reason thereof, and the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, and shall deliver to  any such proceeds or awards actually theretofore paid, less any amounts (the "<u>Reimbursable Amounts</u>") (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation reasonable attorneys, fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restorations or emergency repairs made by or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carriers for such expenditures).

11.3    Nothing contained in this Section 11 shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

12.    <u>Brokerage</u>.    Purchaser and Seller each represent and warrant to the other that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby other than Holliday Fenoglio Fowler, L.P. ("<u>HFF</u>").    Seller shall pay the commission due to HFF pursuant to separate agreement.    Purchaser shall indemnify and hold Seller, its respective successors and assigns, harmless from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys fees and disbursements) which may be asserted against, imposed upon or incurred by Seller by reason of any claim made by any broker, consultant, finder or like agent, other than HFF, for commissions or other compensation for bringing about this transaction

or claiming to have introduced the Property to Purchaser.  The provisions of this Section 12 shall survive the Closing or other termination of this Agreement.

13.  <u>Closing Costs; Fees and Disbursements of Counsel</u>.  Seller and Purchaser shall each execute and/or swear to the returns or statements required in connection with the transfer taxes due under this Agreement.  All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company.  Except as otherwise expressly provided to the contrary in this Agreement, Purchaser shall pay all charges for (i) recording and/or filing the Deed and (ii) owner's and lender's title insurance policies.  Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation and preparation of this Agreement and the Closing.  The provisions of this Section 13 shall survive the Closing.

14.  <u>Notices</u>.  Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "<u>Notices</u>") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by facsimile machine, if followed by the giving of, pursuant to one of the other means set forth in this Section 14 before the end of the first business day thereafter, printed confirmation of successful transmission to the appropriate facsimile number of the addressee listed below as obtained by the sender from the sender's facsimile machine, (c) upon receipt, when sent by prepaid reputable overnight courier or (d) three (3) days after the date so mailed, if sent by certified mail, return receipt requested, postage prepaid, in all cases addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.

At the same time any Notice is given to Seller, a copy shall be sent in the manner aforesaid to:

     Robinson Brog Leinwand Greene Genovese & Gluck, P.C.
     875 Third Avenue, 9th Floor
     New York, New York 10022
     Attention: A. Mitchell Greene, Esq.

At the same time any notice is given to Purchaser, copies shall be sent in the manner aforesaid to:

     _____
     _____
     _____
     _____

Notices shall be valid only if served in the manner provided above.

15.    Attorney's Fees.    Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all costs, charges and expenses, including attorneys fees, expended or incurred in connection therewith.    The provisions of this Section 15 shall survive the Closing hereunder and the termination of this Agreement.

16.    Intentionally Deleted.

17.    Escrow.

17.1    Escrow Agent shall hold the Deposit in escrow, together with all interest earned thereon, in its [non-interest] [interest] bearing attorney trust account, in accordance with the following:

17.2    If the Closing has occurred, Escrow Agent shall deliver the Deposit, together with any interest earned thereon, to Seller.  If Escrow Agent receives a written notice signed by both Seller and Purchaser that this Agreement has been terminated or canceled, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, as directed therein.

17.3    If Escrow Agent receives a written request signed by Purchaser or Seller (the "Noticing Party") stating that this Agreement has been canceled or terminated and that the Noticing Party is entitled to the Deposit, or that the other party hereto (the "Non-Noticing Party") has defaulted in the performance of its obligations hereunder, Escrow Agent shall mail (by certified mail, return receipt requested) a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Deposit by written notice of objection delivered to and received by Escrow Agent within seven (7) days (excluding Saturdays, Sundays and State of New York and Federal holidays) after the date of Escrow Agent's mailing of such copy to the Non-Noticing Party, but not thereafter.  If Escrow Agent shall not have so received a written notice of objection from the Non-Noticing Party, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, to the Noticing Party.  If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands on it and shall continue to hold the Deposit, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Deposit (and interest), or (b) a final order of a court of competent jurisdiction directing disbursement of the Deposit (and interest) in a specific manner, in either of which events Escrow Agent shall then disburse the Deposit, together with the interest earned thereon, in accordance with such notice or order.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such requests or demands until and unless it has received a direction of the nature described.

17.4    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Section 17 shall be addressed to the party to receive such notice at its notice address set forth in Section 14 (with copies to be similarly sent to the additional persons therein indicated), but the

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

provisions of Section 14 relating to the manner of giving notices and the effective dates thereof shall have no application to the provisions of this Section 17.

