**ROBINSON BROG LEINWAND GREENE**
**GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In re:                                                    Chapter 11

**AC I INV MANAHAWKIN LLC,**                    Case No.:  14-22791 through
**AC I MANAHAWKIN MEZZ LLC, and**                       14-22793 (RDD)
**AC I MANAHAWKIN LLC,**                        (Jointly Administered)

                                Debtors.
---------------------------------------------------------X

**APPLICATION FOR ORDER (I) PURSUANT TO §§105 AND 363 OF THE
BANKRUPTCY CODE AND RULES 2002 AND 6004 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AUTHORIZING THE DEBTOR TO ENTER INTO AN
AGREEMENT OF PURCHASE AND SALE AND AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO HAMPSHIRE GLOBAL
PARTNERS LLC, FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS; (II) APPROVING THE ASSET
PURCHASE AGREEMENT IN CONNECTION THEREWITH; (III) PURSUANT TO
§§105 AND 365(A) OF THE BANKRUPTCY CODE AND RULES 6006 AND 9014 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY
CONTRACTS AND LEASES OF NON-RESIDENTIAL REAL PROPERTY; AND (IV)
GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        The debtor and debtor in possession, **AC I Manahawkin LLC** ("LLC" or "Debtor"), by

its attorneys, seeks the entry of an order (the "Order"), (i) pursuant to §§105 and 363 of the

Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure

("FRBP"), Rule 6004 of the Local Rules for the Bankruptcy Court for the Southern District of New York and the Guidelines for the Conduct of Asset Sales adopted by this district, as modified in June 2013, authorizing the Debtor, by its manager to enter into an Agreement of Purchase and Sale ("APA") and authorizing the sale of substantially all of the Debtor's assets to Hampshire Global Partners, LLC, or its permitted assignee ("Hampshire" or "Purchaser") free and clear of any and all claims, liens, encumbrances and other interests; (ii) approving the APA, a copy of which is attached hereto as <u>Exhibit A</u>, in connection therewith; (iii) pursuant to §§105 and 365 of the Bankruptcy Code and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure authorizing the assumption and assignment to Purchaser of certain of the Debtor's executory contracts and unexpired leases of non-residential real property; and (iv) granting related relief (the "Motion"). In support thereof, the Debtor respectfully represents:

<u>**JURISDICTION AND VENUE**</u>

1.      Jurisdiction over this application is vested in the United States District Court for this District pursuant to 28 U.S.C. §1334.

2.      This motion has been referred to this Court for consideration pursuant to Section 157 of the Judicial Code and the *Standing Order of Reference Regarding Title 11* (S.D.N.Y. Feb 1, 2012) (Preska, C.J.).

3.      This is a core proceeding arising under title 11 of the United States Code. <u>See</u> 28 U.S.C. §157(b)(1). The statutory predicates for the relief sought are Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002 and 6004 of the FRBP.

4.      Venue of this civil proceeding in this district is proper pursuant to 28 U.S.C §1409.

## BACKGROUND

5.　　The Debtor's case is being jointly administered with the chapter 11 cases of its affiliates, AC I Inv Manahawkin LLC ("Inv") and AC I Manahawkin Mezz LLC ("Mezz"). Inv owns a 100% interest in Mezz which in turn owns a 100% interest in LLC.

6.　　LLC owns and operates the shopping mall known as Manahawkin Commons, which sits on a 48 acre site located in Manahawkin, New Jersey (the "Property"). The Property was originally built in 1993 and is currently 94% leased to a mix of 29 tenants, including anchor leases with national chain tenants Kmart, Staples and Regal Cinemas. The Property also has TJ Maxx, Michaels and Pier One stores.

7.　　The senior lien on the Property (the "Senior Lien" and together with any and all other mortgage, judgment, other consensual and statutory liens on the Property herein called the "Liens") is held by Deutsche Bank Trust Company Americas, as Trustee for the Registered Holders of the Wells Fargo Commercial Mortgage Securities, Inc. Commercial Mortgage Pass-Through Certificates, Series 2011-C3, by Rialto Capital Advisors, LLC, the special servicer (collectively hereinafter referred to as "Rialto"). The Debtor has finalized a stipulation with Rialto, which stipulation is subject to bankruptcy court approval, and fixes the amount to be paid to the Lender on account its secured claim, at approximately $33,450,000, subject to adjustment as set forth in the stipulation. The Debtor submits that the Rialto claim, after application of amounts held in reserve by Rialto as the servicer of the loan, along with all other allowed claims against the Debtor's estate, will be satisfied in full by the proceeds from the sale of the Property.

8.　　The balance of claims against the Debtor's estate consist of the claim filed by Acadia Realty Limited Partnership ("Acadia") which was filed as a secured claim in an

unliquidated amount "but believed to exceed $4,600,000"[1]; claims filed by various New York

and New Jersey taxing authorities in the approximate amount of $277,028.36; and general

unsecured claims consisting of (i) filed and scheduled unsecured claims, including insider

claims, in the approximate amount of $669,709.67[2], and (ii) any rejection damages or other

claims of non-debtor parties to executory contracts, unexpired leases and other agreements and

contracts that are not being assumed and assigned to the Purchaser (collectively, together with

any secured, priority and other claims against the Debtor and its estate herein called the

"Liabilities").

9.      The sale as contemplated herein seeks authority to sell the Property including

without limitation, the real property and improvements thereon, personal property, interests in

leases and certain other assets as set forth in Section 1.1 of the APA (hereinafter the "Subject

Assets" or the "Purchased Assets"), free and clear of the Liens and Liabilities and all other

claims, interests and encumbrances, including, but not limited to the Parking Rights Agreement

(as defined herein), with Liens to attach to the proceeds.  The purchase price for the Subject

Assets is $43,500,000.  Debtor submits that the purchase price is sufficient to satisfy all claims

filed against the Debtor's estate in full[3].