17.5    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 17.3 above within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a written notice signed by either Seller or Purchaser over entitlement to the Deposit, or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Deposit, together with the interest earned thereon, with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Deposit, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

17.6    The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of any of the parties, and that Escrow Agent shall not be liable to either of the parties for an act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence.  Seller and Purchaser shall jointly and severally indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with regard to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent.

17.7    Notwithstanding anything to the contrary contained herein, Purchaser agrees that Escrow Agent may represent Seller as Seller's counsel in any action, suit or other proceeding between Seller and Purchaser.

18.    <u>Continued Operations; Leasing</u>.

18.1    Seller shall operate and maintain the Property in a manner consistent with the manner in which the Seller has operated and maintained the Property prior to the date hereof provided, however, such obligation shall not include structural or extraordinary capital improvements or repairs.

18.2    Seller shall not remove from the Property any Personal Property unless such item is replaced with a similar item of comparable value.

18.3    Seller shall not (a) make any material modification to any Contract or (b) enter into any new Contract unless same is terminable on no more than one (1) months notice without penalty or charge.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center
19

18.4     Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld, amend, renew or extend any Lease in any respect, unless required by the terms of the Lease or required by law.

18.5     Seller shall not permit occupancy, or enter into any new lease, for space at the Property which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with (a) either a copy of the proposed lease or summary of the terms thereof in reasonable detail and (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof.  If Purchaser rejects the proposed lease, Purchaser shall so notify Seller within three (3) business days after receipt of Seller's notice in which case Seller shall not enter into the proposed lease.  In such event, Purchaser shall pay to Seller, at Closing, the rent and additional rent that would have been payable under the proposed lease from the date the space became vacant through the Closing Date.  If Purchaser does not so notify Seller of its objection within such three (3) business day period, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice.  Purchaser shall be responsible for all leasing commissions and tenant improvement costs incurred in connection with any new lease or modification, extension or renewal of any existing lease and Purchaser shall reimburse Seller at Closing, for such costs.

19.    <u>Survival; Governing Law</u>.     Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein.   This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New Jersey.

20.    <u>Counterparts; Captions</u>.         This Agreement may be executed in counterparts, each of which shall be deemed an original. Facsimile or "pdf" signatures shall be binding with the same force and effect as original signatures.  The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

21.    <u>Entire Agreement; No Third Party Beneficiaries</u>.    This   Agreement   (including   all exhibits annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein.  The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.  The provisions of this Section shall survive the Closing.

22.    <u>Waivers; Extensions</u>.    No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

23.    <u>No Recording</u>.    Purchaser hereto agrees that neither this Agreement nor any memorandum or notice hereof shall be recorded.  Any such recordation or attempted recordation shall be null and void and shall constitute a material default by Purchaser under this Agreement.

24.    <u>Assignment</u>.    Purchaser shall neither (i) assign its rights nor delegate its obligations hereunder without obtaining Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion or (ii) designate any person or entity as the transferee under the Deed or any other conveyance document.  Notwithstanding the foregoing, Purchaser may assign its rights and delegate its obligations hereunder to any Affiliate (as hereinafter defined) of Purchaser which is under the control of Purchaser subject to the terms contained herein. In connection with any assignment permitted or consented to hereunder, such assignee shall assume in writing all of the assignor's obligations under this Agreement in form and substance satisfactory to Seller, provided that Purchaser originally named herein shall not be relieved from its obligations under this Agreement.  Such assignment and assumption agreement shall be delivered to Seller no later than ten (10) days prior to the Closing Date.  Any other purported or attempted assignment or delegation without obtaining Seller's prior written consent or not otherwise permitted hereunder shall be void and of no effect.  Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section.  For purposes of this Section, the capitalized term "<u>Affiliate</u>" means any entity in which Purchaser and its principals own more than fifty-one (51%) percent of the voting interests, and (b) "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the entity in question, through the ownership of voting interests or otherwise.  No consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder.  Purchaser shall not resell the Property or any part thereof through a "double escrow" or other similar procedure without Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion.