10.     On June 4, 2014, (the "Petition Date") INV, MEZZ and LLC each filed

emergency voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On June 30,

---

[1] Debtor disputes the purported secured status of the Acadia claim and the amount asserted in the Acadia claim and
reserves all rights to object to the Acadia claim as well as any other claims scheduled or filed against its estate.
Nothing contained herein shall be deemed Debtor's acknowledgement of any schedule or filed claim as a valid claim
against the estate.  The amounts set forth in paragraph 8 do not take into account the scheduled or filed claims of the
Debtor's affiliates, INV or MEZZ.
[2] Claim amounts do not include and Debtor does not contemplate payment to be made on account of the claims filed
by Tibor Klein and Gershon Klein which claims were filed against each of the Debtors.
[3] Not including the schedule and/or filed claims of Debtor's affiliates, MEZZ and INV.

2014, this Court signed an order directing the joint administration of these 3 cases (ECF doc. no. 23).

11.     On July 9, 2014, INV, MEZZ and LLC each filed their schedules and statement of financial affairs.  No committee, trustee or examiner has been appointed in these cases.

12.     On September 19, 2014, this Court entered a Stipulated Final Order authorizing the Debtor's use of Lender's cash collateral (the "Cash Collateral Order") (ECF doc. no. 60) which approved the Debtor's use of cash collateral, but conditioned it upon certain "Sale Milestones" including the retention of a broker to market and sell the Property and the filing of a plan or sale motion and bidding procedures in connection therewith.   Debtor retained the real estate brokerage firm of Holliday Fenoglio Fowler, L.P. ("HFF") by Court Order entered on November 13, 2014 (ECF doc. no. 81).

13.     On September 9, 2014, a Stipulation and Order Ratifying Actions and Authorizing Appointment of Chief Restructuring Order was filed (ECF doc. no. 52), which stipulation, amongst other things, required the retention of  a broker and marketing of the Property and adjourned, *sine die*, the motions to dismiss the bankruptcy cases which had been filed by Tibor and Gershon Klein.

14.     The Order Resolving Motion to Retain GC Realty Advisors LLC as Chief Restructuring Officer for the Debtors as Moot and Providing for related relief was entered on October 7, 2014, permitting GC Realty Advisors LLC to continue to act as manager of the Debtors.

15.     By order entered on January 13, 2015 (ECF doc. no. 97), this Court approved bidding procedures in connection with the sale of the Property and HFF commenced its

marketing of the Property as is more fully set forth in the declaration of Jose Cruz (the "Cruz

Declaration") which is attached hereto and incorporated herein by reference. After a substantial

marketing period, the Debtor received two (2) qualified bids for the Property and a third offer

from Hampshire. The highest offer was submitted by Hampshire who presented a bid of

$43,000,000 as the stalking horse bidder. The second highest offer was submitted in the amount

of $42,000,000 as the stalking horse bidder or $40,000,000 as an ordinary bidder and the third

bid was in the amount of $37,500,000[4]. After reviewing each of the bids, Debtor in consultation

with HFF and other parties went back to each bidder to determine which, if any of the qualified

bidders, would be prepared to proceed with a private sale of the Property for a purchase price of

$44,000,000. The reason for proceeding in this manner was that based upon the Hampshire

stalking horse bid, the next bid increment would require a bid of no less than $44,200,000. None

of the qualified bidders was prepared to increase its bid to this sum. However, Hampshire was

prepared to and increased its bid to $43,500,000 in order to proceed by a private sale scenario.

The other bidders withdrew their bids and their deposits were returned. In furtherance of the

increased Hampshire bid, the Debtor and Hampshire negotiated a form of order approving

Hampshire as the highest bidder and providing Hampshire with certain bid protections, including

a break up fee and expense reimbursement (the "Break Up Fee Order"). The Break Up Fee

Order was originally served by notice of settlement and filed on February 23, 2015 (ECF doc.

no. 108) with a settlement date of February 27, 2015. The Break Up Fee Order was thereafter

modified and re-served by a new notice of settlement which was filed on March 13, 2015 (ECF

---

[4] The upset price pursuant to the bidding procedures was $44,000,000. Although Hampshire was prepared to qualify
and put up the required deposit under the bid procedures as a stalking horse bidder, the Debtor determined it was in
the best interest of its estate to proceed by private sale in order to procure more money for the Property.

doc. no. 114) with a settlement date of March 19, 2015.  Simultaneous with the negotiation of the

Break Up Fee Order[5], and thereafter for a period of several weeks, Debtor and Hampshire

negotiated the terms of the APA.  The final APA represents those efforts and the transaction for

which the Debtor now seeks approval by this Motion.

### RELIEF REQUESTED

16.    By this Motion, the Debtor seeks entry of an Order, pursuant to sections 105(a),

363 and 365 of the Bankruptcy Code, authorizing the Debtor to enter into the APA and

approving the sale of the Property to Hampshire, free and clear of any and all Liens, claims and

encumbrances and other interests of and the Liabilities owed to third parties, with Liens to attach

to the proceeds of the sale.  In connection with the sale, the Debtor also seeks authority to

assume and assign its interest in certain non-residential real property leases for the stores that

operate from the shopping center at the Property.  Debtor is seeking approval of this Motion as

soon as possible so that it will be able to meet the closing deadlines established in Section 4 of

the APA and thereafter be in a position to meet the June 15, 2015 payment deadline to Rialto, for

the benefit of lender, in connection with the stipulation and order to be filed resolving Rialto's

motion to determine the value of its secured claim (ECF doc. no. 98).  The resolution of the

Rialto motion and tendering payment in accordance with the June 15, 2015 payment deadline set

forth in the stipulation will provide a substantial savings to the Debtor's estate.   In order to meet

these various deadlines, the Debtor also seeks relief from the fourteen day waiting period under

FRBP 6004(h).