25.    <u>Confidentiality</u>.    Purchaser covenants and agrees that it shall not communicate the terms or any aspect of this transaction to any person or entity prior to the Closing except for Purchaser's advisors, attorneys, accountants and lenders (the "<u>Purchaser Parties</u>"); provided, however, that the Purchaser Parties shall also agree to keep all such information confidential in accordance with the terms hereof.  Without limiting the generality of the foregoing, Purchaser covenants and agrees that it shall hold, in the strictest confidence, the content of any and all information in respect of the Property which is supplied by Seller to Purchaser.  Further, Purchaser agrees not to communicate or have any dealings with any of the tenants at the Property regarding this transaction or otherwise.  The foregoing confidentiality obligations shall not apply to any information which is or becomes generally available to the public, other than the result of a disclosure by Purchaser or any of its representatives, or is required to be disclosed by law or by regulatory or judicial process.

26.    <u>Tax Proceedings</u>.    Seller is hereby authorized to continue, from and after the date hereof until the Closing, any proceeding or proceedings now pending for the reduction of the assessed valuation of the Property, and in Seller's sole discretion, to litigate or settle same;

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

provided, however, that Purchaser shall only be entitled to that portion of any refund relating to the period occurring after the Closing after payment to Seller of all costs and expenses, including, without limitation, attorney's fees and disbursements, incurred by Seller in obtaining such refund.  Purchaser shall deliver to Seller, upon demand, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Seller.  The provisions of this Section 26 shall survive the Closing.

27.   <u>Successors and Assigns</u>.   This Agreement shall bind and inure for the benefit of the Seller, Purchaser and the respective permitted successors and permitted assigns.

28.   <u>Subject to Bankruptcy Court Approval</u>.   The Seller has filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the Southern District of New York, Case No. 14-22791 through 14-22793.  This Agreement is subject to and contingent upon the Bankruptcy Court confirmation pursuant to 11 U.S.C § 1129 of a Plan of Reorganization of Seller, which plan shall including a provision approving of and incorporating the sale of the Property pursuant to this Agreement.  The Plan shall include a provision that this sale is a transfer pursuant to and in contemplation of the Seller's Chapter 11 Plan of Reorganization and, accordingly, subject to confirmation of the Plan of Reorganization shall not be taxed and/or shall not be subject to any tax under any federal, state, local, municipal or other law imposing a transfer or stamp tax, mortgage tax, or any other law imposing or claiming to impose a transfer or stamp tax, mortgage tax, or any other similar tax in connection with this sale pursuant to §1146(a) of the Bankruptcy Code.  This Agreement is also subject the incorporation of the Sale Order under the Seller's Plan of Reorganization.  "Sale Order" means an order of the Bankruptcy court pursuant to sections 105, 363(b) and 363(f) and 365 of the Bankruptcy Code which order authorizes and approves, <u>inter alia</u>, the sale of the Property to the Purchaser on the terms and conditions set forth herein, free and clear of all liens claims and encumbrances pursuant to 11 U.S.C. §363(f), except as otherwise set forth herein, and containing a finding that Purchaser has acted in "good faith" within the meaning of section 363 (m) of the Bankruptcy Code.  The Sale Order and the Confirmation Order, including the exhibits thereto, and as the same may be amended, modified supplemented from time to time, shall be in the form and substance acceptable to Purchaser.   If said Bankruptcy Court approval of a Plan of Reorganization and issuance of the Sale Order is not obtained, then this Agreement shall be terminated, shall be of no further force or effect, the deposit on paid hereunder shall be returned to Purchaser, and neither party shall have any further obligation or liability to the other.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER:

**AC I Manahawkin LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:


PURCHASER:

_____,
a _____

By: _____
    Name:
    Title:

<u>LIST OF SCHEDULES</u>

Schedule A - Legal Description

Schedule B - Surveys

Schedule C - Rent Roll

Schedule D - Contracts

Schedule E - Permitted Exceptions

Schedule F - Form of Deed

Schedule G - Form of Assignment and Assumption of Leases

Schedule H - Form of Assignment of Contracts

Schedule I - Form of Bill of Sale

## SCHEDULE A

## Legal Description

## <u>SCHEDULE B</u>

<u>Surveys</u>

SCHEDULE C

Rent Roll

## SCHEDULE D

## Contracts

<u>SCHEDULE E</u>

<u>Additional Permitted Exceptions</u>

<u>SCHEDULE F</u>

<u>Form of Deed</u>

<u>SCHEDULE G</u>

<u>Form of Assignment and Assumption of Leases</u>

THIS ASSIGNMENT (this "Assignment") made as of _____ ___, 2015 from **AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("<u>Assignor</u>") to _____, having an address at _____ ("<u>Assignee</u>").