17.    The Debtor submits that the proceeds of sale in the amount of $43,500,000 will be

---

[5] Entry of the Break Up Fee Order as a final and non-appealable order is a pre-condition to Hampshire's obligation
to proceed with the sale.

sufficient to satisfy all creditors in full and such sale proceeds will be utilized to fund its
proposed plan of liquidation.

### **Marketing Process**

18.     Prior to the Petition Date, the Debtor had been exploring the potential sale of the
Property and had engaged in discussions with various brokers and parties with regard to the sale
of the Property.  HFF had been retained at one point prior to the filing of these cases and had
been marketing the Property for at least three months.  As part of that process, the Debtor
received some initial indications of interest regarding the Property.  Upon the Debtor's Chapter
11 filing, an understanding was reached with Rialto, for the benefit of the senior lender that the
Debtor would continue to market the Property for sale with the sale proceeds utilized to fund a
plan and pay the Rialto claim.

19.     As more fully set forth in the Cruz Declaration, the Debtor, with the assistance of
HFF, entered into confidentiality agreements with over 100 potential purchasers and granted
them access to a virtual war room with information to enable such parties to perform due
diligence on the Property.  Eventually, the pool of interested and qualified bidders was reduced
to five (5) and Debtor received three (3) serious bids. As none of the bidders was prepared to
increase its offer to the next bid increment as required in the bidding procedures, the Debtor
determined that a private sale would be the most appropriate manner in which to proceed.  After
communicating with each bidder and providing each with an opportunity to provide a highest
and best offer in a private sale scenario, Hampshire increased its bid to $43,500,000 in
connection with a private sale of the Property to Hampshire.  The remaining bidders withdrew
their bids and each of their deposits was returned.

20.     Hampshire and Debtor extensively negotiated the terms of the APA and are

prepared to present the APA for the Court's approval.  Debtor requests this Court enter an order:

(a) authorizing Debtor by David Goldwasser, Managing Member of GC Realty Advisors, LLC,

the Manager of the Debtor, to enter into the APA; (b) approving (i) the APA, and (ii) the

proposed assumption and assignment of any assumed contracts and unexpired leases; and (c)

authorizing the Debtor to consummate the proposed transaction.  The terms of the Break Up Fee

Order shall remain in full force and effect as set forth in Section 28 of the APA.

## THE ASSET PURCHASE AGREEMENT

21.     The APA provides for the sale of substantially all of the Debtor's assets.  The sale

is contingent upon, among other things, bankruptcy court approval in the Debtor's bankruptcy

case and the Debtor's authorization and ability to assume and assign certain of its unexpired

leases to Purchaser.

22.     As set forth in Section 5.2 of the APA, the Property is being sold to Purchaser

"**As Is, Where Is and With All Faults**" and without representations or warranties of any kind,

nature, or description by the Debtor, its agents, or estate, except to the extent set forth in the APA

as accepted by the Debtor and approved by the Court.  Except as otherwise provided in the APA,

all of the Debtor's right, title and interest in the Purchased Assets will be transferred free and

clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests

in accordance with sections 363 and/or 1129 of the Bankruptcy Code with any such claim, lien

or encumbrance attaching to the net proceeds of the sale[6].

---

[6]Debtor is proceeding by this 363 sale motion prior to filing its liquidating plan.  To the extent the Debtor files its
plan and the plan is confirmed prior to any closing of the sale, Debtor reserves its rights to proceed with the sale
pursuant to a plan and to seek to exempt any transfer tax in accordance with Section 1146 of the Bankruptcy Code.
The APA specifically sets forth at Section 30 that it is not a condition to closing that a plan be confirmed or the sale

23.    The following is a brief summary of certain key provisions of the APA.  The

Court and interested parties are respectfully referred to the APA for a full recitation of the terms

and conditions of the transaction[7].

**Assets** – The "Purchased Assets" (as defined in the APA[8]) consist of substantially all of

the Debtor's assets, specifically, (i) those certain lots, pieces or parcels of land, commonly

known as the Manahawkin Commons Shopping Center, located in the County of Ocean,

Township of Stafford, State of New Jersey, as more particularly described in Schedule Attached

to the APA, (ii) the buildings and all other improvements erected on such land, (iii) any rights

(including development rights), appendages, appurtenances, and easements adjoining or

appurtenant to the such land and improvements, (iv) all fixtures, machinery, tangible personal

property and equipment (excluding furniture, furnishings, equipment and other personal property

of tenants) used in connection with the Property, (v) the Debtor's interest, as landlord, in all

leases for portions of the Property, including all security deposits, guarantees or other security

relating to the such leases, (vi) if and to the extent assignable, Debtor's interest in any intangible

personal property relating to the Property, including all intellectual property, licenses, permits,

plans, specifications, operating manuals, guarantees and warranties and any reports relating to

the Property.  The foregoing assets shall sometimes herein also be referred to as the "Subject

Assets"[9].

**Purchase Price** – The total cash consideration being paid by Purchaser for the Subject

---

be found to be exempt from transfer fees.  As more fully set forth in this sale motion, and the APA, Debtor submits
that the transfer of the Property is exempt from transfer tax pursuant to N.J.S.A. 46:15-10(g) and Section 1146 of the
Bankruptcy Code.
[7] To the extent of any inconsistency, the terms of the APA shall control over the terms of this Motion.
[8] Capitalized terms not otherwise defined herein shall have the meaning as set forth in the APA.
[9]Debtor is retaining all avoidance actions, accounts receivable due and owing prior to the closing and the Radio
Shack lease rejection damage claim.

Assets is $43,500,000.

**Holdback Escrow**– Pursuant to Section 6.14 of the APA, the sum of $500,000 shall be escrowed from the Purchase Price to secure Debtor's obligation to reimburse Purchaser for (i) amounts owed to Purchaser pursuant to the Final Apportionment Report and (ii) any losses incurred by Purchaser with eighteen (18) months following the closing due to discrepancies, claims or offsets related to billings and/or payments of any additional rent (including operating expenses and/or real estate tax payments) paid or payable under any of the leases during any period prior to the closing.  The Holdback Escrow shall also secure Debtor's obligation to indemnify, defend and hold Purchaser harmless from and against any loss, cost, claim or expense (including reasonable attorney's fees) arising out of the failure of any of Debtor's representations or warranties contained in Section 7 of the APA to be true and accurate in all material respects when made, which indemnity obligation shall survive closing for a period of six (6) months.

**Roof Membrane Credit**-Pursuant to Section 9.2.7 of the APA, at the closing, Purchaser shall receive a credit as against the Purchase Price in the amount of $150,000 to cover certain defects in the roof membrane at the Property revealed in Purchaser's preliminary Roof Survey report dated March 2, 2015.

**Roof Structural Repair Credit** – Pursuant to Section 9.2.7 of the APA, Purchaser shall obtain a structural inspection of the building roofs, which inspection shall be completed no later than April 2, 2015.  If such structural roof inspection reveals any structural defects for which repair is recommended within twenty-four (24) months, and if the cost estimate to repair such roof defects is equal to or less than $250,000, Purchaser shall receive a credit against the Purchase Price in the amount of the cost estimated to complete the repairs up to a maximum

amount of $150,000, with Purchaser obligated to pay the cost in excess of $150,000 up to

$250,000.  If the cost estimate to repair the roof defects is in excess of $250,000, then Purchaser

shall not be obligated to close unless Debtor agrees to pay the costs in excess of $250,000 (with

Purchaser remaining obligated to pay $100,000 of the repair costs).

**Repair Obligations** – If any governmental authority requires that zoning certificates,

certificates of occupancy, certificates of continued occupancy, smoke detector certifications or

other inspection or occupancy certificates ("CCO") be obtained in connection with the

conveyance of the Property to Purchaser, Debtor shall, at its cost, obtain such documents and

make any repairs, replacements, alterations and changes to the Property required in connection

therewith prior to the closing of title; provided, however, that Debtor shall not be obligated to

spend in excess of $250,000.00 to make and repairs or cure any violations of the Property in

order to obtain any such CCO.  If the cost to obtain the CCO exceeds $250,000 and Debtor is

unwilling to pay the excess, then Purchaser shall have the right to either (i) terminate the APA

and receive a refund of the deposit, or (ii) agree to be responsible for and pay the excess cost

$250,000, or (iii) proceed to closing and waive the requirement to deliver the CCO.

**Common Area Agreements  -**  There are two (2) reciprocal easement agreements (the

"REA's") that affect the Property, as follows:  (1) that certain Shopping Center Reciprocal

Easement and Operation Agreement dated August 3, 1992, among Manahawkin Route 72, L.P.,

Manahawkin Sand & Gravel Co., Inc. and Kmart Corporation recorded in Deed Book 5042, Page

217; Supplemental Agreement dated December 14, 1993, between Mark Manahawkin, L.P. and

Mark Centers Limited Partnership recorded in Deed Book 5122, Page 905; First Amendment to

Shopping Center Reciprocal Easement and Operation Agreement dated October 7, 2002, among

Acadia Realty Limited Partnership, Mark Manahawkin, L.P., OrixWoodmont Manahawkin

Venture and Kmart Corporation recorded  in Official Record Book 11031, Page 43, rerecorded in

Official Record Book 11148, Page 1102 (collectively, the "K-Mart REA"), and (2) that certain

Common Areas Maintenance and Reciprocal Easement Agreement dated February 19, 2004,

between South Jersey Land Development, LLC and OrixWoodmont Manahawkin Venture

recorded in Official Record Book 11959, at Page 1209 ("Friday's REA").  The Debtor has

represented that to Seller's knowledge, no breach, default or violation exist as to the terms of

either the K-Mart REA or Friday's REA.  In addition, the title search of the Property reflects a

reservation of parking rights by South Jersey Land Development, LLC in that certain Deed,

dated October 15, 1986, and recorded on October 20, 1986 in Deed Book 4471, Page 611 (the

"Parking Rights Agreement"), due to the merger of the subject properties and the new agreement

with regard to same encompassed in the Friday's REA referenced above.  Under the terms of the

APA, Purchaser shall have no liability under the REA's for the period prior to the Closing Date.

The Motion seeks authority to sell the Subject Assets free and clear of the Liens and Liabilities

and all other claims, interests and encumbrances, including, but not limited to the Parking Rights

Agreement with Liens to attach to the proceeds.

    **Conditions to Closing** – The following are conditions to closing the transaction under

the APA: (i) Debtor shall provide Purchaser with the missing items of due diligence information

listed on Schedule M attached to the APA; (iii) Debtor shall deliver to Purchaser estoppel

certificates from the eleven (11) tenants designated on Schedule L to the APA and such of the

other tenants to cover fifty percent (50%) of the remaining rentable square footage of the

Property; (iii) all of Debtor's representations and warranties set forth in the APA shall remain

true and correct in all material respects as of the closing date.

**Conditions of Sale** – The sale is conditioned upon (i) authorization to enter into and approval of the APA by the Bankruptcy Court in the Debtor's bankruptcy case, (ii) authorization to assume and assign the Debtor's various unexpired leases of non-residential real property to Purchaser, and (iii) the Assets being conveyed to Purchaser free and clear of any and all claims, liens, interests and encumbrances.

**Closing** – The closing shall occur on the first business day following the later of (i) May 15, 2015, and (ii) thirty (30) days after the Bankruptcy Court's entry of the Order approving the sale under the APA, subject to Debtor's adjournment rights provided in the APA, provided that closing shall not be adjourned beyond July 15, 2015, and further provided that either Debtor or Purchaser may set a TIME OF THE ESSENCE closing date upon delivery of not less than ten (10) day's written notice to the other party after the later of (i) May 15, 2015, and (ii) thirty (30) days after the Bankruptcy Court's entry of the Order approving the sale.

## Basis for Relief

## DEBTOR'S SALE PURSUANT TO BANKRUPTCY CODE §363(b) AND (f) IS APPROPRIATE

24.     Bankruptcy Code section 105(a) provides in pertinent part that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. Section §105(a). Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "the Debtor, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. §363(b)(1). Inasmuch as the Subject Assets constitute substantially all of the Debtor's property and its business, the proposed sale is out of the ordinary course of the Debtor's business. The Debtor believes that the relief

requested is in the best interests of its estate and creditors and all parties in interest.  The proposed sale transaction will generate cash proceeds sufficient to satisfy all of the Debtor's creditors in full, including its most significant creditor, Rialto, whose claim is being fixed in the amount of $33,450,000.  The agreement to fix Rialto's claim is conditioned upon the Debtor continuing to make timely adequate protection payments in accordance with the Cash Collateral Order and satisfying Rialto's claim on or before June 15, 2015.  Compliance with each of these components will result in a savings of approximately $1,765,000 plus an additional savings of $575,000 of default interest due Rialto in accordance with the Rialto stipulation.

### The Debtor's Manager Should be Authorized to Execute the APA

25.      Pursuant to Bankruptcy Code section 105(a) and in furtherance of the Order Resolving Motion to Retain GC Realty Advisors LLC as Chief Restructuring Officer for the Debtors as Moot and Providing for related relief entered on October 7, 2014, GC Realty Advisors LLC should be authorized to execute the APA and any and all other documents required to effectuate the sale.

### The Sale Should Be Approved As An Exercise Of Sound Business Judgment

26.      It has long been held in this Circuit that a sale of assets is permitted pursuant to Section 363 of the Bankruptcy Code under appropriate circumstances.  *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).  The Debtor submits that the sale as proposed herein will maximize the value of the Subject Assets and the return to creditors and that the sale complies with the applicable provisions of the Bankruptcy Code, specifically, Sections 105(a) and 363(b).  Section 363 does not set forth an express standard for determining whether a sale of property under §363(b) should be approved; however, courts that have interpreted this section consistently apply

an "articulated business judgment" standard.  *See, Stephen Indus., Inc. v. McClung*, 789 F.2d

386, 390 (6th Cir. 1986); *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In

re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Walter*, 83 B.R. 14, 17 (Bankr. 9th Cir.

1988); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *In

re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Baldwin United

Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

27.    The Court of Appeals for the Second Circuit first enunciated this standard by

stating:

> The rule we adopt requires that a judge determining
> a §363(b) application expressly find from the
> evidence presented before him at the hearing *a good
> business reason* to grant such application.

*Lionel*, 722 F.2d at 1070-71 (emphasis added).

28.    Section 363(b) does not require that the Court substitute its business judgment for

that of the Debtor, *See, e.g., Ionosphere Clubs*, 100 B.R. at 676 (court will not substitute a hostile

witness's business judgment for a debtor's, unless testimony "established that the [debtor] had

failed to articulate a sound business justification for its chosen course").  Rather, the Court

should ascertain whether a debtor has articulated a valid business justification for the proposed

transaction.  This is consistent with "the broad authority to operate the business of the Debtor . . .

[which] indicates congressional intent to limit Court involvement in business decisions by a

Trustee . . . [so that] a Court may not interfere with a reasonable business decision made in good

faith by a Trustee".  *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

29.    Other courts have approved the sale of a debtor's assets under §363(b)(1) of the

Bankruptcy Code when (i) the sale is supported by the sound business judgment of the debtor's

management; (ii) interested parties are provided with adequate and reasonable notice; (iii) the

sale price is fair and reasonable; and (iv) the purchaser has acted in good faith.  *See, e.g., In re*

*Betty Owens Schools, Inc.*, WL 188127 at *4 (S.D.N.Y. 1997) (setting forth the foregoing four

elements in connection with the 363(b)(1) inquiry and citing *In re Delaware & Hudson Ry. Co.*,

124 B.R. 169  (D. Del. 1991);  *In re General Bearing Corp.*,  136 B.R. 361, 365-66 (Bankr.

S.D.N.Y. 1992) (suggesting that the salient factors under *Lionel* are the foregoing elements).

Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." *In re Ames Dept. Stores, Inc.*, 136 BR 357, 359 (Bankr. S.D.N.Y. 1992);

*In re Integrated Resources, Inc.*, 147 B.R. at 656-57 (S.D.N.Y. 1992) (a debtor's business

judgment is entitled to substantial deference with respect to the procedures to be used in selling

assets from the estate).  The Debtor has determined that the maximization of the return to

creditors can best be accomplished through the proposed asset sale upon the terms contained in

the APA and that the transaction is in the best interests of its estate and creditors and should be

approved by the Court.

30.      In determining whether a "sound business purpose" exists with respect to a sale of

assets prior to confirmation of a plan, Courts have looked at such factors as:

> the proportionate value of the asset to the estate as a
> whole, the amount of elapsed time since the filing,
> the likelihood that a plan of reorganization will be
> proposed and confirmed in the near future, the
> effect of the proposed disposition on future plans of
> reorganization, the proceeds to be obtained from the
> disposition vis-à-vis any appraisals of the property,
> which of the alternatives of use, sale or lease the
> proposal envisions, and most importantly perhaps,

> whether the asset is increasing or decreasing in
> value.

> *Lionel*, 722 F.2d at 1071.

31.      In the Debtor's business judgment, the relief sought will maximize the Debtor's

recovery on its assets and is therefore in the best interests of its estate and creditors.  Specifically,

the soundness of the Debtor's decision is supported by the following circumstances:  An

immediate sale of the Subject Assets to Hampshire will allow for recovery of sufficient funds to

satisfy all claims in full, including the agreed upon claim of Rialto, the payment of which will

cut off the continued accrual of interest at the default rate.  Moreover, the sale to Hampshire will

result in net sale proceeds being available, after payment to all classes of creditors on account of

their allowed claims, in full, to flow to Debtor's equity holder.  These net proceeds will be paid

to the Debtor's 100% owner, MEZZ, and will be utilized to fund a plan of liquidation, thereby

resulting in a distribution being made available to additional creditors in the MEZZ bankruptcy

case.  This Debtor's plan of liquidation will set forth the procedures for the distribution of the

sale proceeds to allowed claims of secured, priority, administration and unsecured creditors in

accordance with the priorities established by the Bankruptcy Code and thereafter for all net

proceeds to be designated to MEZZ for distribution under its plan, which plan is in prospect.

**The Sale Price is Fair and Reasonable**

32.      The sale to Purchaser represents the highest and best price for the Subject Assets

secured by the Debtor to date.  Consequently, in the Debtor's view, the APA represents

substantial value to the Debtor's estate and provides favorable terms for disposition of the

Subject Assets in exchange for fair and reasonable consideration. *See, Mellon Bank N.A. v.*

*Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1992); *See, also, Mellon Bank N.A. v.*

*Official Comm. Of Unsecured Creditors*, 92 F.3d 139 (3d) Cir. 1996).  Moreover, the Debtor's

arm's length negotiations with the Purchaser ensured that the ultimate purchase price secured for

the Subject Assets is fair and reasonable under the circumstances.

33.    The Debtor's universe of claims is as follows:  Secured obligations (including the

disputed claim filed by Acadia in an unliquidated amount "but believed to exceed $4,600,000"),

in the aggregate amount of $38,050,913.54 consisting of: (1) the lender's claim, which to the

extent the Debtor remains in compliance with the terms of the Cash Collateral Order and makes

payment to Rialto for the benefit of lender no later than June 15, 2015, shall be fixed in the

amount of $33,450,000 in accordance with the stipulation to be filed with this Court; (2) the

secured portion of the NYS claim filed in the amount of $913.54; and (3) the disputed secured

claim filed by Acadia in an amount not less than $4,600,000.  The Debtor's priority tax liabilities

in the aggregate amount of $277,028.36, which are based upon: (1) NYC filed claims in the

amount of $213,909.10, which Debtor submits should be substantially reduced as they are based

upon certain NYC specific provisions which are inapplicable to this Debtor who has never

operated in NYC; (2) State of New Jersey filed claims in the amount of $62,176.32 for purported

delinquent or deficient tax liabilities; and (3) a NYS filed claim in the amount of $29.40.  The

Debtor's unsecured debt, including insiders, totals approximately $669,709.67.  The proposed

sale transaction will result in sufficient dollars to satisfy all of these claims in full, including

designating the sum of $4,600,000 to Acadia, without waiving Debtor's right to object to the

Acadia or other claims filed against its estate, without taking into account any reduced claim

amount after prosecuting claims objections, without applying the reserves held by Rialto which

are to be applied as against its claim in accordance with the Stipulation, and with reducing the

purchase price for the Subject Assets by the $500,000 Holdback Escrow; $150,000 Roof

Membrane Credit; and $150,000 Roof Repair Credit.

## The Sale Terms Were Negotiated In Good Faith

34.     As set forth above, the APA is the product of good faith, arm's length

negotiations between the parties.  Consequently, the Debtor requests that this Court find that

these arm's length negotiations were in good faith and that the Purchaser is a "good faith

purchaser" under §363(m) of the Bankruptcy Code.  The APA is a product of extensive

negotiations, taking place over a period of several weeks and the final APA reflects compromises

by both buyer and seller in order to reach this agreed upon final form of APA.

## A Private Sale Is Appropriate Under The Circumstances

35.     Bankruptcy Rule 6004(f)(1) provides in relevant part that "All sales not in the

ordinary course of business may be private sale or by auction . . . ."

36.     While the Debtor initially sought authority for and proceeded by way of a public

auction and sale, the Debtor submits that under the present circumstances a private sale is

appropriate.

37.     Debtor received three (3) bids in connection with the bidding procedures.  Debtor

communicated with each offeror with regard to their bid and their willingness to increase their

bids, which, pursuant to the bidding procedures would require the next incremental bid to be no

less than $44,200,000.  As none of the bidders were prepared to increase their bids to this

amount, the Debtor determined that a private sale would be the most appropriate manner in

which to proceed and where the Debtor would be able to maximize the value of the Subject

Assets.  In connection with the proposal to seek approval of a private sale, Hampshire increased

its offer from $42,000,000 to $43,500,000 and the other qualified bidders withdrew their bids.

Hampshire's increased offer is the highest and best offer received for the Subject Assets and the

purchase price is sufficient to satisfy all claims against the Debtor's estate in full.

38.    The Debtor respectfully submits that it tested the fairness and value of the offer in

the original auction process and that Hampshire's private sale bid is highest and best.

## ASSET SALE FREE AND CLEAR OF ENCUMBRANCES

39.    The Debtor seeks approval to sell the Subject Assets free and clear of any and all

liens, claims or encumbrances in accordance with §363(f) of the Bankruptcy Code.  A debtor-in-

possession may sell property to §§363(b) and 363(f) "free and clear of any interest in such

property of an entity other than the estate" if one of the following conditions are satisfied:

a.    applicable non-bankruptcy law permits sale of such property free and clear of

such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater

than the aggregate value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest.

11 U.S.C. §363(f).

As the statute is drafted in the disjunctive, satisfaction of one of the five elements is sufficient to

approve the transaction free and clear of all liens, claims and encumbrances.

40.    The Debtor submits that the Purchase Price is well in excess of the Debtor's

secured obligations, including the disputed secured claim filed by Acadia.  Thus, §363(f) is

satisfied as the purchase price far exceeds the aggregate of all liens on the Subject Assets.  In

addition, as to the Parking Rights Agreement, it is the position of the Debtor and Purchaser that

Parking Rights Agreement and the rights of the non-debtor parties thereto have merged into the

Friday's REA and therefore no longer is a valid agreement.

41.    Consequently, the Debtor proposes that any liens, claims or encumbrances

asserted against the Subject Assets sold pursuant to the APA be transferred to and attach to the

proceeds of the sale, subject to the rights, claims, defenses, and objections, if any, of all

interested parties with respect thereto.

42.    FRBP 6004(h) provides that an "order authorizing the use, sale or lease of

property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the

court order otherwise."  The Debtor requests that the sale order be effective immediately by

providing that the fourteen day period is waived.

43.    The purpose of Rule 6004(h) is to provide sufficient time for an appeal to be filed

before an order can be implemented. See Advisory Committee Notes to FRBP 6004(h) and

6006(d).  In this circumstance, Debtor submits that it is appropriate for the stay period to be

eliminated as all interested parties were noticed with the initial bidding procedures motion and

other than certain limited objections to the bidding procedures, which objections were resolved

prior to entry of the bidding procedures order, no party raised any objection to the sale process.

Moreover, the Cash Collateral Order contained certain milestones that required the Property be

sold.  The Debtor therefore submits that notice made by the service of the bidding procedures

motion is adequate for entry of the order approving this Motion and waiving the fourteen day

waiting period set forth in FRBP 6004(h).

## ASSUMPTION AND ASSIGNMENT OF
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

44.    In connection with the Debtor's request for approval of the APA, the Debtor seeks

authority to assume and assign to the Purchaser certain of its unexpired leases of non-residential

real property (the "Assigned Contracts"), including, without limitation, the leases set forth on

Schedule D to the APA.  Pursuant to §365(a) of the Bankruptcy Code, a debtor may assume or

reject any executory contract, subject to the approval of the Bankruptcy Court.  11 U.S.C.

§365(a).  Once a contract is assumed, the debtor may assign such contract to a third party.  11

U.S.C. §365(f).

45.    Although §365(a) of the Bankruptcy Code does not provide a standard for

determining when it is appropriate for a court to approve a debtor's assumption or rejection of an

executory contract or an unexpired lease, courts have uniformly deferred to the business

judgment of the debtor.  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("A

bankruptcy court reviewing a trustee's or debtor-in-possession's  decision to assume or reject an

executory contract should examine a contract and the surrounding circumstances and apply its

"business judgment" to determine whether it would be beneficial or burdensome to the estate to

assume it."); *see, also, In re Minges*, 602 F.2d 38, 43 (2d Cir. 1979); *In re G. Survivor Corp.*,

171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd,* 187 B.R. 111 (S.D.N.Y. 1995) ("Generally,

absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment

[to assume or reject an executory contract] will not be altered.")

46.    Here, the assumption and assignment of certain of the Debtor's unexpired leases

of non-residential real property as designated by the Purchaser are a required component of the

APA, provide for the continued occupancy of the various retail spaces at the Property, and as

such, represents the sound exercise of the Debtor's business judgment.

47.    Along with this Motion, the Debtor is serving on each non-debtor party to any

lease or other contract designated by the Purchaser for assumption and assignment a notice of

intent to assume and assign containing a statement of the amount (the "Cure Amount"), if any,

required to cure a default by the Debtor (the "Assumption and Assignment Notice").  The Debtor

does not believe there are any Cure Amounts due in connection with the assumption of any

Assigned Contracts and therefore the Cure Amount for each of the Assigned Contracts is $0.

The form of Assumption and Assignment Notice is attached hereto and made a part hereof as

Exhibit B.  Any lease or other executory contract of the Debtor that is not an Assigned Contract

designated by the Purchaser for assumption and assignment as one of the Purchased Assets under

the APA will be rejected by the Debtor in due course.

### The Sale of the Subject Assets Should be Exempt from Transfer Tax

48.    In connection with the sale of real estate in New Jersey, the State imposes upon

the grantor realty transfer taxes under N.J.S.A. 46:15-7 and 7.1 ("Realty Transfer Tax") and

upon the grantee a tax under N.J.S.A. 46:15-7.2 (the "Mansion Tax" and together with the Realty

Transfer Tax herein called the NJ Transfer Taxes"), and together with any and all other sales,

use, excise or transfer taxes due as a result of this transaction, herein called "Transfer Taxes").

The sale should be declared exempt from all Transfer Taxes under both New Jersey Law and the

Bankruptcy Code.

49.    Under New Jersey Law, sales by a trustee are exempt from NJ Transfer Taxes.

*See* N.J.S.A. 46-15-10(g) which states that "the fee imposed by this act shall not apply to a deed

by a receiver, *trustee in bankruptcy or liquidation,* or assignee for the benefit of creditors.) (Emphasis added.)  Under Bankruptcy law, a debtor in possession is in effect a trustee.  *See* Bankruptcy Code section 1107(a) which states, in pertinent part, that "a debtor in possession shall have *all of the rights ... and powers*, and shall perform all of the functions and duties … of a trustee serving in a case under this title."  (Emphasis added.)  Since the Debtor here is a debtor in possession, the sale by the Debtor is in effect a sale by a trustee and therefore exempt from taxation under N.J.S.A. 46-15-10(g).

50.     To the extent the Debtor files its liquidating plan and a closing on a sale of the Subject Assets occurs pursuant to that plan, the Debtor submits that the transfer tax exemption provided for in Section 1146 of the Bankruptcy Code is similarly applicable. Under bankruptcy law, section 1146(a) of the Bankruptcy Code is controlling , and provides as follows:

> (a) The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer *under a plan confirmed under section 1129* of this title, may not be taxed under any law imposing a stamp or similar tax.

11 U.S.C. § 1146(a) (emphasis added).

51.     Exactly what constitutes a "transfer under a chapter 11 plan" is a question that has been debated in recent years, especially where the debtor moves to sell prior to plan confirmation of a chapter 11 plan.

52.     The U.S. Supreme Court in *In re Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008) adopted a temporal approach in finding that a transfer cannot be "under a plan confirmed" until the court confirms a plan, and "if the statutory context suggests anything, it is that § 1146(a) is inapplicable to pre-confirmation transfers." *Id.* at 2336. *In re New 118th, Inc., et al.,* 398 B.R. 791, 797.  The Supreme Court stated as follows as the appropriate rule:

> we see no absurdity in reading § 1146(a) as setting forth a simple,
> bright-line rule instead of the complex, after-the-fact inquiry
> Piccadilly envisions.  At bottom, we agree with the Fourth
> Circuit's summation of § 1146(a) [in *In re NVR, LP*]: 'Congress
> struck a most reasonable balance.  If a debtor is able to develop a
> Chapter 11 reorganization and obtain confirmation, then the debtor
> is to be afforded relief from certain taxation to facilitate the
> implementation of the reorganization plan. Before a debtor reaches
> this point, however, the state and local tax systems may not be
> subjected to federal interference.'

*Piccadilly,* 128 S.Ct. at 2339 (quoting *NVR,* 189 F.3d at 458).

53.    Here, it is the Debtor's intention to file its liquidating plan which will provide for the distribution of the sale proceeds.  The Debtor is moving forward with this Motion prior to filing its plan in order to meet the deadlines established in the APA and the payment deadline set forth in the Rialto stipulation.  If timing provides, the sale will occur simultaneous with or about the time that the plan is confirmed.    The goal is have the sale and confirmation occur at the same time.  Thus it is contemplated that the sale may be approved prior to the expected time of confirmation of the Plan, but it may not be consummated and closing would not occur until after confirmation of the Plan.

54.    *Piccadilly* did not address the situation presented here, but research uncovered one bankruptcy court case that did, *In re New 118th, Inc., et al.*, *supra.* In that case, the Bankruptcy Court for the Southern District of New York was faced with whether the 1146(a) exemption could apply to a pre-confirmation sale that closed post-confirmation.  There, the court held that:

> *Piccadilly* did not address whether the exemption could
> apply to a pre-confirmation sale that closed post-confirmation.
> Nevertheless, the post-confirmation delivery of the deed, and
> hence, the transfer, satisfies *Piccadilly's* "simple, bright-line rule."

Furthermore, the Supreme Court's adoption of the *NVR* standard, and by ex-tension, the reasoning of *Jacoby-Bender,* suggests that the § 1146(a) exemption applies to a post-confirmation transfer that follows a pre-confirmation sale if the transfer facilitates the implementation of the plan, or in the words of *Jacoby-Bender,* is necessary to the consummation of the plan.

Under this standard, the transfers of the Rental Properties qualify for the exemption.  Although the § 363 sale occurred pre-confirmation, the deeds were delivered and the transfers occurred post-confirmation.  Having procured confirmation, the Trustee is 'to be afforded relief from certain taxation to facilitate the implementation of the reorganization plan.'

Furthermore, the transfers of the Rental Properties did not merely facilitate the implementation of the Amended Plan; they were essential to its consummation.

*New 118th,* 398 F.3d at 797-98.

55.     The bankruptcy court further looked to the fact that a significant portion of the debtors' estates was being funded by proceeds from the sales and that the debtors' chapter 11 plan was only able to be consummated as a result of such sales.  *Id.* at 798.

56.     The proposed sale as presented in this Motion is analogous to *New 118th* and also comports with the Supreme Court's ruling in *Piccadilly*, such that the transfer of the Real Property and other assets of the Debtor in connection therewith is exempt from the payment Transfer Taxes under section 1146(a) of the Bankruptcy Code.

57.     Accordingly, the Debtor submits that in connection with the Court's approval of the sale, the Court should also decree that the transfer of the Real Property and other assets of the Debtor in connection therewith is exempt from the payment of Transfer Taxes pursuant to both N.J.S.A. 46:15-10, and Section 1146(a) of the Bankruptcy Code.

## **CONCLUSION**

58.     The Debtor submits that a sale of the Subject Assets pursuant to the APA is a sound and prudent exercise of its business judgment.  The sale to Purchaser will maximize the value of the Subject Assets, result in a 100% distribution to creditors as well as a waterfall of funds to the Debtor's owner/affiliate, and a distribution to its creditors.

59.     Accordingly, the Debtor respectfully requests that (i) it be authorized to enter into the APA, (ii) that the APA be approved, (ii) the sale of the Subject Assets to Purchaser free and clear of all claims, liens, interests and encumbrances be authorized, and (iii) the assumption and assignment of the Lease in connection with the APA, be approved.

## NOTICE

60.     The Debtor has served this Motion, the APA and all exhibits thereto, and the Assumption and Assignment Notice upon (i) all of its creditors, (ii) all entities that have an interest in the assets being sold, (iii) all parties which have filed notices of appearance, (iv) all tenants at the Property and other non-debtor parties to any leases to be assumed, and (v) the Office of the United States Trustee for the Southern District of New York by serving a copy of the Notice of Motion and Motion, with exhibits, by first class mail.

61.     The Debtor respectfully submits that such notice is good and sufficient under the circumstances, and satisfies the requirements of Bankruptcy Rules 2002, 6004, and 6006.

62.     No prior application for the relief sought has been made by the Debtor to this or any other court.

   **WHEREFORE**, the Debtor respectfully requests that this Court enter the Order granting

the relief requested herein and such other and further relief as may be just and appropriate.


**Dated:**  New York, New York
       March 19, 2015

                         **ROBINSON BROG LEINWAND**
                          **GREENE GENOVESE & GLUCK P.C.**
                         Attorneys for the Debtors
                         875 Third Avenue, 9th Floor
                         New York, New York 10022
                         Tel. No.:  212-603-6300


                         By:  /s/ A. Mitchell Greene
                               **A. Mitchell Greene**