W I T N E S S E T H:

WHEREAS, Assignor, as seller, and Assignee, as purchaser, having entered into an Agreement of Purchase and Sale dated January ___, 2015 (the "Contract"), providing for the sale of the Property (as such capitalized term is defined in the Contract) described on <u>Schedule A</u> attached hereto;

WHEREAS, pursuant to this Assignment, Assignor desires to assign all of Assignor's right, title and interest in and to all of the Leases (as such capitalized term is defined in the Contract), all as set forth on <u>Schedule B</u> hereto and made a part hereof; and

WHEREAS, all capitalized terms used herein shall, unless otherwise provided, have the meanings ascribed to them in the Contract;

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to all of the Leases.

2.  This Assignment is made without representations or warranties, expressed or implied, and is without recourse against Assignor in any event whatsoever.

3.  Assignee hereby accepts this Assignment, and assumes and agrees to be bound by the terms, covenants and conditions of the Leases from and after the date hereof.  Without limiting the generality of the preceding sentence, Assignee acknowledges the receipt of all security deposits in the aggregate amount of $_____ set forth on <u>Schedule B</u> hereto and made a part hereof (the "Deposits").

4.  Assignee hereby indemnifies and holds Assignor harmless from and against any and all claims, liabilities, costs and reasonable expenses (including, but not limited to, reasonable attorneys' fees and disbursements) arising out of or pertaining to the period from and after the date hereof with respect to the Leases and the Deposits.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center

31

5.   This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.


IN WITNESS WHEREOF, this Assignment has been entered into on the date first above written.

ASSIGNOR:

**AC I Manahawkin LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:


ASSIGNEE:


By: _____
    Name:
    Title:

SCHEDULE H


Form of Assignment of Contracts

THIS ASSIGNMENT (this "Assignment") made as of _____ ___, 2015 from **AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("Assignor") to _____, having an address at _____ ("Assignee").


W I T N E S S E T H :

WHEREAS, Assignor, as seller, and Assignee, as purchaser, having entered into an Agreement of Purchase and Sale dated January ___, 2015 (the "Agreement"), providing for the sale of the Property (as such capitalized term is defined in the Agreement) described on Schedule A attached hereto;

WHEREAS, pursuant to this Assignment, Assignor desires to assign all of Assignor's right, title and interest in and to all of the Contracts (as such capitalized term is defined in the Agreement), all as set forth on Schedule B hereto and made a part hereof; and

WHEREAS, all capitalized terms used herein shall, unless otherwise provided, have the meanings ascribed to them in the Agreement;

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to all of the Contracts.

2. This Assignment is made without representations or warranties, expressed or implied, and is without recourse against Assignor in any event whatsoever.

3. Assignee hereby accepts this Assignment, and assumes and agrees to be bound by the terms, covenants and conditions of the Contracts from and after the date hereof.

4. Assignee hereby indemnifies and holds Assignor harmless from and against any and all claims, liabilities, costs and reasonable expenses (including, but not limited to, reasonable attorneys' fees and disbursements) arising out of or pertaining to the period from and after the date hereof with respect to the Contracts.

{00709542.DOC;2 }
Manahawkin Commons Shopping Center
33

5.   This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, this Assignment has been entered into on the date first above written.

ASSIGNOR:

**AC I Manahawkin LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:

ASSIGNEE:

By: _____
    Name:
    Title:

## SCHEDULE I

### Form of Bill of Sale

**AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("Grantor"), for good and valuable consideration, the receipt and the sufficiency of which is hereby acknowledged, by these presents, does, without representation by, or warranty or recourse against, Grantor, convey, assign, transfer, sell, deliver and set over unto _____, having an address at _____ ("Grantee"), its successors and assigns, all of Grantor's right, title and interest in and to the personal property transferred pursuant to that certain Agreement of Purchase and Sale between Grantor and Grantee dated January ___, 2015 ("Contract"), used by Grantor in connection with the operation of the buildings located in the County of Ocean, Township of Stafford and State of New Jersey, as more particularly bounded and described in Schedule A attached hereto and made a part hereof.

IN WITNESS WHEREOF, Grantor has caused this Bill of Sale to be signed as of this _____ day of _____, 2015.

GRANTOR:

**AC I Manahawkin LLC**,
a Delaware limited liability company

By: _____
      Name:
      Title:

GRANTEE:

By: _____
      Name:
      Title: