EXHIBIT A: APA

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement"), made as of March ___, 2015, by and between AC I MANAHAWKIN LLC, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 (hereinafter referred to as "Seller") and HAMPSHIRE GLOBAL PARTNERS, LLC a New Jersey limited liability company, having an address at 22 Maple Avenue, Morristown, New Jersey 07960 (hereinafter referred to as "Purchaser").

### WITNESSETH:

A.  Seller is a debtor in possession in a chapter 11 bankruptcy case before the United States Bankruptcy Court for the Southern District of New York (Venued in White Plains) (the "Bankruptcy Court"), under Docket No. 14-22793-rdd (the "Bankruptcy Case") filed on June 4, 2014 (the "Petition Date"), and subject to the provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). As sometimes used in this Agreement or the documents ancillary to this Agreement the term "Debtor" shall refer to the Seller.

B.  Seller desires to liquidate all, or substantially all, of its assets to fund its plan of reorganization under the Bankruptcy Code (the "Plan").

C.  Purchaser desires to purchase the Property (as defined below) of Seller, free and clear of liens, claims and interest of third parties pursuant to Section 363(f) of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and other local rules of bankruptcy practice applicable in the Bankruptcy Court (the "Local Rules"), or as otherwise provided in this Agreement, so that Seller may employ the sale proceeds to fund its Plan.

NOW THEREFORE, intending to be legally bound, the Seller and Purchaser agree as follows:

1.    Agreement to Sell and Purchase: Description of Property.

1.1 Assets to be Purchased.  On and subject to the terms of this Agreement, and subject to the approval of the Bankruptcy Court as provided in Section 28, and other conditions set forth in this Agreement, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained, all right, title and interest of Seller in and to (a) those certain lots, pieces or parcels of land, commonly known as the Manahawkin Commons Shopping Center, located in the County of Ocean, Township of Stafford, State of New Jersey, as more particularly bounded and described in Schedule A attached hereto and hereby made a part hereof, together with Seller's interest, if any, in and to the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining such parcels, to the center line thereof (collectively the "Land"), (b) the building(s), any and all other improvements erected thereon (the building and such other improvements being hereinafter collectively referred to as the "Improvements"), (c) any rights (including

development rights), appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land and the Improvements or any portion thereof ("Rights"), (d) all fixtures, machinery, tangible personal property and equipment, excluding furniture, furnishings, equipment and other personal property of Tenants (as hereinafter defined) used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements at the date hereof, including, but not limited to, the property particularly described on Schedule B attached hereto ("Personal Property"), (e) the interest of the landlord in and to all leases listed on Schedule D attached hereto (the "Leases"), including without limitation, all security deposits, guarantees or other security relating to the Leases (collectively, the "Lease Interests"), (f) if and to the extent assignable by Seller, all right, title and interest of Seller, if any, in and to any intangible personal property relating to the Land and the Improvements, including all intellectual property, licenses, permits, plans, specifications, operating manuals, guarantees and warranties and any structural, engineering, soil, seismic, geologic, hydrogeologic, architectural and other reports and studies prepared for Seller by third-party consultants relating to the Land and the Improvements (the *"Intangible Property"*), and (g) all such other and additional assets and items of Personal Property and Intangible Property described on Schedule B attached hereto (the "Additional Assets").

All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement (including, without limitation, the Land, Improvements, Rights, Personal Property, Intangible Property, Leases, Lease Interests and Additional Assets) are hereinafter sometimes collectively referred to as the "Property", all of which Property may be referred to herein as the "Purchased Assets" to be sold to Purchaser pursuant to this Agreement.

2.    Exceptions to Title; Title Matters.

2.1    Title to the Land and Improvements shall be good, marketable and insurable at regular rates by a reputable title insurance company selected by Purchaser doing business in the State of New Jersey (the "Title Insurer"), subject only to the following matters (the "Permitted Exceptions"):

2.1.1    Real estate taxes and water and sewer charges not yet due and payable as of the date of the Closing (as hereinafter defined), subject to adjustment as hereinbelow provided.

2.1.2    All present and future zoning and building laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property (collectively, "Zoning Laws").

2.1.3    All covenants, restrictions, agreements, reservations, and rights of record, all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property (collectively, "Permitted Rights").

2.1.4    The state of facts set forth on the surveys listed on Schedule C attached hereto (collectively, "Facts").

2.1.5    Rights of Tenants in possession pursuant to the Leases.

2.1.6    The matters disclosed on Schedule N.

2.2    Purchaser has requested that Eddington Title Agency, as agent for Chicago Title Insurance Company (the "Title Company") examine the title to the Real Property and deliver copies of such title report (the "Title Report") to Seller's attorney simultaneously with the execution of this Agreement.    Purchaser has also ordered a new survey of the Property (the "Survey").    Within five (5) days from the later of (i) the Effective Date of this Agreement, and (ii) Purchaser's receipt of both the Title Report and Survey, Purchaser shall deliver to Seller's attorney a statement specifying any defects in title and/or the Survey which are not Permitted Exceptions ("Purchaser's Statement"); provided, however, that each financial encumbrance such as a mortgage, judgment, lien for delinquent real estate taxes, attachment, lien claim or other lien or encumbrance of a definite or ascertainable amount which may be removed by the payment of money that is revealed by the Title Report shall automatically, and without requirement that same be specified in Purchaser's Statement, be deemed an unpermitted exception, and Seller agrees to remove, or cause same to be removed, at or prior to Closing. Seller shall notify Purchaser within five (5) days after receipt of Purchaser's Statement whether Seller will remove (or cause to be removed) such defects.    If Seller does not agree to remove (or cause to be removed) any such defects, Purchaser shall have the right to either (a) waive the defect and close title without abatement or reduction of the Purchase Price (as defined in Section 3.1), or (b) terminate this Agreement, in which event Escrow Agent (as defined in Section 3.2.1.) shall refund the Deposit (as hereinafter defined), together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination; provided, however, that Seller shall have a last right to remove (or cause to be removed) any such defects, in which case this Agreement shall not be terminated.    Upon such refund neither party shall have any further liability to the other hereunder, except with respect to those provisions which expressly survive such termination.

2.3    If Seller fails or is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser, to reasonable adjournments of the Closing upon at least three (3) business days advance written notice to Purchaser, provided that in no event shall the Closing be extended beyond the earlier of (i) ninety (90) days in the aggregate, and (ii) July 15, 2015 (the "Outside Date") to enable Seller to convey such title.    If Seller does not so adjourn the Closing, or if Seller has elected to adjourn the Closing, but is still unable to convey title subject to and in accordance with the provisions of this Agreement by the Outside Date, Purchaser may terminate this Agreement by written notice to Seller, in which event the Escrow Agent shall refund to Purchaser the Deposit (as defined below), together with any interest earned thereon.    This Agreement shall thereupon be deemed canceled and become void and of no further effect, and neither party shall have any obligations of any nature to the other hereunder or by reason thereof, except those provisions which expressly survive such termination.

2.4    Notwithstanding anything in Section 2.3 above to the contrary, Purchaser may, in its sole and absolute discretion, at any time accept such title as Seller can convey, without

reduction of the Purchase Price (as hereinafter defined) or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed (as defined in subsection 8.1.1 below) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such obligations as are expressly provided herein to survive the delivery of the Deed.

2.5    The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge, with interest and penalties, may at the option of Seller be allowed to be paid by or credited to Purchaser out of the balance of the Purchase Price if official bills therefor with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof.

2.6    If the Property shall, at the time of Closing, be subject to any liens such as for judgments or transfer, franchise, license or other similar taxes or any encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of Closing, Seller uses all or a portion of the Purchase Price to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing instruments in recordable form sufficient to satisfy and discharge of record such liens and encumbrances, together with the cost of recording or filing such instruments. If a request is made, Purchaser agrees to provide out of the proceeds payable at Closing, separate certified or official bank checks, as requested to facilitate the satisfaction of any of such liens or other defects, and the existence of any thereof shall not be deemed defects in or objections to title if Seller shall comply with the foregoing requirements.

2.7    This Agreement and Purchaser's obligation to proceed hereunder is expressly contingent upon Purchaser's receipt of all of the missing information and documentation set forth on Schedule M hereto ("Missing Information"). Purchaser's obligation to proceed to Closing is expressly conditioned upon Seller's delivery of the Missing Information. In the event that Seller fails to deliver any of the Missing Information, or if such Missing Information reveals any fact or circumstance inconsistent with this Agreement that could be reasonably determined by Purchaser to have a Material Adverse Effect (as such term is defined in Section 9.3) on Purchaser, Purchaser shall have the right to terminate this Agreement by providing written notice to Seller, in which event the Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination, unless Seller, at its option and in its sole discretion, agrees to pay to Purchaser at Closing, such amount as will cause any such fact or circumstance revealed in any of the Missing Information delivered to Purchaser to no longer have a Material Adverse Effect on Purchaser, in which event Purchaser shall be required to close hereunder.

4

3.    <u>Purchase Price and Payment</u>:

3.1    The total purchase price payable to Seller for the Property is USD FORTY THREE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($43,500,000.00) (the "<u>Purchase Price</u>").

3.2    The Purchase Price is payable as follows:

3.2.1    The parties acknowledge that Purchaser previously delivered the sum of FOUR HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($430,000.00) (the "<u>Initial Deposit</u>"), by federal funds wire transfer to an account at such bank or banks as designated by Robinson Brog Leinwand Green Genovese & Gluck, P.C. ("<u>Escrow Agent</u>"). Within four (4) business days following the Effective Date (as defined in <u>Section 32</u> hereof), Purchaser shall deliver an additional deposit in the amount of ONE MILLION SEVEN HUNDRED FORTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,745,000.00) (the "<u>Additional Deposit</u>") by federal funds wire transfer to Escrow Agent. The Initial Deposit and Additional Deposit shall hereafter collectively be referred to as the "<u>Deposit</u>". Escrow Agent shall hold and pay the Deposit in accordance with the terms of this Agreement. Escrow Agent joins in this Agreement for the purpose of acknowledging same.

3.2.2    The Deposit shall be held by Escrow Agent and disbursed in accordance with the terms and provisions of this Agreement. Any interest earned on the Deposit shall not be deemed to be part of the Deposit, but shall be paid to the party entitled to receipt of the Deposit.

3.2.3    The balance of the Purchase Price, less the Deposit and subject to adjustment as provided in this Agreement, at the Closing (as hereinafter defined) of title to the Property as set forth in <u>Section 4</u> herein, in immediately available funds by federal funds wire transfer to such payee(s) and to such account(s) as designated by the Seller.

4.    <u>Closing</u>.

4.1    The closing of the transaction contemplated hereby (the "<u>Closing</u>") shall occur at 10:00 AM on or before the first business day following the later of (i) May 15, 2015, and (ii) thirty (30) days after the Bankruptcy Court's entry of the Sale Approval Order (as defined <u>Section 28</u>). Closing being herein referred to as the "<u>Closing Date</u>", subject to the terms of <u>Section 9.2.</u> After the later of (i) May 15, 2015, and (ii) thirty (30) days after the Bankruptcy Court's entry of the Sale Approval Order, either party may set a TIME OF THE ESSENCE Closing Date upon delivery of not less than ten (10) day's written notice to the other party.

4.2    The Closing shall occur at the offices of Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022, or such other location as the parties may mutually agree. Upon closing of this transaction, Purchaser shall have the right to possession of the Property, subject to the rights of Tenants under the Leases.

5.    "As-Is" Condition of Property; Acknowledgements of Purchaser.

5.1    Before entering into this Agreement, and except as provided in Section 2.2, Section 2.7, and Section 9.2.7, or as otherwise expressly provided in this Agreement, Purchaser has made such examination of the Property, the condition thereof (including, without limitation, all structural, mechanical and environmental matters), the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary.  In entering into this Agreement, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Agreement, whether or not any such representations, warranties or statements were made in writing or orally.  Except for the representations and warranties expressly set forth in this Agreement, Seller makes no representations or warranties with regard to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser.  In connection therewith, Purchaser acknowledges that except for the representations, warranties and covenants set forth in this Agreement, Purchaser is relying exclusively upon its own independent investigation and evaluation of every aspect of the Property.

5.2    Purchaser hereby acknowledges, represents, warrants and agrees as follows:

5.2.1    Except for the express representations, warranties and covenants expressly set forth in this Agreement, Purchaser is purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions and defects.  Except as expressly provided in this Agreement, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same.  Except as set forth in Section 2.2, Section 2.7 and Section 9.2.7, or as otherwise expressly provided in this Agreement, Purchaser has performed all such investigations and reviews of the Property, Zoning Laws, Environmental Laws (as defined in Section 5.2.3), Permitted Rights, Facts and Leases as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property.  Except for the express representations, warranties and covenants of Seller set forth herein, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers and Purchaser is fully satisfied that the Purchase Price is fair and adequate consideration for the Property, and by reason of all the foregoing.

5.2.2    Except for the representations and warranties expressly set forth in this Agreement, Seller hereby disclaims all warranties of any kind or nature whatsoever (including warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property.  Purchaser acknowledges that, except as otherwise expressly provided in this Agreement, Purchaser is not relying upon any representation of any kind or nature made by Seller, or any of its employees or agents with respect to the Property, and that, in fact, no such representations were made except as expressly set forth in this Agreement.

5.2.3   Except as expressly set forth in this Agreement, Seller makes no warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property.   The term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation.   The term "Environmental Laws" shall mean all Federal, state and local laws, statutes, ordinances and regulations now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Clean Water Act, 33 U.S.C. §§ 1251 et seq. (1972), the Clean Air Act, 42 U.S.C. §§ 7401 et seq. (1970), the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. §§ 2601 et. seq., the Hazardous Material Transportation Act, as amended, 49 U.S.C. §§ 5101 et. seq., the New Jersey Site Remediation Reform Act, N.J.S.A. 58:10C-1, et. Seq., and all state and federal common law relating to nuisance and trespass.

5.2.4   Purchaser acknowledges that Purchaser has had an adequate opportunity to make such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property.   Such inquiries and investigations of Purchaser shall be deemed to include but shall not be limited to the review of any Leases pertaining to the Property, the physical components of all portions of the Property, the existence of any wood-destroying organisms on the Property, such state of facts as an accurate survey and inspection would show, existing zoning ordinances, resolutions and regulations of the City, County and State where the Property is located and the value and marketability of the Property. Purchaser, in purchasing the Property, has relied solely upon the tests, analyses, inspections and investigations that Purchaser makes, or has had the right to make, and opted not or otherwise failed to make, and not in reliance upon any alleged representation made by or on behalf of Seller except the express representations set forth herein.

5.2.5   Without in any way limiting the generality of the preceding paragraphs and except with respect to the express representations, warranties and covenants of Seller set forth in this Agreement, Purchaser specifically acknowledges and agrees that it hereby waives, releases and discharges any claim it has, might have had or may have against Seller with respect to the condition of the Property, either patent or latent, environmental matters, its ability or

inability to obtain or maintain building permits, either temporary or final certificates of occupancy or other licenses for the use or operation of the Property and/or certificates of compliance for the Property, the actual or potential income or profits to be derived from the Property, the real estate taxes or assessments now or hereafter payable thereon, the compliance with any environmental protection, pollution or land use laws, rules, regulations or requirements, and any other state of facts which exist with respect to the Property.

     5.3    Notwithstanding any provision that may be construed to the contrary, in no event shall Purchaser be deemed to assume any obligations or liabilities of Seller for any period prior to the Closing Date, or for any period subsequent to the Closing Date, unless such obligation is expressly assumed pursuant to the terms of this Agreement. In addition, and notwithstanding any provision in this Agreement that may be construed to the contrary, in no event shall Purchaser be deemed to release Seller from any liability in connection with a claim by a third party relating to environmental matters and Purchaser hereby reserves the right to assert a cross-claim or bring a third-party complaint in the event Purchaser is sued by a third Party who does not include Seller as a defendant.

6.    <u>Apportionments</u>.

     6.1    Rent, including, without limitation, fixed rent, prepaid rent and additional rent for the month in which the Closing Date occurs shall be apportioned as of the Closing Date to the extent collected from the Tenants under the Leases. If any rents under the Leases relating to any period prior to the month in which the Closing Date occurs shall be unpaid as of the Closing Date, then the rents collected by Purchaser under the Leases on or after the Closing Date (i) shall first be applied to any costs incurred by Purchaser in connection with collecting the rents, (ii) shall then be applied to all rents due at the time of such collection for the month in which the Closing Date occurs, (iii) shall then be applied to all rents due at the time of such collection for any period after the month in which the Closing Date occurs, and (iv) shall then be payable to Seller to the extent of rents unpaid as of the Closing Date which relate to any period prior to the month in which the Closing Date occurs. After the Closing Date, Purchaser shall take good faith efforts to collect such unpaid rents from the Tenants, subject to the terms of Section 6.15 with respect to the K-Mart Dispute (as defined in <u>Section 6.15</u>), including sending out bills to Tenants for rents owed to Seller; provided, however, that Purchaser shall not be required to institute any proceeding to collect any such rents. After Closing, Seller shall have no right to bring any action or proceedings against any Tenant to collect any accrued and unpaid rents, even if such action does not affect possession.

     6.2    All leasing commissions and Tenant costs with respect to Leases (and renewals, extensions or expansions thereof) shall be paid by Seller at or prior to Closing and Seller shall indemnify, defend and hold Purchaser harmless with respect thereto.

     6.3    If rents, including, without limitation, fixed rent, prepaid rent, additional rent and expense reimbursement payments, under any of the Leases are payable or accruable on the basis of estimates or formulae and are subject to adjustment after the Closing Date, such rents shall be apportioned on the Closing Date on the basis of the sums actually paid by the Tenants under the Leases to Seller on account of such rents and/or expenses prior to the Closing Date, and shall be

subject to reapportionment on the basis of the rents and expenses as finally determined to be owing under the Leases in accordance with Section 6.14 below.

6.4     Amounts payable under any Service Contracts and other operation and maintenance expenses and other recurring costs shall be paid by Seller.

6.5     Real estate taxes shall be apportioned on the Closing Date. If the tax bill for the real estate tax year in which the Closing occurs has not been issued on or before the date of the Closing, the apportionment of taxes shall be computed based upon the most recent assessor's valuation and tax rates available. If, on the date of Closing, bills for the real estate taxes imposed upon the Property for the real estate tax year in which Closing occurs have been issued but shall not have been paid, such taxes shall be paid at the time of Closing and apportioned between Seller and Purchaser.

6.8     If there are any assessments against the Property on the Closing Date, Seller shall pay same if the work giving rise to the assessment was completed prior to the Closing Date, but if the work giving rise to the assessment is to be completed subsequent to the Closing Date, such assessment shall be paid by Purchaser.

6.9     At least five (5) days prior to Closing, Seller shall prepare and deliver to Purchaser a preliminary Closing Statement on the basis of the Leases and Lease Interests to be assigned to Purchaser, real estate taxes and other sources of income and expenses for the Property, and shall deliver such preliminary Closing Statement to the parties for approval prior to the Closing Date. All apportionments and prorations provided for in this Section 6.9 to be made as of the Closing Date shall be made, on a per diem basis, as of midnight of the day immediately preceding the Closing Date. The preliminary Closing Statement and the apportionments and/or prorations reflected therein shall be based upon actual figures to the extent available. If any of the apportionments and/or prorations cannot be calculated accurately based on actual figures on the Closing Date, then (other than with respect to determination of real estate taxes that shall be computed as set forth above) they shall be calculated based on Seller's and Purchaser's good faith estimates thereof, subject to reconciliation as hereinafter provided.

6.10     Intentionally Omitted.

6.11     If after the Closing, the parties discover any errors in adjustments and apportionments, same shall be corrected as soon after their discovery as possible, except that no adjustments (other than as provided in Section 6.14 and Section 6.15) shall be made later than one (1) year after the Closing Date unless prior to such date the party seeking the adjustment shall have delivered a written notice to the other specifying the nature and basis for such claim.

6.12     At Closing, Seller shall deliver or cause its property manager to deliver to Purchaser (or give Purchaser a credit for), without consideration, all security deposits then held by or for Seller under the Leases. Purchaser will cause the security deposits to be maintained after Closing in accordance with the requirements of applicable law and shall indemnify and defend Seller from, and hold Seller harmless from, all claims of Tenants with respect to the

9

security deposits actually delivered to Purchaser or for which Purchaser received a credit at Closing.

6.13    Charges for electric, natural gas, non-lienable water and sewer shall not be adjusted. Seller shall cause the meters for such utilities to be read within two (2) days prior to the Closing. At or prior to Closing, Seller shall pay all charges based upon such meter readings.

6.14    Within a reasonable time after Purchaser has made its calculations of the final rents and expense reimbursement payments in respect of the pertinent fiscal periods and has billed the Tenants therefor, Purchaser shall prepare and submit to Seller a final reapportionment of the rents and other items to be apportioned pursuant to this Article 6 as of the Closing Date (the "Final Apportionment Report"). Within ten (10) days after Purchaser submits the Final Apportionment Report to Seller, Seller shall pay to Purchaser, or Purchaser shall pay to Seller, as applicable, the amount determined to be due from such party to the other pursuant to the Final Apportionment Report; provided, however, that Purchaser shall not be required to pay to Seller any amount attributable to uncollected rents or other charges to Tenants as of such date, but shall pay to Seller such amounts within thirty (30) days after Purchaser has collected same, except that any amounts collected by Purchaser related to the K-Mart Dispute shall be held and paid as provided in Section 6.15 below. Notwithstanding the foregoing, or any provision in this Agreement that may be construed to the contrary, in the event that within eighteen (18) months from the Closing Date (the "CAM Survival Period"), Purchaser incurs any loss ("CAM Losses") due to discrepancies, claims or offsets related to billings and/or payments of any additional rent (including operating expenses and/or real estate tax payments) (collectively "CAM Charges") paid or payable under any of the Leases during any period prior to the Closing Date, after ten (10) days notice to Seller which shall be accompanied by a reasonably detailed explanation of the CAM Losses, Purchaser shall have the right to offset any such CAM Losses against any amounts owed to Seller. At the Closing, the sum of USD Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "Holdback Escrow") shall be held back and placed into an escrow account with Purchaser's counsel to secure Seller's obligation to reimburse Purchaser for items owed to Purchaser pursuant to the Final Apportionment Report as well as for any CAM Losses (collectively, "Seller's Reimbursement Obligations"). In the event Seller fails to reimburse Purchaser for any of Seller's Reimbursement Obligations within ten (10) days of Purchaser's written notice thereof (and which, in the case of CAM Losses, have not previously been offset by Purchaser), Purchaser's counsel shall be authorized to release such unreimbursed amounts to Purchaser from the Holdback Escrow in accordance with the terms of the Escrow Agreement (as defined Section 8.1.4 below). The Holdback Escrow shall also secure Seller's Indemnity Obligation in accordance with Section 7 below. Any sums remaining in the Holdback Escrow at the end of the CAM Survival Period shall be released to Seller, provided that (A) all Claims (as defined in Section 7) raised within the Indemnity Survival Period, and (B) all CAM Losses raised prior to the expiration of the CAM Survival Period, have been full and finally resolved. At Closing, Purchaser and Seller shall enter into an escrow agreement with Purchaser's counsel, documenting the terms of the Holdback Escrow pursuant to the terms of this Section 6.14 and Section 7.

6.15    Purchaser and Seller acknowledge that Seller has served Kmart Corporation ("K-Mart"), with the notice of default letter dated December 19, 2014 and attached hereto as

Schedule Q for claims related to K-Mart's failure to pay certain CAM Charges. Seller has advised Purchaser that K-Mart does not dispute that CAM Charges are owed, but rather claims that Seller has failed to provide an adequate accounting of the subject CAM Charges. Seller hereby agrees not to settle or comprise the dispute with K-Mart ("K-Mart Dispute") without Purchaser's prior written consent. If by the Closing Date the K-Mart Dispute has not been resolved, Purchaser shall accept title to the Property subject to the K-Mart Dispute. After the Closing, Purchaser shall have the right to settle or compromise the K-Mart Dispute in any manner that Purchaser deems appropriate, in Purchaser's sole discretion. In the event that Purchaser should collect any CAM Charges from K-Mart attributable to periods prior to the Closing Date, such amounts, after deduction of Purchaser's costs to recover same, shall be added to the Holdback Escrow to secure Seller's Reimbursement Obligations and Indemnity Obligation and paid to Seller upon the release of any sums remaining in the Holdback Escrow in accordance with Section 6.14 above. For the avoidance of doubt, if Seller receives any unsolicited payments from K-Mart, such funds shall be retained by Seller and become part of the cash collateral in Seller's bankruptcy proceeding.

     6.16    The provisions of this Section 6 shall survive the Closing.

7.     Representations and Warranties of the Parties.

     7.1    Seller warrants, represents and covenants to and with Purchaser that the following are true and correct on the date hereof:

     7.1.1    Seller is a limited liability company duly organized and validly existing under the laws of the State of Delaware, is in good standing and is qualified to do business in the State of New Jersey, and has the requisite power and authority to enter into and to perform the terms of this Agreement. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller.

     7.1.2    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

     7.1.3    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, except the approval of the Bankruptcy Court as provided in Section 28 below.

     7.1.4    There are no service or maintenance contracts, management agreements or other agreements or contracts relating to the Property or any portion thereof other than the contracts set forth on Schedule E attached hereto and made a part hereof (the "Service Contracts"). Seller is not in default of any of its obligations under any Service Contract and, to

11

Seller's knowledge, none of the other parties thereto is in default of any of its obligations thereunder.  All Service Contracts shall be terminated by Seller prior to Closing.

 7.1.5 Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Property or any portion thereof.

 7.1.6 Except as disclosed in the environmental reports listed on <u>Exhibit 7.1.6</u>, Seller has no actual knowledge of (i) the presence of any Hazardous Materials on, in or beneath the Land or Improvements, (ii) the existence of any underground storage tanks on the Land or Improvements, and (iii) the previous removal of any underground storage tanks from the Land or Improvements.

 7.1.7 Seller has no environmental reports other than the environmental reports listed on <u>Exhibit 7.1.6</u>, copies of which have been delivered to Purchaser, which to Seller's knowledge, constitute complete copies of such reports.

 7.1.8 Intentionally Omitted.

 7.1.9 Intentionally Omitted.

 7.1.10 Intentionally Omitted.

 7.1.11 Seller has not received any written notice of any breach, default or violation of the terms of either of the following reciprocal easement agreements: (1) Shopping Center Reciprocal Easement and Operation Agreement dated August 3, 1992, among Manahawkin Route 72, L.P., Manahawkin Sand & Gravel Co., Inc. and Kmart Corporation recorded in Deed Book 5042, Page 217; Supplemental Agreement dated December 14, 1993, between Mark Manahawkin, L.P. and Mark Centers Limited Partnership recorded in Deed Book 5122, Page 905; First Amendment to Shopping Center Reciprocal Easement and Operation Agreement dated October 7, 2002, among Acadia Realty Limited Partnership, Mark Manahawkin, L.P., Orix Woodmont Manahawkin Venture and Kmart Corporation recorded in Official Record Book 11031, Page 43, rerecorded in Official Record Book 11148, Page 1102 (collectively, the "<u>K-Mart REA</u>"), and (2) Common Areas Maintenance and Reciprocal Easement Agreement dated February 19, 2004, between South Jersey Land Development, LLC and Orix Woodmont Manahawkin Venture recorded in Official Record Book 11959, at Page 1209 ("<u>Friday's REA</u>"), and to Seller's knowledge, no breach, default or violation of the terms of either the K-Mart REA or Friday's REA.

 7.1.12 Intentionally Omitted.

 7.1.13 Seller is and as of the Closing Date will be in possession of the Property, free of any tenancies and rights of third parties (other than the Tenants under the Leases).

 7.1.14 Seller has not received any written notice from any governmental agency, entity, department or authority having jurisdiction over the Property that the Property does not

comply with any applicable federal, state, county or municipal laws, ordinances, rules or regulations, and Seller has not received any written notice from any insurance company or inspection or rating bureau setting forth any requirements as a condition to the continuation of any insurance coverage with respect to the Property or the continuation thereof at premium rates existing at present.

       7.1.15  Seller has furnished to Purchaser true and complete copies of the Leases set forth on <u>Schedule D</u>; the Leases are the only leases currently affecting or relating to the Land and the Improvements; the tenants under the Leases (collectively, the "<u>Tenants</u>") have not prepaid any rent under the Leases more than one month in advance; no guarantor of a tenant's obligations under the Leases has been discharged of its obligations by Seller; the Leases have not been modified or amended by Seller, except as set forth in the documents listed as part of the definition of "Leases" herein; except for the Lease between Seller and RadioShack Corporation ("<u>RadioShack</u>"), which was properly rejected in the RadioShack bankruptcy action, the Leases are in full force and effect; except for (i) the K-Mart Dispute and (ii) Regal Cinemas' underpayment of CAM Charges, the Tenants under the Leases are not in default under the Leases; the Tenants under the Leases have not asserted in writing that Seller is in default under the Leases; the information set forth on <u>Schedule D-1</u> ("<u>Rent Roll</u>") with respect to each Lease is true and correct and not misleading in any respect.

       7.1.16  Except for the commission due HFF (as defined below) in connection with the sale of the Property as contemplated in this Agreement, there are no brokerage commission agreements between Seller and any broker in connection with the Leases or the Property, and no commissions or payments are due or payable in connection with such Leases, or any modifications or extension thereof.

       7.1.17  To Seller's knowledge, all of the information and documents heretofore delivered by Seller to Purchaser or to be delivered by Seller to Purchaser and relating to the Property are true, complete and accurate in all material respects, and with respect to documents, are true, correct and complete copies thereof.

       7.1.18  To Seller's knowledge, there is no material adverse fact or condition relating to the Property which has not been specifically disclosed in writing by Seller to Purchaser, and Seller knows of no fact or condition of any kind or character which materially and adversely affects the Property.

       7.1.19  To Seller's knowledge, except for the Pending Tax Appeal (as defined below) and the Bankruptcy Case referenced herein, Seller has not received written notice that there is any pending action, litigation, investigation, arbitration, mediation, reference, condemnation or other proceeding involving any portion of the Property including, without limitation, any proceeding for the reduction or correction of the assessed valuation of the Land or Improvements or against Seller.

       7.1.20  Seller shall employ its best efforts to comply with the provisions regarding the Bankruptcy Case set forth in <u>Section 28</u>, herein below.

13

The truth, accuracy and completeness, in all material respects, of each of the representations and warranties of Seller as of the date hereof, and as of the Closing Date, shall constitute a condition precedent to the obligations of Purchaser hereunder. References to the "knowledge" of Seller in this Section 7.1 shall refer only to the actual current knowledge of GC Realty Advisors, LLC or Armstrong Management Corp., the parties who are, or were, charged with the day-to-day operations of the Seller and are the most knowledgeable regarding the matters set forth in this Section, as well as the ownership and operation of Seller and the Property. Additionally, notwithstanding the foregoing, if Purchaser obtains actual knowledge prior to the Closing that any representation or warranty hereunder is untrue, and Purchaser nonetheless proceeds to close on the purchase of the Property, then Purchaser shall be deemed to have waived any claims against Seller for any damage or other loss arising out of or resulting from such untrue representation or warranty. Purchaser shall be deemed to be aware of any matter regarding which Purchaser's representative, Robert T. Schmitt, obtains actual knowledge. Each of the above representations and warranties of Seller shall survive the Closing Date for a period of six (6) months ("Indemnity Survival Period"). Seller shall indemnify, defend and hold Purchaser harmless ("Indemnity Obligation") from and against any loss, cost, claim or expense (including reasonable attorney's fees) ("Claim") arising out of the failure of such representation or warranty to be true and accurate in all material respects when made. As provided in Section 6.14, the Holdback Escrow shall secure Seller's Indemnity Obligation. In the event any Claim is made within the Indemnity Survival Period, Purchaser shall have the right to recover its actual out-of-pocket costs incurred in connection with such Claim from the Holdback Escrow.

7.2    Purchaser warrants, represents and covenants to and with Seller that the following are true and correct on the date hereof:

7.2.1    Purchaser is a New Jersey limited liability company duly organized or formed and in good standing under the laws of the State of its organization or formation and has the requisite power and authority to enter into and to perform the terms of this Agreement. Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2.2    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser, except the approval of the Bankruptcy Court as provided in Section 28 below.

7.2.3    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which

would have any material adverse effect on the business or assets or the condition, financial or otherwise, of or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.3    Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Seller nor HFF (as hereinafter defined) nor any representative nor any purported agent or representative of Seller or HFF have made, and neither Seller nor HFF are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties (in either case express or implied), and Seller and HFF have not made any representations or warranties. other than as expressly set forth herein, as to (a) the current or future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, local or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for residential purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the compliance of the Property or the Leases (or the rents thereunder) with any rent control or similar law or regulation, and (h) the ability to relocate any Tenant or to terminate any Lease. Further, Purchaser acknowledges and agrees that except for the representations and warranties expressly set forth herein, neither Seller nor HFF are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller or HFF or any broker, employee, agent, consultant or other person representing or purportedly representing Seller or HFF. The provisions of this Section 7.3 shall survive the Closing.

8.    Closing Deliveries.

8.1    At or prior to the Closing, Seller shall make or cause to be made the following deliveries:

8.1.1    Seller shall execute, acknowledge and deliver to Purchaser a statutory form of bargain and sale deed (with covenants against grantor's acts), sufficient to convey fee title to the Property subject to and in accordance with the provisions of this Agreement, in the form attached hereto as Schedule G and made a part hereof (the "Deed").

8.1.2    Seller shall execute, acknowledge and deliver to Purchaser an assignment, of Seller's right, title and interest as landlord or otherwise under each of the Leases, and of any

security deposits held by Seller, in the form attached hereto as <u>Schedule H</u> (the "<u>Assignment of Leases</u>").

8.1.3    Seller shall execute and deliver to Purchaser notices to the Tenants under the Leases advising them of the sale of the Property, and the assignment to Purchaser of such Leases.

8.1.4    Seller shall execute and deliver to Purchaser an escrow agreement documenting the terms of the Holdback Escrow pursuant to <u>Section 6.14</u> and <u>Section 7.1</u>, and otherwise on terms reasonably acceptable to Purchaser, Seller and Purchaser's counsel ("<u>Escrow Agreement</u>").

8.1.5    Seller shall execute, acknowledge and deliver to Purchaser a bill of sale in the form attached hereto as <u>Schedule J</u>, conveying and transferring to Purchaser all right, title and interest of Seller in and to all of the Purchased Assets, other than the Land and Improvements.

8.1.6    Seller shall deliver to Purchaser all keys and access cards to the Improvements which are in Seller's possession or control.

8.1.7    Seller shall deliver to Purchaser a certificate, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code.

8.1.8    Seller shall deliver to Purchaser a consent of its manager and/or members authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder.

8.1.9    Seller shall execute, acknowledge and deliver to Purchaser any transfer tax returns required to be executed by Seller to consummate the transactions contemplated hereunder.

8.1.10   Seller shall deliver originals of all of the Leases to Purchaser.  In the event, however, that Seller does not have the original of any Lease in Seller's possession, Seller shall have the right to deliver a copy of such original Lease, provided that Seller certifies, in writing, that such copy is a true, accurate and complete copy of the original of such Lease.

8.1.11   Seller shall execute, acknowledge and deliver an Affidavit of Title in such form as is reasonably required by Title Company.

8.1.12   Seller shall execute, acknowledge and deliver a duly executed Seller's Residency Certification (form GIT/REP-3).

8.1.13   Seller shall execute, acknowledge and deliver an Affidavit of Consideration for Use by Seller (form RTF-1).

16

8.1.14  Seller shall execute, acknowledge and deliver to Purchaser a certification that all of Seller's representations and warranties set forth in this Agreement remain true and correct in all material respects as of the Closing Date, as if first made on and as of the Closing Date.

8.1.15  Seller shall deliver to Purchaser the original of any letters of credit then held by Seller as security for the performance of the obligations of any Tenants under a Lease, together with any documents which may be required pursuant to the applicable letter of credit to effectuate a transfer of the letter of credit to Purchaser.  Seller shall reasonably cooperate with Purchaser in causing any letters of credit to be transferred to Purchaser.  Purchaser will be entitled to a credit at Closing in the amount of any fees payable to the issuer of any letter of credit in connection with the transfer of such letter of credit to Purchaser.  The provisions of this subsection 8.1.15 will survive the Closing.

8.1.16  Seller shall execute, acknowledge and deliver such other documents as may be necessary or required in order to consummate the closing of the transaction as contemplated in this Agreement.

8.1.17  Seller shall deliver a certified copy of the Sale Approval Order (as defined in Section 28) of the Bankruptcy Court.

8.1.18  Seller shall deliver to Purchaser the Required Estoppels required under Section 9.2.3.

8.1.19  Seller shall deliver to Purchaser any CCO Seller is obligated to obtain in accordance with Section 9.2.4.

8.1.20  Seller shall deliver to Purchaser an accounts receivable report updated through the date of Closing.

8.2      At or prior to the Closing, Purchaser shall make or caused to be made the following deliveries:

8.2.1  Purchaser shall pay the balance of the Purchase Price required pursuant to subsection 3.2.3 hereof, less the Deposit and subject to adjustment as provided herein.

8.2.2  Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Assignment of Leases.

8.2.3  Purchaser shall counter-sign and deliver the Escrow Agreement.

8.2.4  Purchaser shall execute, acknowledge and deliver to Seller any transfer tax returns required to be executed by Purchaser to consummate the transactions contemplated hereunder.

17

8.2.5   Purchaser shall deliver such corporate, partnership and/or limited liability company certificates and resolutions as the Title Company may reasonably request in order to confirm Purchaser's authority to consummate the transactions contemplated hereby.

8.2.6   Purchaser shall execute, acknowledge and deliver such other documents as may be necessary or required in order to consummate the transactions contemplated in this Agreement.

8.3   At least two (2) business days prior to Closing, Seller and Purchaser, shall prepare, execute and deliver to each other, subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments and material monetary terms of the transaction contemplated hereby, and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement

9.   Conditions to the Closing Obligations.

9.1   Notwithstanding anything to the contrary contained herein, the obligation of Seller to close title in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Seller, at its election, evidenced by written notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

9.1.1   Purchaser shall have executed and delivered to Seller all of the documents, shall have paid all sums of money and shall have taken or caused to be taken all of the other action required of in this Agreement.

9.1.2   All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the date of the Closing.

9.2   Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions, and further provided that in the event that all conditions have not been either satisfied by Seller or waived by Purchaser by July 15, 2015, Purchaser shall have the right to terminate this Agreement, in which event Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination.

9.2.1   Seller shall have executed and delivered to Purchaser all of the documents required of Seller under this Agreement.

9.2.2   All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, except to the extent the facts

and circumstances underlying such representations and warranties may have changed as of the Closing; provided, however, that if on the Closing Date any such change to a representation or warranty would have a Material Adverse Effect (as defined in Section 9.3 below) on Purchaser, Purchaser shall have the right to terminate this Agreement by providing written notice to Seller, in which event the Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination, unless Seller, at its option and in its sole discretion, agrees to pay to Purchaser at Closing, such amount as will cause the same to no longer have a Material Adverse Effect on Purchaser, in which event Purchaser shall be required to close hereunder.  Seller shall not be deemed to be in breach of this Agreement if any representation or warranty becomes untrue or incorrect through no act or fault of Seller, but merely by reason of changed facts or circumstances beyond the control of Seller, but Purchaser shall nonetheless have the right to terminate this Agreement and receive a refund of the Deposit, together with any interest earned thereon, and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination.

      9.2.3    No later than the date which is three (3) business days prior to Closing, Seller shall deliver to Purchaser estoppel certificates from (i) each tenant designated on Schedule L hereto, and (ii) enough Tenants to cover fifty percent (50%) of the remaining rentable square footage of the Real Property (collectively, the "Required Estoppels"), with all Required Estoppels dated no more than thirty (30) days prior to the Closing.  Seller will not be deemed to have satisfied the requirement to deliver the Required Estoppels if any estoppel certificate provided by a Tenant under a Lease discloses a default on the part of the landlord or such tenant or discloses another Material Matter.  "Material Matter" means a default or other matter relating to a Lease which, in each case, would subject the landlord thereunder to any liability, or otherwise adversely affect the rent, additional rent or other revenue that Purchaser will receive under a Lease after the Closing Date or contain a discrepancy with the information shown in the Leases delivered to Purchaser or any representation or warranty made in this Agreement by Seller.  Seller shall have the right to adjourn the Closing for the duration of any legal proceeding required to compel any Tenant to deliver a Required Estoppel; provided, however, in no event shall such adjournment extend beyond the Outside Date.  Notwithstanding the foregoing, in the event the aggregate of all Material Matters claimed by all Tenants providing estoppel certificates can be cured by the payment of a sum certain ("Curable Matters") that does not exceed an aggregate total for all such Curable Matters of USD Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), Seller shall have the right, at its option and in its sole discretion, to cure such Curable Matters by paying to Purchaser at Closing the entire amount of all Material Matters that constitute Curable Matters.  Notwithstanding the foregoing, in no event shall any Material Matter be deemed a Curable Matter if such Material Matter (i) creates a reoccurring or future claim by any Tenant, or (ii) constitutes, or would constitute with the passage of time or giving of notice, a default under any subject Lease that cannot be cured by the payment a sum certain.  In the event that any estoppel certificate provided by a Tenant under a Lease discloses any Material Matter that does not constitute a Curable Matter, or if the aggregate total necessary to cure all Curable Matters exceeds the sum of USD Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), Purchaser shall have the right to terminate this Agreement upon written notice to Seller, in which event Escrow Agent shall refund the Deposit, together with any interest earned

19

thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination. The failure of Seller to obtain all Required Estoppels in the form required pursuant to this paragraph will not be deemed a default by Seller, but shall entitle Purchaser with the right to terminate this Agreement upon written notice to Seller, in which event the Deposit together with any interest earned thereon, shall be refunded to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination. Purchaser will have the right, but not the obligation, to waive the requirement that Seller furnish any Required Estoppel with respect to any Tenant.

9.2.4    If any governmental authority requires that zoning certificates, certificates of occupancy, certificates of continued occupancy, smoke detector certifications or other inspection or occupancy certificates ("CCO") be obtained in connection with the conveyance of the Property to Purchaser, Seller shall, at its cost, obtain such documents and make any repairs, replacements, alterations and changes to the Property required in connection therewith prior to the closing of title; provided, however, that Seller shall not be obligated to spend in excess of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) ("CCO Cap") to make and repairs or cure any violations of the Property in order to obtain any such CCO. In the event that the cost to obtain the CCO exceeds the CCO Cap and Seller is unwilling to pay the excess, then Purchaser shall have the right to either (i) terminate this Agreement, in which event Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination, or (ii) agree to be responsible and pay the excess cost over the CCO Cap at Closing, or (iii) proceed to Closing and waive the requirement to deliver the CCO.

9.2.5    Seller shall have complied fully with the covenants and obligations of Seller set forth in Section 28, herein below.

9.2.6    The Sale Approval Order shall have been entered by the Bankruptcy Court and shall be final and not appealable or if on appeal then not subject to any stay.

9.2.7    (a)      At the Closing, Purchaser shall receive a credit against the Purchase Price in the amount of USD One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) ("Roof Membrane Credit") to cover certain defects in the roof membrane ("Roof Membrane Defects") revealed in Purchaser's preliminary Roof Survey report dated March 2, 2015.

(b)      Purchaser shall have a period of seven (7) days from the later of (i) the Effective Date of this Agreement ("Roof Inspection Period"), and (ii) Purchaser's receipt of the building plans from Seller or the Manahawkin Township (which Purchaser has previously ordered from the Manahawkin Township building department), in order to perform a structural inspection of the building roofs ("Structural Inspection"); provided, however, in no event shall the Structural Inspection be completed by later than April 2, 2015. In the event that Purchaser's Structural Inspection reveals any issues with the structural integrity of any of the roofs for which repair is recommended within twenty-four (24) months ("Structural Roof Defects"), then prior to

20

the end of the Roof Inspection Period, Purchaser shall provide Seller with a copy of the written report of such Structural Inspection, together with a written estimate, from Purchaser's roofing contractor, detailing the cost to repair the Structural Roof Defects (exclusive of any costs to repair the Roof Membrane Defects). If the cost estimate to repair the Structural Roof Defects is equal to or less than USD Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), Purchaser shall proceed to Closing in accordance with the terms of this Agreement and receive a credit against the Purchase Price at Closing (separate from the Roof Membrane Credit) in the amount of the cost estimated to repair the Structural Roof Defects, up to a maximum amount of USD One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) ("Roof Repair Credit") and Purchaser shall be responsible for the costs to repair the Structural Roof Defects in excess of the Roof Repair Credit. If the cost to repair the Structural Roof Defects is greater than USD Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), then unless Seller agrees to provide Purchaser with the Roof Repair Credit plus an additional credit for the structural roof repair costs in excess of USD $250,000.00 (with Purchaser responsible for USD $100,000.00 of the cost to repair the Structural Roof Defects), Purchaser shall have the right to either (i) proceed to Closing with the Roof Repair Credit, but without the additional credit for repair costs in excess of $250,000.00, in which event Purchaser shall be responsible for all costs to repair the Structural Roof Defects in excess of the Roof Repair Credit, or (ii) terminate this Agreement, in which event Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination.

9.3    As used in this Agreement, the term "Material Adverse Effect" means any facts or circumstances that when taken in the aggregate of all adverse facts and circumstances could reasonably be expected to cause Purchaser to suffer an aggregate loss in excess of USD Seventy-five Thousand and 00/100 Dollars ($75,000.00).

10.    Default; Remedies.

10.1    In the event Purchaser shall default in the performance of Purchaser's obligations under this Agreement and such default continues for a period of ten (10) business days following Seller's written notice to Purchaser, Seller shall have the right, as Seller's sole and exclusive remedy, to retain the Deposit and any interest earned thereon as and for full and complete liquidated and agreed damages for Purchaser's default, and Purchaser shall be released from any further liability to Seller hereunder, except with respect to any provision contained herein that expressly survives termination of this Agreement.

10.2    In the event Seller shall default in the performance of Seller's obligations under this Agreement and such default continues for a period of ten (10) business days following Seller's written notice to Purchaser, Purchaser shall have the right, as Purchaser's sole and exclusive remedy, to either (i) terminate this Agreement, in which event Escrow Agent shall pay to Purchaser the Deposit, together with the interest earned thereon, and thereafter neither party shall have any further liability hereunder, except that such provisions contained herein as otherwise expressly survives termination of this Agreement shall survive or (ii) to seek specific performance, Purchaser hereby specifically waiving any and all other rights and remedies in equity or at law, including, without limitation, a suit for damages. Notwithstanding the

21

foregoing, in the event of any willful or intentional default on the part of Seller that causes the remedy of specific performance to be unavailable or inadequate, Purchaser shall have the right to pursue any and all remedies at law or in equity.

11.    Fire or Other Casualty: Condemnation.

11.1    In the event of a Major Casualty (as hereinafter defined), Purchaser may terminate this Agreement by written notice to Seller, in which event Escrow Agent shall pay to Purchaser the Deposit, together with the interest earned thereon, and thereafter neither party shall have any further liability hereunder, except with respect to any provision contained herein that expressly survives termination of this Agreement. If Purchaser does not elect to terminate this Agreement within ten (10) business days after Purchaser's receipt of written notice from Seller of the occurrence of such Major Casualty, then Purchaser shall be deemed to have elected to proceed with the purchase and sale of the Property, in which event the Seller shall assign to Purchaser all of Seller's right, title and interest in and to any claims and proceeds that Seller may have with respect to any casualty insurance policies relating to the Property, and the Purchase Price shall be reduced by the amount of the deductible under Seller's insurance policy plus any insurance proceeds received by Seller in connection with such casualty. For purposes of this Section 11.1 "Major Casualty" refers to a loss or damage to Property such that (a) the cost of repairing or restoring the Property in question to substantially the same condition which existed prior to the event of damage would be, in the opinion of an architect selected by Purchaser, equal to or greater than two Million and 00/100 Dollars ($2,000,000.00), or (b) any Tenant under a Lease as to which a Required Estoppel is applicable would be permitted to terminate its lease as a result of such casualty. In the event of loss or damage to the Property that does not constitute a Major Casualty, this Agreement shall remain in full force and effect, provided Seller assigns to Purchaser all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies relating to the Property, in which case the Purchase Price shall be reduced by an amount equal to the amount of the deductible under Seller's insurance policy plus any insurance proceeds received by Seller in connection with such casualty.

11.2    In the event of any pending or threatened condemnation of all or any portion of the Land or Improvements, Purchaser may terminate this Agreement by written notice to Seller, in which event Escrow Agent shall pay to Purchaser the Deposit, together with the interest earned thereon, and thereafter neither party shall have any further liability hereunder, except with respect to any provision contained herein that expressly survives termination of this Agreement. If Purchaser does not elect to terminate this Agreement within ten (10) business days after Seller sends Purchaser written notice of the occurrence of such condemnation, then Purchaser shall be deemed to have elected to proceed with the purchase and sale of the Property, in which event the Seller shall assign to Purchaser all of such Seller's right, title and interest in and to any condemnation award or proceeds that Seller may have with respect to the Property, and the Purchase Price shall be reduced by an amount equal to any condemnation award paid to Seller.

11.3    Nothing contained in this Section 11 shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

11.4    Attached hereto as <u>Schedule P</u> are the certificates for the casualty and general liability insurance policies covering the Property.  Seller shall maintain all such policies in full force and effect.

12.    <u>Brokerage</u>.    Purchaser and Seller each represent and warrant to the other that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby other than Holliday Fenoglio Fowler, L.P. ("<u>HFF</u>").    Seller shall pay the commission due to HFF pursuant to separate agreement.  Each party hereto agrees that if any person or entity makes a claim for brokerage commissions or finder's fees related to the sale of the Property by Seller to Purchaser, and such claim is made by, through or on account of any acts or alleged acts of said party or its representatives, said party will protect, indemnify, defend and hold the other party free and harmless from and against any and all losses, liabilities, costs, damages and expenses (including reasonable attorneys' fees) in connection therewith.  The provisions of this <u>Section 12</u> shall survive Closing or any termination of this Agreement.

13.    <u>Closing Costs; Fees and Disbursements of Counsel</u>.    Purchaser and Seller shall each pay their own legal fees related to the preparation of this Agreement and all documents required to settle the transaction contemplated hereby.  Purchaser shall pay (i) all costs associated with its due diligence, including the cost of appraisals, architectural, engineering, and environmental reports, (ii) all title insurance premiums and charges and all title examination costs, and (iii) all survey costs.  Subject to the provisions of <u>Section 30</u>, Purchaser and Seller shall each pay any amounts imposed by law upon grantees and grantors, respectively, on account of transfer taxes, documentary stamps or similar fees charged for the conveyance of real property, in accordance with the laws and/or customs with respect to title closings where the Property is located, including, if applicable, the "realty transfer fee" imposed pursuant to N.J.S.A. 46:15-7 and N.J.S.A. 46:15-7.1, and, if applicable, the so-called "mansion tax" imposed pursuant to N.J.S.A. 46:15-7.2.  All other customary purchase and sale closing costs shall be paid by Seller or Purchaser in accordance with the customs with respect to title closings where the Property is located.  The provisions of this <u>Section 13</u> shall survive the Closing.

14.    <u>Notices</u>.    Except as otherwise expressly provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section 14 collectively referred to as "<u>Notices</u>") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by e-mail to the address set forth below, if followed by the giving of, pursuant to one of the other means set forth in this <u>Section 14</u> before the end of the first business day thereafter, (c) upon receipt, when sent by prepaid reputable overnight courier or (d) three (3) days after the date so mailed, if sent by certified mail, return receipt requested, postage prepaid, in all cases addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.

23

At the same time any Notice is given to Seller, a copy shall be sent to Escrow Agent in the manner aforesaid to:

> Robinson Brog Leinwand Greene Genovese & Gluck, P.C.
> 875 Third Avenue, 9th Floor
> New York, New York 10022
> Attention: A. Mitchell Greene, Esq. and Philip Thomas, Esq.
> Phone: (212) 603-0492
> Email: amg@robinsonbrog.com
>         pht@robinsonbrog.com

At the same time any notice is given to Purchaser, copies shall be sent in the manner aforesaid to:

> Hampshire Global Partners, LLC
> c/o The Hampshire Companies
> 22 Maple Avenue
> Morristown, New Jersey 07960
> Attention: Mark S. Rosen
> Phone: (973) 734-4239
> E-mail: mrosen@hampshireco.com

With a copy to:

> Fox Rothschild, LLP
> 15 Maple Avenue
> Morristown, New Jersey 07960
> Attention: Robert A. Klausner, Esq.
> Phone: (973) 326-7102
> E-mail: rklausner@foxrothschild.com

And a copy to:

> Fox Rothschild, LLP
> 1301 Atlantic Avenue
> Midtown Building, Suite 400
> Atlantic City, New Jersey  08401-7212
> Attention:  Michael Viscount, Esq.
> Phone:  (609) 572-2227
> E-mail:  mviscount@foxrothschild.com

And a copy to:

> Fox Rothschild, LLP
> 1301 Atlantic Avenue
> Midtown Building, Suite 400
> Atlantic City, New Jersey  08401-7212
> Attention:  Raymond M. Patella, Esq.
> Phone:  (609) 572-2254
> E-mail:  rpatella@foxrothschild.com

Notices shall be valid only if served in the manner provided above.

15.    Attorney's Fees.    Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all costs, charges and expenses, including attorney's fees, expended or incurred in connection therewith.    The provisions of this Section 15 shall survive the Closing hereunder and the termination of this Agreement.

16.    New Environmental Defect.    In the event of any new Environmental Defect (as defined below) occurs on any portion of the Real Property between the date of Purchaser's inspection and the Closing ("New Environmental Defect"), and such New Environmental Defect is reasonably determined by Purchaser to have a Material Environmental Defect (as defined below), Purchaser shall have the right to terminate this Agreement by providing written notice to Seller, in which event the Escrow Agent shall refund the Deposit, together with any interest earned thereon, to Purchaser and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination.    For purposes of this Agreement, the term "Environmental Defect" means the presence (or evidence of the presence) at, on or below the Property of any (i) Hazardous Materials at concentrations or levels in excess of the cleanup standards applicable to the current use of the Property under any Environmental Law, or at concentrations or levels otherwise not permitted under any Environmental Law, or (ii) Hazardous Materials which have been or which are being used, generated, transported, manufactured, treated, delivered, stored, handled, spilled, leaked, disposed, poured, emitted, emptied, dumped, produced, or released, on, from or about the Property in any manner not in compliance with any Environmental Law.    The term "Material Environmental Defect" means any New Environmental Defect that (1) costs in excess of USD Seventy-five Thousand and 00/100 Dollars ($75,000.00) to remediate in compliance with all Environmental Laws, (2) creates a potential claim (including a natural resource damage claim) by any Tenant, third party or governmental agency or authority, (3) creates any monitoring or reporting obligation that would continue after the Closing, (4) creates the obligation to post any financial assurances, (5) requires the installation of any Engineering Controls or Institutional Controls (as defined in N.J.S.A. §58:10B-13 or N.J.S.A. § 13:1E-56, including without limitation, any deed notice, declaration of environmental restriction, groundwater classification exception area or well restriction area), (6) would provide any Tenant with the right to terminate its Lease, (7) would interfere or disrupt any Tenant's operations on the Real Property, (8) may create the potential for vapor intrusion, or (9) the cost to remediate in compliance with all Environmental Laws would not be quantifiable by a sum certain.    Purchaser shall have the right to access the Real Property for the purpose of confirming that no New Environmental Defect has occurred since Purchaser's original inspection of the Real Property; provided, however, that Purchaser shall not perform any invasive testing without the consent of Seller.    Seller's consent shall not be unreasonably withheld, conditioned or delayed provided that Purchaser agrees to restore the Real Property, as near as reasonably possible, to the condition which existed prior to such invasive testing and further provided that Purchaser agrees to indemnify Seller against any loss suffered by Seller as a result of such invasive testing, which indemnity shall not extend to (i) any loss resulting from the negligence or willful misconduct of Seller, any party acting by or on

25

behalf of Seller, or any Tenant, or (ii) the release or spread of any Hazardous Materials discovered (but not deposited or exacerbated) on or under the Real Property.

17.    Escrow.

17.1    Escrow Agent shall hold the Deposit in escrow, together with all interest earned thereon, in an interest-bearing attorney trust account, in accordance with the following:

17.2    If the Closing has occurred, Escrow Agent shall deliver the Deposit, together with any interest earned thereon, to Seller.  If Escrow Agent receives a written notice signed by both Seller and Purchaser that this Agreement has been terminated or canceled, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, as directed therein.

17.3    If Escrow Agent receives a written request signed by Purchaser or Seller (the "Noticing Party") stating that this Agreement has been canceled or terminated and that the Noticing Party is entitled to the Deposit, or that the other party hereto (the "Non-Noticing Party") has defaulted in the performance of its obligations hereunder, Escrow Agent shall mail (by certified mail, return receipt requested) a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Deposit by written notice of objection delivered to and received by Escrow Agent within seven (7) days (excluding Saturdays, Sundays and State of New York and Federal holidays) after the date of Escrow Agent's mailing of such copy to the Non-Noticing Party, but not thereafter.  If Escrow Agent shall not have so received a written notice of objection from the Non-Noticing Party, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, to the Noticing Party. If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands on it and shall continue to hold the Deposit, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Deposit (and interest), or (b) a final order of a court of competent jurisdiction directing disbursement of the Deposit (and interest) in a specific manner, in either of which events Escrow Agent shall then disburse the Deposit, together with the interest earned thereon, in accordance with such notice or order.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such requests or demands until and unless it has received a direction of the nature described.

17.4    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Section 17 shall be addressed to the party to receive such notice at its notice address set forth in Section 14 (with copies to be similarly sent to the additional persons therein indicated), but the provisions of Section 14 relating to the manner of giving notices and the effective dates thereof shall have no application to the provisions of this Section 17.

17.5    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 17.3 above within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a written notice signed

by either Seller or Purchaser over entitlement to the Deposit, or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Deposit, together with the interest earned thereon, with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Deposit, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

17.6    The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of any of the parties, and that Escrow Agent shall not be liable to either of the parties for an act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence.  Seller and Purchaser shall jointly and severally indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with regard to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent.

17.7    Notwithstanding anything to the contrary contained herein, Purchaser agrees that Escrow Agent may represent Seller as Seller's counsel in any action, suit or other proceeding between Seller and Purchaser.

18.    Continued Operations; Leasing.

18.1    Seller shall operate and maintain the Property in a manner consistent with the manner in which the Seller has operated and maintained the Property prior to the date hereof, provided, however, such obligation shall not include structural or extraordinary capital improvements or repairs, except as may be required pursuant to subsection 9.2.4.

18.2    Seller shall not remove from the Property any Personal Property unless such item is replaced with a similar item of comparable value.

18.3    Seller shall not modify or amend any Service Contract or enter into any new Service Contract without Purchaser's prior written consent.   All Service Contracts shall be terminated by Seller prior to Closing.

18.4    Seller shall not, without Purchaser's prior written consent, terminate, amend, renew or extend any Lease in any respect, unless required by the terms of the Lease or required by law.  Purchaser shall have the right, with Seller's consent, not to be unreasonably withheld, to contact the Tenants under the Leases directly.  Notwithstanding the foregoing, Purchaser shall have the right to contact K-Mart and Staples, provided that Purchaser shall provide Seller with a

reasonable opportunity, on not less than two (2) days' notice (which may be via email or telephone) to participate in any such discussions with K-Mart and Staples.

18.5    Seller shall not permit occupancy, or enter into any new lease, for space at the Property without Purchaser's prior written consent.

18.6    Seller shall not grant any concessions or rent rebates to any tenant in connection with any of the Leases for any period following the Closing Date.

18.7    Seller shall provide Purchaser with all 2014 CAM Reconciliation Statements sent to Tenants (except for K-Mart).

18.8    Seller shall not settle or compromise the K-Mart Dispute without Purchaser's prior written consent, which Purchaser may withhold in Purchaser's sole discretion.

18.9    Seller shall provide Purchaser with copies of all Tenant billings, Tenant correspondence, monthly accounting reports and all other documentation received or generated by Seller after the date of this Agreement which relate to the Tenants, the Leases or the Property, all of which must reflect no Material Adverse Effect. Nothing contained in this Section 18.9 shall constitute Purchaser's approval of any such information or documentation or be deemed to be a modification of Seller's representations contained in Article 7 of this Agreement.

18.20    Seller shall undertake good faith, commercially reasonable efforts to obtain and provide to Purchaser copies of the following agreements with respect to K-Mart: (i) Sublease from Sears to K-Mart, and (ii) Exhibit B to Second Amendment (site plan) (collectively, the "Missing K-Mart Documents"). If Seller has not obtained the Missing K-Mart Documents within ten (10) days from the Effective Date, Seller shall submit an appropriate application to the Bankruptcy Court for an order to subpoena the Missing K-Mart Documents from K-Mart. Seller represents that, to Seller's knowledge, none of the Missing K-Mart Documents will operate to cause Purchaser to suffer a Material Adverse Effect (as defined above in Section 9.3). If, contrary to the foregoing representation, any of the Missing K-Mart Documents would operate to cause Purchaser to suffer a Material Adverse Effect, then Seller shall not be deemed to be in breach of this Agreement, but Purchaser shall nonetheless have the right to terminate this Agreement and receive a refund of the Deposit, together with any interest earned thereon, and thereafter neither party shall have any further right or obligation to the other, except those provisions which expressly survive such termination.

18.21    Seller shall undertake good faith, commercially reasonable efforts to obtain and provide to Purchaser a copy of the plans dated 5/12/2009 prepared by SunEdison for Staples' installation of the solar photovotaic system, as referenced in the consent letter dated 7/24/2009.

18.22    Within three (3) business days of any request by Purchaser, Seller shall send to each tenant under the Leases, and request that each such tenant execute and return, a subordination, non-disturbance and attornment agreement ("SNDA") as may be required by Purchaser's lender, the form of which shall be included with Purchaser's request.

19.     <u>Survival; Governing Law</u>.     Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein.   This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New Jersey.

20.     <u>Counterparts; Captions</u>.     This Agreement may be executed in counterparts, each of which shall be deemed an original. Facsimile or "pdf" signatures shall be binding with the same force and effect as original signatures.   The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

21.     <u>Entire Agreement; No Third Party Beneficiaries</u>.     This   Agreement   (including   all schedules and exhibits annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein.   The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.   The provisions of this <u>Section 21</u> shall survive the Closing.

22.     <u>Waivers; Extensions</u>.     No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained.   No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

23.     <u>No Recording</u>.     Purchaser hereto agrees that neither this Agreement nor any memorandum or notice hereof shall be recorded.   Any such recordation or attempted recordation shall be null and void and shall constitute a material default by Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser shall have the right to record a Notice of Settlement with the County recording office pursuant to N.J.S.A. 46:26A-11, et seq.

24.     <u>Assignment</u>.     Purchaser shall have the right to assign this Agreement without Seller's prior written consent, provided, that The Hampshire Companies or any affiliate thereof has an interest in the assignee and Purchaser provides Seller with the name and organizational documents for such assignee prior to the Closing Date.   Purchaser shall in no event be released from any of its obligations or liabilities hereunder as a result of any assignment.

25.     <u>Time Periods</u>.     If any date to perform any act or give any notice or approval set forth in this Agreement shall fall on a Saturday, Sunday or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or legal holiday in the State of New Jersey.   The term "<u>Business Day(s)</u>" or "<u>business day(s)</u>" shall mean any day other than a Saturday, Sunday or any other day which is a legal holiday in the State of New Jersey

26.     <u>Tax Proceedings</u>.     Seller has filed and there is currently pending a tax appeal of the 2013 and 2014 assessment years before the Tax Court of New Jersey ("<u>Pending Tax Appeal</u>"). If

any Pending Tax Appeal shall not have been finally resolved or settled prior to the Closing and shall relate to any tax period which covers both before and after the Closing, any benefits derived from same, net of any reasonable expenses incurred by Seller and Purchaser in connection therewith, shall be returned to any Tenants or former tenants at the Property to the extent required pursuant to the terms of such Tenants' or former tenants' leases and then prorated between the parties on the basis of the portions accruing to periods before and after the Closing. The Seller and Purchaser shall reasonably cooperate in the resolution of such jointly controlled tax appeals or protests and no such jointly controlled proceeding shall be settled or compromised without the written consent of each of the Seller and Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed.   Notwithstanding the foregoing, or any provision in this Agreement that may be construed to the contrary, Seller shall not settle or compromise any tax appeal (including any Pending Tax Appeal) in any manner that would (i) prohibit or prevent Purchaser from filing a tax appeal in the tax year in which the Closing occurs (if not already filed) or any year subsequent thereto, or (ii) result in a benefit to Seller for any period prior to the Closing, to the detriment of Purchaser for any period subsequent to the Closing Date.  Any settlement of a Pending Tax Appeal shall be subject to Purchaser's review and approval, which approval shall not be unreasonably withheld provided the terms of such settlement or compromise are consistent with this paragraph.  The provisions of this <u>Section 26</u> shall survive the Closing.

27.   <u>Successors and Assigns</u>.   This Agreement shall bind and inure for the benefit of the Seller, Purchaser and the respective permitted successors and permitted assigns.

28.   <u>Subject to Bankruptcy Court Approval</u>.   This Agreement is subject to and contingent upon the entry of an order of the Bankruptcy Court approving the sale of the Property and all Purchased Assets by the Seller to the Purchaser, free and clear of liens claims and interests of third parties, except as otherwise set forth in this Agreement, and the assumption and assignment of the Leases (the "<u>Sale</u>"), pursuant to Sections 105, 363(b) and 363(f) and 365 of the Bankruptcy Code, and containing a finding that Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code (the "<u>Sale Approval Order</u>"), in accordance with <u>Section 28.2</u> below.  The parties have submitted to the Bankruptcy Court the form of Order attached hereto as <u>Exhibit O</u>, designating Purchaser as the successful bidder pursuant to the bidding procedures previously approved by the Bankruptcy Court and approving the Break-up Fee and Expense Reimbursement (the "<u>Break-up Fee Order</u>").   In the event the Bankruptcy Court does not enter the Break-up Fee Order in the form attached hereto by March 20, 2015, Purchaser shall have the right to terminate this Agreement by written notice to Seller, in which event the Escrow Agent shall refund to Purchaser the Deposit, together with any interest earned thereon, and neither party shall have any obligations to the other hereunder, except those provisions which expressly survive such termination.

28.1   <u>Reimbursement Expense</u>.  Notwithstanding any provision in this Agreement that may be construed to the contrary, Purchaser shall have the right to receive the Expense Reimbursement (as such term is defined in the Break-up Fee Order) in accordance with and subject to the terms of the Break-up Fee Order.

28.2   <u>Private Sale</u>.  The Sale shall proceed as a private sale without an auction pursuant to Bankruptcy Rule 6004(f)(1), the Break-up Fee Order and all other applicable Bankruptcy

Rules.  In that regard, the Seller shall file with the Bankruptcy Court, within five (5) business days after the full execution and delivery to the other party of this Agreement, a motion seeking (i) the approval of this Agreement, (ii) the approval of the transactions contemplated hereby and in the Break-up Fee Order, including (1) the provisions of this Agreement to be performed by the Seller prior to the Closing, and (2) Section 28.3 of this Agreement (including the Break-up Fee and the Expense Reimbursement), (iii) the approval of the timely performance by Purchaser of its obligations hereunder, and (iv) a finding that Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code  (such motion, the "Private Sale Motion"), in form and substance reasonably satisfactory to Purchaser.  The Seller shall attach a true and complete copy of this Agreement (including all schedules and exhibits thereto except for schedules and exhibits that contain information the disclosure of which is prohibited by law) to the Private Sale Motion. The Seller shall also comply with the following procedures:  (A) the Seller shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Sale Approval Order, shall serve all parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and all related rules and shall diligently pursue the obtaining of such orders; (B) the Seller shall oppose and seek the dismissal of any appeal (including petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation) of the Sale Approval Order that is filed; and (C) the Seller shall properly serve (i) all Tenants under the Leases and (ii) South Jersey Land Development, LLC (with respect to the parking rights contained in that certain Deed, dated October 15, 1986, and recorded on October 20, 1986 in Deed Book 4471, Page 611) in accordance with Bankruptcy Code, so as to convey the Property free of any existing claims by any Tenant, provided that with respect to the service on South Jersey Land Development, LLC, Purchaser shall provide the address for notice and the text to be incorporated into such notice.  The Seller shall provide Purchaser at least three (3) business days in advance of filing with the Bankruptcy Court, a draft of any motions, orders, amendments, supplements or other pleadings that the Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement. The Seller shall reasonably cooperate with Purchaser with respect to all such filings and incorporate any reasonable comments of Purchaser and its counsel into such order, amendment, supplement, motion or pleading.  The Seller shall diligently prosecute approval of the Sale Approval Order.  Each party hereto shall promptly notify the other party if at any time before the Closing Date such party becomes aware that any information provided to the Bankruptcy Court contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

29.    Assigned Leases.  At the Closing, the Seller shall, pursuant to the Sale Approval Order, the Assignment of Leases and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser, the Leases (herein as assumed and assigned under section 365 of the Bankruptcy Code the Leases are referred to as the "Assumed Leases"). The Seller shall cause to be paid prior to the Closing or from the sale proceeds paid by the Seller at the Closing any cure amount or other obligation required to be paid under any Assumed Lease (herein called a "Cure Claim").  The Seller shall cause any cure amount required to be paid under any Lease to be paid prior to the Closing.

30.    Transfer Fees. The Seller and Purchaser shall cooperate to the end that transfer fees payable on account of the conveyance of real and personal property in New Jersey shall not be due on account of the Sale hereunder either because the Sale is a principal component of the

31

Seller's Plan as the funding source for distributions making the Sale exempt under Section 1146(a) of the Bankruptcy Code and /or because the Sale is exempt under N.J.S.A. 46:15-10(g). Notwithstanding the foregoing, it shall not be a condition to Closing that the Plan be confirmed nor that the Sale be found to be exempt from transfer fees. In the event that transfer fees are due, such fees shall be paid as provided in Section 13 hereof.

31.    Bulk Sale Tax Filing.    Seller shall cooperate with the Purchaser in preparing and filing the necessary forms and statements to provide bulk sale notice to the New Jersey Division of Taxation and, if appropriate, obtain a waiver of the requirement for an escrow deposit.  The parties agree that any sum of money required to be held in escrow by the New Jersey Division of Taxation shall be held by Purchaser's attorney from the proceeds of sale due at Closing, which will be released to the Seller, if, as and when Seller obtains a tax clearance letter from the New Jersey Division of Taxation, which obligation of Seller to obtain such tax clearance letter, and satisfy any and all conditions required for the issuance thereof, shall survive Closing. Notwithstanding anything to the contrary contained herein, Purchaser shall not be liable for any taxes owed in connection with the use and operation of the Property prior to Closing, or any taxes on any gain realized upon the sale, transfer or assignment of the Property.

32.    Effective Date. As used in this Agreement, the term "Effective Date" means the date on which this Agreement has both been fully executed by and delivered to each party to the other and the Break-up Fee Order is entered by the Bankruptcy Court.

33.    Like Kind Exchange.  Purchaser and Seller each hereby acknowledge that the sale and purchase of the Property pursuant to this Agreement may comprise part of independent like-kind (tax deferred) exchange under Section 1031 of the Internal Revenue Code, provided that same will not delay the Closing, cause additional expense to either party, increase either party's liabilities or obligations or otherwise modify any of the terms or provisions of this Agreement. Seller's and/or Purchaser's rights, as the case may be, under this Agreement may be assigned to a qualified intermediary for the purpose of completing such an exchange.  Each party agrees to reasonably cooperate with the other party and the other party's qualified intermediary for the purpose of effectuating or facilitating such like-kind exchange.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER:

**AC I MANAHAWKIN LLC,**
a Delaware limited liability company

By: _____
    Name: David Goldwasser
    Title: Managing Member of GC Realty Advisors LLC,
           Manager of AC I Manahawkin, LLC.

PURCHASER:

**HAMPSHIRE GLOBAL PARTNERS, LLC,**
a New Jersey limited liability company

By: _____
    Name:
    Title:

Agreement of Escrow Agent

Escrow Agent hereby agrees to hold and disburse the Deposit in accordance with the terms of this Agreement.

ESCROW AGENT

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK, P.C.**

By: _____
    Name: A. Mitchell Greene
    Title: Partner

33

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER:

**AC I MANAHAWKIN LLC,**
a Delaware limited liability company

By: _____
     Name:
     Title:


PURCHASER:

**HAMPSHIRE GLOBAL PARTNERS, LLC,**
a New Jersey limited liability company

By: _____
     Name: Mark S. Rosen
     Title: Executive Vice President

Agreement of Escrow Agent

Escrow Agent hereby agrees to hold and disburse the Deposit in accordance with the terms of this Agreement.

ESCROW AGENT

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK, P.C.**

By: _____
     Name:
     Title:

33

## LIST OF SCHEDULES

Schedule A - Legal Description

Schedule B – Personal Property

Schedule C – Existing Surveys

Schedule D – List of Leases

Schedule D-1 – Rent Roll

Schedule E – Service Contracts

Schedule F – Intentionally Omitted

Schedule G - Form of Deed

Schedule H - Form of Assignment and Assumption of Leases

Schedule I – Intentionally Omitted

Schedule J - Form of Bill of Sale

Schedule K – Form of Estoppel Certificate

Schedule L – List of Required Estoppels

Schedule M – List of Missing Information

Schedule N –  List of Certain B-II Exceptions from Purchaser's Title Report

Schedule O – Break-up Fee Order

Schedule P – Copies of Insurance Certificates for all Property Policies

Schedule Q – K-Mart Default Notice Letter

Exhibit 7.1.6 – List of Environmental Reports provided by Seller

SCHEDULE A

Legal Description

(See Attached)

**All those certain tracts or parcels of land and premises, situate, lying and being in the Township of Stafford, County of Ocean and State of New Jersey, more particularly described as follows:**

**PHASE 1:**

**TRACT ONE:**

BEGINNING at the intersection of the southerly line of Garden State Parkway (right of way varies) with the westerly line of New Jersey Highway Route No. 72 (130 foot right of way) and running;

1. South 37 degrees 49 minutes 45 seconds East along the aforesaid westerly line of New Jersey State Highway Route No. 72 a distance of 116.81 feet to an angle point; thence

2. South 31 degrees 29 minutes 30 seconds East still along the westerly line of New Jersey State Highway Route No. 72 a distance of 310.28 feet to a point of curvature; thence

3. South 26 degrees 30 minutes 18 seconds East still along the westerly line of New Jersey State Highway Route No. 72 a distance of 57.52 feet to a point; thence

4. Along the common line of the Access Entrance Parcel and Lot 1.03 Block 77 on a curve to the right having a radius of 60.00 feet (central angle 60 degrees 59 minutes 09 seconds) and an arc length of 63.86 feet (chord bearing South 26 degrees 57 minutes 15 seconds West 60.89 feet) to a point; thence

5. Still along the common line of the Access Entrance Parcel and Lot 1.03 Block 77 on a curve to the left having a radius of 1035.00 (central angle 09 degrees 31 minutes 58 seconds) and an arc length of 172.20 feet (chord bearing South 52 degrees 40 minutes 51 seconds West 172.00 feet) to a point; thence

6. South 31 degrees 29 minutes 30 seconds East along the westerly line of the Access Entrance Parcel then Washington Avenue (a/k/a New Washington Avenue) (60 foot right of way) a distance of 318.61 feet to a point; thence

7. South 28 degrees 17 minutes 43 seconds West along the common line of Tax Map Lots 1.06 and 1.20 Block 77 a distance of 250.00 feet to a point; thence

8. South 31 degrees 29 minutes 30 seconds East along the common line of Tax Map Lots 1.06 and 1.20 Block 77 a distance of 12.00 feet to a point; thence

9. South 58 degrees 30 minutes 30 seconds West still along the common line of Tax Map Lots 1.06 and 1.20 Block 77 a distance of 729.57 feet to a point; thence

10. North 31 degrees 29 minutes 30 seconds West along the common line of Tax Map Lots 1.06 and 1.10 then 1.05 Block 77 a distance of 431.04 feet to a point; thence

11. North 52 degrees 00 minutes 00 seconds West along Tax Map Lots 1.05 and 1.10 then Lot 1.04 Block 77 a distance of 212.83 feet to an angle point; thence

12. North 12 degrees 57 minutes 56 seconds West along the common line of Tax Map Lots 1.04 and 1.10 Block 77 a distance of 618.97 feet to a point; thence

13. North 46 degrees 09 minutes 25 seconds East a distance of 46.61 feet to a point; thence

14. North 77 degrees 02 minutes 04 seconds East along the southerly line of Garden State Parkway a distance of 628.21 feet to an angle point; thence

15. North 40 degrees 10 minutes 15 seconds East still along the southerly line of Garden State Parkway a distance of 202.52 feet to an angle point; thence

16. North 84 degrees 55 minutes 25 seconds East still along the southerly line of Garden State Parkway a distance of 229.12 feet to the point and place of beginning.

FOR INFORMATIONAL PURPOSES ONLY: Being known and designated as Lots 1.03, 1.04, 1.05 and 1.06 Block 77 on the Tax Map of the Township of Stafford, Ocean County, New Jersey.

**TRACT TWO:**

BEGINNING at the intersection of the westerly line of New Jersey State Highway Route No. 72 (130 foot right of way) with the southerly Access Entrance Parcel also being the northeasterly corner of Tax Map Lot 2 Block 75 and running; thence

1. South 58 degrees 30 minutes 30 seconds West along the common line of Tax Map Lot 1 Block 77.01 and Tax Map Lot 2 Block 75 a distance of 168.00 feet to a point; thence

2. Along the Access Entrance Parcel the following three (3) courses: On a curve to the right having a radius of 34.00 feet (central angle 77 degrees 25 minutes 17 seconds) and an arc length of 45.94 feet (chord bearing North 15 degrees 42 minutes 16 seconds East 42.53 feet) to a point; thence

3. On a curve to the right having a radius of 965.00 feet (central angle 05 degrees 53 minutes 35 seconds) and an arc length of 99.26 feet (chord bearing North 55 degrees 33 minutes 42 seconds East 99.21 feet to a point; thence

4. North 58 degrees 30 minutes 30 seconds West a distance of 17.72 feet to a point; thence

5. On a curve to the right having a radius of 22.00 feet (central angle 42 degrees 59 minutes 09 seconds) and an arc length of 16.51 feet (chord bearing North 80 degrees 00 minutes 05 seconds East 16.12 feet) to a point; thence

6. South 41 degrees 35 minutes 05 seconds East a distance of 28.53 feet to the point and place of beginning.

FOR INFORMATIONAL PURPOSES ONLY: Being known and designated at Lot 1 Block 77.01 on the Tax Map of the Township of Stafford, Ocean County, New Jersey.

**PHASE II:**

Beginning at the point of intersection of the westerly line of Doc Cramer Boulevard (60 foot right of way) with the southwesterly line of Washington Avenue (60 foot right of way) and running; thence

1. South 28 degrees 17 minutes 43 seconds west along the aforesaid westerly line of Doc Cramer Boulevard a distance of 1,085.15 feet to a point being the common corner of Tax Map Lots 1.20 and 1.10 Block 77; thence

2. North 61 degrees 42 minutes 17 seconds west along the common line of Tax Map Lots 1.20 and 1.10 Block 77 a distance of 317.04 feet to an angle point; thence

3. North 31 degrees 29 minutes 30 seconds west still along the common line of Tax Map Lots 1.20 and 1.10 Block 77 a distance of 800.44 feet to an angle point; thence

4. North 58 degrees 30 minutes 30 seconds east still along the common line of Tax Map Lots 1.20 and 1.10 then 1.06 Block 77 a distance of 881.24 feet to an angle point; thence

5. North 31 degrees 29 minutes 30 seconds west along the common line of Tax Map Lots 1.20 and 1.06 Block 77 a distance of 12.00 feet to an angle point; thence

6. North 28 degrees 17 minutes 43 seconds east still along the common line of Tax Map Lots 1.20 and 1.06 Block 77 a distance of 250.00 feet to a point in the aforesaid southwesterly line of Washington Avenue; thence

7. South 31 degrees 29 minutes 30 seconds east along the aforesaid southwesterly line of Washington Avenue a distance of 666.15 feet to the point and place of beginning.

**Excepting thereout and therefrom so much as was conveyed to South Jersey Land Development, LLC by Deed from ORIX Woodmont Manahawkin Venture by Deed Book 11959, page 1193, more particularly described as follows:**

Beginning at a point located the following two (2) lettered courses from the intersection of the southwesterly line of Washington Avenue (aka New Washington Avenue) (right of way varies) with the northwesterly Line of Doc Cramer Boulevard (60 foot right of way) and running

(a) North 31 degrees 29 minutes 30 seconds west along the aforesaid southwesterly line of Washington Avenue a distance of 314.75 feet to a point; thence

(b) South 58 degrees 30 minutes 30 seconds west through a portion of Tax Map Lot 1.20 Block 77 a distance of 70.34 feet to the point and place of beginning; and running thence

Along the common line of Lots 1.20 and 1.21 Block 77 the following four (4) courses:

1. South 58 degrees 30 minutes 30 seconds west a distance of 153.96 feet to an angle point; thence

2. North 31 degrees 29 minutes 30 seconds west a distance of 88.15 feet to an angle point; thence

3. North 58 degrees 30 minutes 30 seconds east a distance of 153.96 feet to an angle point; thence

4. South 31 degrees 29 minutes 30 seconds east a distance of 88.15 feet to the point and place of beginning.

Being more particularly shown on a map entitled, "Major Subdivision of Tax Map Lot 1.08 Block 77, Township of Stafford, Ocean County, New Jersey," prepared by Errol Melnick, Professional Land Surveyor for the firm of Kenderian-Zilinski Associates, dated October 7, 2003 and last revised January 9, 2004 filed in the Ocean County Clerk's Office on February 26, 2004 as Map J-3297; and being now known as Lot 1.21 in Block 77 on the Stafford Township Tax Map.

FOR INFORMATIONAL PURPOSES ONLY: Phase II is known and designated at Lot 1.20 in Block 77 on the tax map of the Township of Stafford.

**Together with the benefits of the following:**

Reciprocal Easement and Operation Agreement in Deed Book 5042, page 217; as supplemented by Supplemental Agreement in Deed Book 5122, page 905; as amended by First Amendment to Shopping Center Reciprocal Easement and Operation Agreement recorded in Book OR 11031, page 43, re-recorded in Book OR 11148, page 1102.

Common Areas Maintenance and Reciprocal Easement Agreement as set forth in Deed Book 11959, page 1209.

## SCHEDULE B

## List of Personal Property

Together with the following additional assets (collectively, "Additional Assets"):

(a)    All inventory, wherever located, including raw materials, packaging materials and supplies, work-in-progress and finished goods that are owned, leased or licensed by the Seller, including inventory held at any location controlled by the Seller, inventory previously purchased and in transit and any inventory paid for but not yet delivered or received by the Seller, to the extent set forth on Section 1(b)(ii) of the Seller Disclosure Schedule filed in the Bankruptcy Case    (collectively, the "Transferred Inventory");

(b)    All other tangible property and interests therein, wherever located, including all apparatus, materials, furniture, office supplies, fixtures, furnishings, office equipment, vehicles, and other items of tangible personal property owned, leased, used or licensed by the Seller, and including printing plates or similar property used to print labels or other promotional materials (collectively, "Printing Plates"), tangible property held at any location controlled by the Seller, tangible property previously purchased and in transit and any tangible property held by a customer or prospective customer of the Seller, to the extent set forth on Section 1(b)(iii) of the Seller Disclosure Schedule;

(c)    All other rights to payment (including notes receivable), pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit and other deposits included in pre-paid assets or rights of payment (including rights to insurance proceeds in respect of any of the Purchased Assets in each case), of the Seller, and any claim, cause of action, remedy or right related to the foregoing;

(d)    All Intellectual Property Rights of the Seller (including all related documentation and data in all forms and formats in which it exists), including, for the avoidance of doubt, all rights in the trademarks set forth on Section 1(b)(v) of the Seller Disclosure Schedule; and

(e)    All computers, computer hardware, computer support equipment and software, telephone and communication systems, security systems, accounting systems, email addresses, databases, source codes, user manuals and master disks of source codes and other proprietary information, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis) or specific, unique-to-the-business usage, in each case as owned, leased, used or licensed by the Seller, including, for the avoidance of doubt, all such property set forth on Section 1(b)(vi) of the Seller Disclosure Schedule.

SCHEDULE C

Existing Surveys

ALTA / ACSM Land Title Survey of Lots 1.03, 1.04, 1.05, 1.06 and 1.20, Block 77 and Lot 1, Block 77.01, prepared by KZA Engineering P.A., dated February 24, 2004, last revised February 3, 2011, containing 2 sheets.

ALTA / ACSM Land Title Survey of Lots 1.03, 1.04, 1.05, 1.06 and 1.20, Block 77 and Lot 1, Block 77.01, prepared by Control Point Associates, Inc., dated February 26, 2015.

SCHEDULE D

List of Leases

(see attached)

| TENANT NAME | DESCRIPTION | AS-OF DATE |
|---|---|---|
| Carvel | Lease Between AC I Manahawkin LLC & Del Rio's Fun Time Ice Cream Shoppe Inc | 2/25/2005 |
| Carvel | Contract of Guaranty | 2/25/2005 |
| Carvel | Rider to Lease | 5/1/2005 |
| Dunkin Donuts | Dunkin' Donuts/Baskin Robbins/ Lease of Commerical Real Estate Space | 3/20/2003 |
| Dunkin Donuts | Guarantee | 3/13/2003 |
| Dunkin Donuts | Certificate of Commencement | 5/15/2003 |
| Dunkin Donuts | First Amendment to Lease | 4/28/2003 |
| Dunkin Donuts | Second Amendment to Lease | 8/29/2013 |
| Eastern Dental | Lease By and Between AC I Manahawkin LLC and Dimensional Management Corp | 10/1/2010 |
| Eyes First | Lease By and Between AC I Manahawkin LLC and Marie Wells Smith, Michael Meltzer and Dean Shissias | 2/28/2006 |
| Eyes First | Extending the lease under the terms of the option period | 3/1/2012 |
| Famous Footware | Lease Agreement for space located at Manahawkin Commons AC I Manahawkin / Brown Group Retail Inc. tenant | 3/18/2004 |
| Famous Footware | Term Commencement Agreement | 8/10/2004 |
| Famous Footware | Notice of Exercise of Option | 12/23/2008 |
| Famous Footware | Notice of Exercise of Option | 1/27/2014 |
| Five Below | Lease Agreement By and Between AC I Manahawkin "landlord" and Five Below, Inc. "tenant" | 6/21/2007 |
| Five Below | Subordination, Non-Disturbance and Attornment Agreement;Wells Fargo Bank, N.A. as Trustee (Mortgagee). | 11/11/2006 |
| Five Below | LL Letter: Rejection of Termination Notice | 6/9/2009 |
| TGI Friday's | Common Areas Maintenance and Reciprocal Easement Agreement | 2/19/2004 |
| TGI Friday's | Ground Lease | 5/24/2002 |
| TGI Friday's | First Amendment to Lease | 9/27/2002 |
| TGI Friday's | Certificate of Commencement | 10/27/2003 |
| GameStop | Lease by and between AC I Manahawkin LLC landlord and Gamestop Inc. Tenant | 2/23/2010 |
| GameStop | Gamestop Renewal Terms - Proposal | 1/13/2015 |
| Great Clips | Lease By and Between AC I Manahawkin LLC and Emancetwo LLC | 4/14/2008 |
| Great Clips | Contract of Guaranty | 4/17/2008 |
| Jade Chinese Restaurant | Lease By and Between AC I Manahawkin LLC and QUI LIN | 11/4/2008 |
| Kmart | Lease | 8/3/1992 |
| Kmart | Memorandum of Lease | 8/3/1992 |
| Kmart | Shopping Center Reciprocal Easement and Operation Agreement | 8/3/1992 |
| Kmart | First Amendment to Lease | 10/5/1992 |
| Kmart | Tenant Letter to Sanford/Nallit | 11/22/1993 |
| Kmart | Second Amendment to Lease | 10/1/2002 |
| Kmart | Tenant Letter re: Assignment | 9/1/2004 |
| Kmart | Assignment and Assumption of Lease to Sears, Roebuck and Co | 9/29/2004 |
| Kmart | Sublease | 9/29/2004 |
| Kmart | Tenant Letter re: Notice | 10/15/2014 |
| La Bella Vita Pizzeria | Lease Agreement between Mark Centers Lmtd Partnership, landlord and Trupia's Pizzeria and Restaurant Inc,Tenant | 9/10/1998 |
| La Bella Vita Pizzeria | Assignment and Assumption of Lease to Bella Rosa Restaurant and Pizzeria Inc | 2/25/2003 |
| La Bella Vita Pizzeria | Assignment and Assumption of Lease to La Bella Vita Pizzeria 7 Restorante Inc | 11/16/2004 |
| La Bella Vita Pizzeria | Guaranty | 11/16/2004 |
| La Bella Vita Pizzeria | Supplement to Lease | 11/10/2005 |
| La Bella Vita Pizzeria | Second Supplement to Lease | 8/25/2008 |
| La Bella Vita Pizzeria | Lease Extension | 5/30/2013 |
| Linda Nails | Lease Agreement | 4/18/2002 |
| Linda Nails | Certificate of Commencement | 9/13/2003 |
| Linda Nails | Manahawkin Shipping Center - Lease Between AC I Man LLC and Le Dinh Ky, election to extend agreement of lease | 7/2/2008 |

| TENANT NAME | DESCRIPTION | AS-OF DATE |
|---|---|---|
| Linda Nails | Amendment to Lease | 3/15/2014 |
| Mandees | Agreement of Lease between Mark Centers Limited Partnership, landlord, and Big M, Inc, Tenant | 11/21/1997 |
| Mandees | Memorandum of Lease for Recordation | 11/21/1997 |
| Mandees | Assignment, Subordination, Non-Disturbance and Attornment Agreement; Royal Bank of Pennsylvania ("Bank") | 1/28/1998 |
| Mandees | Extension of Tenant's Right to Terminate | 2/14/2000 |
| Mandees | Extension of Tenant's Right to Terminate | 4/3/2001 |
| Mandees | First Amendment to lease summary | 6/21/2001 |
| Mandees | First Amendment to Lease | 6/21/2001 |
| Mandees | Tenant Elect to extend terms of the Lease for the second Extended term | 6/4/2008 |
| Mandees | Tenant Elect to extend and renew the Term of the Lease for the third Extended term | 5/31/2013 |
| Massage Heaven | Lease Agreement | 9/16/2013 |
| Mattress Mart | Temporary License Agreement | 10/17/2013 |
| McDonald's | Ground Lease | 5/10/1996 |
| McDonald's | Covenant Not to Compete | 5/10/1996 |
| McDonald's | Memorandum of Lease | 5/15/1996 |
| McDonald's | Supplement to Lease | 8/6/1997 |
| Michaels | Shopping Center Lease | 7/24/2002 |
| Michaels | First Amendment to Lease | 10/2/2002 |
| Michaels | Subordination, Nondisturbance and Attornment Agreement; Orix Real Estate Equities, Inc. (Lender). | |
| Michaels | Second Amendment to Lease | 7/10/2003 |
| Michaels | Notice of Lease - commencement | 12/4/2003 |
| Michaels | Tenant hereby exercises its option to extend the Lease Term | 8/24/2012 |
| Pier1 | Memorandum of Lease | 2/15/2002 |
| Pier1 | Lease Agreement | 2/15/2002 |
| Pier1 | First Amendment to Lease | 9/30/2002 |
| Pier1 | Notice of Lease - commencement | 12/4/2003 |
| Pier1 | Tenant hereby exercises its first option to extend the terms of the lease | 4/10/2012 |
| Radio Shack | Lease Agreement between Manahawkin Rout 72, L.P. and Tandy Corporation | 6/2/1993 |
| Radio Shack | Lease Extension Agreement | 4/20/2004 |
| Radio Shack | Lease Extension Agreement | 8/6/2008 |
| Radio Shack | Lease Extension Agreement | 12/30/2013 |
| Regal Cinemas | Assignment of lease from Frank Theaters to Stateway Plaza Cinemas | 12/18/1996 |
| Regal Cinemas | Commercial Property Lease Agreement | 6/4/1996 |
| Regal Cinemas | Lease Amendment Agreement | 4/18/1997 |
| Regal Cinemas | Lease Amendment Agreement No.2 | 6/6/1997 |
| Regal Cinemas | Lease Amendment Agreement No.3 | 10/24/1997 |
| Regal Cinemas | Letter Agreement (document not provided but referenced in LL's Consent to Assignement dated 4/29/04. | 3/26/1998 |
| Regal Cinemas | Lease Amendment Agreement No.4 | 12/1/1998 |
| Regal Cinemas | Assignment and Assumption of Lease from Stateway Plaza to Hoyt's Cinemas | 9/1/2002 |
| Regal Cinemas | Short Form Memorandum of Lease | 4/27/2004 |
| Regal Cinemas | Guaranty | 4/29/2004 |
| Regal Cinemas | Assignment of lease to AC I Manahawkin & Hoyt's Cinemas Corporation | 4/29/2004 |
| Regal Cinemas | Assignment of Lease from Northeast Cinemas to Hoys Cinemas | 4/29/2004 |
| Sally Beauty | Lease By and Between AC I Manahawkin LLC and Sally Beauty Supply LLC | 5/1/2008 |
| Sally Beauty | Agreement Setting Lease Term | 1/7/2009 |
| Sally Beauty | First Amendment to Lease | 2/4/2014 |
| Shore Tanning | Lease By and Between Manahawkin Village Shopping Cente and Shore tanning II, LLC | 12/1/2003 |

| TENANT NAME | DESCRIPTION | AS-OF DATE |
|---|---|---|
| Shore Tanning | Guaranty | 12/5/2003 |
| Shore Tanning | Extending our option on the lease for Shore Tanning II in the Manahawkin Commons Plaza | 8/25/2008 |
| Staples | Lease | 3/15/2002 |
| Staples | Memorandum of Lease | 3/15/2002 |
| Staples | First Amendment to Lease | 8/25/2002 |
| Staples | Second Amendment to Lease | 2/27/2003 |
| Staples | Commencement Date Agreement | 11/26/2003 |
| Staples | Tenant Estoppel Certificate | 2/28/2011 |
| Staples | Notice of Default | 9/13/2005 |
| Subway | Certificate of Commencement | 2/3/2003 |
| Subway | Lease Agreement By and Between Aorix Woodmont Manahawkin Venture and Subway Real Estate Corp | 2/3/2003 |
| Subway | Guaranty | 2/3/2003 |
| Subway | Certificate of Commencement | 10/6/2004 |
| Subway | Renew Lease for New Term | 1/3/2008 |
| Subway | First Amendment to Lease | 2/2/2011 |
| TJ Maxx | Lease Agreement by and between Woodmont Real Estate Corp and The TJX Companies Inc | 12/13/2001 |
| TJ Maxx | First Amendment to Lease | 3/13/2002 |
| TJ Maxx | Second Amendment to Lease | 6/28/2002 |
| TJ Maxx | Third Amendment to Lease | 8/31/2002 |
| TJ Maxx | Commencement Date Agreement | 6/19/2003 |
| Top Nails | Lease Agreement Between Marks Center limited partnership and Linda's Nails 2 | 4/22/1998 |
| Top Nails | Assignment and Assumption of Lease | 5/22/2000 |
| Top Nails | First Amendment to Lease Agreement | 2/15/2003 |
| Top Nails | Assignment of Lease to Tuyet K Huynh | 11/16/2005 |
| Top Nails | Extension of Lease | 6/24/2009 |
| Top Nails | Second Amendment to Lease Agreement | 2/5/2010 |
| Verizon | Lease Agreement Dated January 27,2005 By & Between AC I Man LLC and Cellco Partnership D/B/A Verizon Wireless | 1/27/2005 |
| Verizon | Verizon Lease Sections 7 and 20 | 1/27/2005 |
| Verizon | First Lease Modification Agreement | 10/1/2005 |
| Verizon | Second Lease Modification Agreement | 8/23/2010 |
| Verizon | Verizon Wireless hereby exercises Tenant's option to renew lease | 11/24/2014 |
| Weight Watchers | Lease | 3/10/2011 |
| Weight Watchers | Exhibit B – lease commencement | 5/10/2011 |

SCHEDULE D-1

Rent Roll

(see attached)

Ac1 Manahawkin
Rent Roll
U.S RE 72 (mase 42)
03/10/16

| Tenant / Manahawkin Common | Sq Ft. | % | Rent Start | Expiration | Monthly Rent | Annual Rent | Rent/sq | Annual RE Taxes | Annual CAM | Date | Monthly | Annual Amount | Rent/sq | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacant | 5,500 | 1.69% | | | | | | | | | | | | |
| 5 Below | 5,500 | 1.69% | 06/21/07 | 01/31/17 | $8,020.83 | $96,250.00 | $17.50 | $9,624.96 | | $11,587.60 | 2/1/2017 | $8,937.50 | $107,250.00 OPTION $19.50 | Three (5) year options |
| | | | | | | | | | | 2/1/2022 | $9,854.17 | $118,250.04 OPTION $21.50 | |
| | | | | | | | | | | 2/1/2027 | $10,770.83 | $129,249.96 OPTION $23.50 | |
| TJ Maxx | 45,000 | 13.80% | 05/16/03 | 05/31/18 | $53,812.50 | $645,750.00 | $14.35 | $89,344.79 | | $79,541.96 | 6/1/2018 | $57,562.50 | $690,750.00 OPTION $15.35 | Two (5) year options |
| | | | | | | | | | | 6/1/2023 | $61,312.50 | $735,750.00 OPTION $16.35 | |
| Famous Footwear Store | 7,700 | 2.36% | 07/1/2004 | 07/31/19 | $9,034.67 | $108,416.00 | $14.08 | $15,254.42 | | $12,900.00 | 8/1/2019 | $9,675.00 | $116,100.00 OPTION $15.06 | One (5) year options |
| Salty Beauty | 3,800 | 0.55% | 09/22/06 | 01/19/19 | $3,450.00 | $41,400.00 | $23.00 | $3,000.00 | | $3,122.08 | 1/20/2019 | $4,012.50 | $48,150.00 OPTION $20.75 | One (5) year option |
| Michaels | 21,094 | 6.47% | 07/1/03 | 05/31/18 | $21,972.92 | $263,675.04 | $12.50 | $41,580.86 | | $36,955.80 | 6/1/2018 | $22,851.63 | $274,221.96 OPTION $13.00 | Two (5) year options |
| | | | | | | | | | | 6/1/2023 | $23,730.75 | $284,769.00 OPTION $13.50 | |
| Staples | 20,388 | 6.25% | 07/06/03 | 07/31/18 | $25,230.15 | $302,761.80 | $14.85 | $40,479.14 | | | 8/1/2018 | $30,531.63 | $366,372.36 OPTION $17.97 | Three (5) year options |
| | | | | | | | | | | 8/1/2023 | $33,589.23 | $403,070.76 OPTION $19.77 | |
| | | | | | | | | | | 8/1/2028 | $36,953.25 | $443,439.00 OPTION $21.75 | |
| Pier One Imports | 9,002 | 2.76% | 05/26/03 | 05/31/18 | $11,797.50 | $141,570.00 | $15.73 | $17,798.54 | | | 6/1/2018 | $12,975.00 | $155,700.00 OPTION $17.30 | Two (5) year options |
| | | | | | | | | | | 6/1/2023 | $14,272.50 | $171,270.00 OPTION $19.03 | |
| Vacant | 8,777 | 2.69% | | | | | | | | | | | | |
| Vacant | 1,890 | 0.58% | | | | | | | | | | | | |
| Weight Watchers | 1,500 | 0.55% | 02/01/11 | 01/31/16 | $3,750.00 | $45,000.00 | $25.00 | $369.36 | | $473.76 | 4/1/2016 | $4,200.00 | $50,400.00 OPTION $28.00 | One (5) year option |
| Verizon | 3,623 | 1.11% | 01/27/06 | 05/31/20 | $9,087.69 | $109,052.30 | $30.10 | $9,650.40 | | $4,689.44 | 9/1/2015 | $3,934.93 | $47,219.16 $23.80 | |
| | | | | | | | | | | 9/1/2016 | $4,034.00 | $48,104.00 $24.75 | |
| | | | | | | | | | | 9/1/2017 | $4,255.08 | $51,069.16 $25.74 | |
| | | | | | | | | | | 9/1/2018 | $4,316.68 | $50,618.08 $30.19 | |
| Subway | 1,984 | 0.61% | 06/30/03 | 06/30/18 | $3,782.83 | $45,393.92 | $22.88 | $4,194.36 | | $4,276.92 | | | | |
| Massage Heaven | 1,794 | 0.55% | 11/01/13 | 10/31/23 | $3,600.00 | $43,200.00 | $24.00 | $4,485.00 | | $5,383.00 | 11/1/2018 | $3,975.00 | $46,500.00 $25.00 | Two (5) year option |
| | | | | | | | | | | 11/1/2023 | $3,975.00 | $47,700.00 OPTION $26.50 | |
| | | | | | | | | | | 11/1/2028 | $4,125.00 | $49,500.00 OPTION $27.50 | |
| Great Clips | 1,176 | 0.36% | 05/01/08 | 07/31/18 | $2,748.67 | $32,984.04 | $28.00 | $3,103.44 | | $2,395.64 | 8/1/2018 | $3,023.53 | $36,282.36 OPTION $30.80 | One (5) year option |
| Jade Chinese Restaurant | 1,364 | 0.42% | 12/01/06 | 02/28/19 | $3,705.55 | $45,066.58 | $33.04 | $2,727.96 | | $4,451.04 | 3/1/2015 | $3,668.21 | $44,018.52 $34.03 | Two (5) year options |
| | | | | | | | | | | 3/1/2016 | $3,984.19 | $47,810.28 $35.55 | |
| | | | | | | | | | | 3/1/2017 | $4,103.54 | $49,242.48 $36.10 | |
| | | | | | | | | | | 3/1/2018 | $4,205.13 | $50,461.56 $37.18 | |
| | | | | | | | | | | 3/1/2019 | $4,353.33 | $52,239.96 $38.30 | |
| | | | | | | | | | | 3/1/2020 | $4,484.15 | $53,809.80 $39.55 | |
| | | | | | | | | | | 3/1/2021 | $4,618.28 | $55,419.36 $40.63 | |
| | | | | | | | | | | 3/1/2022 | $4,756.95 | $57,083.40 $41.85 | |
| | | | | | | | | | | 3/1/2023 | $4,900.17 | $58,802.04 $43.11 | |
| | | | | | | | | | | 3/1/2024 | $5,046.60 | $60,561.90 $44.40 OPTION | |
| | | | | | | | | | | 3/1/2025 | $5,191.98 | $62,375.76 $45.73 | |
| | | | | | | | | | | 3/1/2026 | $5,353.70 | $64,244.40 $47.10 | |
| | | | | | | | | | | 3/1/2027 | $5,513.97 | $66,167.64 $48.51 | |
| | | | | | | | | | | 3/1/2028 | $5,679.92 | $68,159.04 $49.67 | |
| Linda Nails | 1,116 | 0.34% | 08/1/303 | 03/31/19 | $2,790.00 | $33,480.00 | $30.00 | $2,411.76 | | $2,766.36 | 4/1/2019 | $2,883.00 | $34,596.00 OPTION $31.00 | One (5) year option |
| Dunkin Donuts | 2,460 | 0.76% | 05/1/503 | 08/31/2016 | $5,342.33 | $64,108.00 | $25.85 | $5,243.04 | | $7,488.00 | 9/1/2016 | $6,144.20 | $73,730.40 OPTION $29.73 | Two (5) year option |
| | | | | | | | | | | 9/1/2021 | $7,065.93 | $84,791.20 OPTION $34.19 | |
| T.if Friday's (CAM ONLY) | 6,500 | 2.00% | 06/21/03 | 05/31/23 | $0.00 | $0.00 | $0.00 | $0.00 | | $15,242.78 | | | | |

**Manahawkin Village**

| Tenant | SqFt | % | Start | End | Monthly | Annual | $/SqFt | | | Option Rent | Option Date | Option Annual | Option $/SqFt | Options |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regal Entertainment Group | 31,819 | 9.69% | 11/13/98 | 11/30/18 | $38,206.29 | $458,475.50 | $14.50 | $103,571.16 | $66,775.60 | $29,522.75 / $40,541.21 / $42,108.67 / $45,416.13 | 12/1/2018 / 12/1/2023 / 12/1/2028 / 12/1/2033 | $474,285.00 / $486,504.50 / $506,504.00 / $521,712.50 | $15.00 OPTION / $15.00 OPTION / $16.00 OPTION / $16.50 OPTION | Four (5) year options |
| Shore Tanning | 2,679 | 0.82% | 02/01/04 | MTM | $4,050.00 | $59,400.00 | $22.17 | $5,874.84 | $5,607.76 | | | | OPTION | One (5) year option |
| Top Nails | 1,500 | 0.46% | 04/22/98 | 05/30/15 | $3,318.75 | $39,825.00 | $26.55 | $3,136.32 | $3,167.68 | $6,500.00 | 7/1/2015 | $78,000.00 | $13.00 OPTION | Two (5) year options |
| Eastern Dental | 6,000 | 1.84% | 06/01/11 | 05/31/21 | $5,000.00 | $6,000.00 | $10.00 | $13,157.64 | $12,172.02 | $7,500.00 / $8,500.00 | 6/1/2016 / 6/1/2021 | $90,000.00 / $102,000.00 | $15.00 OPTION / $17.00 OPTION | One (5) year option |
| La Bella Vita Pizzaria & Ristorante | 2,250 | 0.69% | 09/10/98 | 11/30/18 | $4,828.13 | $57,937.50 | $25.75 | $54,934.16 | $6,438.00 | $4,972.97 / $5,122.16 / $5,275.82 / $5,434.10 / $5,597.12 / $5,765.03 / $5,937.98 / $6,116.12 | 12/1/2015 / 12/1/2016 / 12/1/2017 / 12/1/2018 / 12/1/2019 / 12/1/2020 / 12/1/2021 / 12/1/2022 | $59,675.64 / $61,465.92 / $63,309.84 / $65,209.20 / $67,165.44 / $69,180.36 / $71,255.76 / $73,393.44 | $26.52 / $27.32 / $28.14 / $28.98 / $29.85 / $30.75 / $31.67 / $32.62 | Two (5) year options |
| Carvel | 1,500 | 0.59% | 05/01/05 | 04/30/15 | $4,779.20 | $57,350.40 | $29.87 | $4,067.88 | $3,184.92 | $4,575.20 / $4,712.80 / $5,073.00 / $5,188.60 / $5,276.80 / $5,382.40 / $5,490.80 / $5,600.00 / $5,711.20 / $5,827.20 | 5/1/2015 / 9/1/2016 / 5/1/2017 / 5/1/2018 / 5/1/2019 / 5/1/2020 / 5/1/2021 / 5/1/2022 / 5/1/2023 / 5/1/2024 | $26,522.40 / $39,573.60 / $60,864.00 / $62,256.00 / $63,321.60 / $64,588.60 / $65,884.80 / $67,200.00 / $68,544.00 / $69,926.40 | $30.47 / $31.08 / $31.70 / $32.43 / $32.98 / $33.64 OPTION / $34.31 / $35.00 / $31.67 / $32.62 | Two (5) year options |
| Eyes First | 1,620 | 0.50% | 05/31/06 | 02/28/17 | $3,780.00 | $45,360.00 | $28.00 | $3,552.60 | $3,421.32 | $3,915.00 | 3/1/2016 | $46,980.00 | $29.00 | |
| Gamestop | 1,000 | 0.55% | 08/01/10 | 04/30/15 | $3,300.00 | $39,600.00 | $22.00 | $2,340.00 | $4,140.00 | $3,630.00 / $3,993.00 | 5/1/2015 / 5/1/2020 | $43,560.00 / $47,916.00 | $24.20 OPTION / $26.62 OPTION | Two (5) year options |
| Radio Shack | 2,400 | 0.74% | 01/14/04 | 01/31/19 | $5,000.00 | $42,000.00 | $17.50 | $35,203.08 | $4,799.40 | $3,800.00 | 2/1/2017 | $46,000.00 | $19.00 | One (5) year option |
| Mancheri's | 5,950 | 1.82% | 03/26/96 | 01/31/19 | $6,693.75 | $80,325.00 | $13.50 | $13,047.96 | $10,721.16 | $7,169.58 | 2/1/2019 | $86,275.00 | $14.50 OPTION | |
| Vacant | 2,617 | 0.82% | | | | | | | | | | | | |
| Vacant | 3,874 | 0.94% | | | | | | | | | | | | |
| Kmart Corporation | 112,434 | 34.47% | 02/01/94 | 11/30/18 | $70,271.25 | $843,255.00 | $7.50 | $179,274.10 | $183,383.16 | $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 / $70,271.25 | 12/1/2018 / 12/1/2023 / 12/1/2028 / 12/1/2033 / 12/1/2038 / 12/1/2043 / 12/1/2048 / 12/1/2053 / 12/1/2058 / 12/1/2063 / 12/1/2058 / 12/1/2064 | $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 / $843,255.00 | $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION / $7.50 OPTION | Ten (5) year options |
| McDonald's Corporation Store | 2,186 | 0.67% | 05/15/96 | 11/12/16 | $3,636.83 | $43,641.96 | $19.96 | $15,840.72 | | $4,182.23 / $4,806.75 / $5,530.17 / $6,360.92 | 11/13/2021 / 11/13/2026 / 11/13/2031 / 11/13/2036 | $50,187.96 / $57,717.00 / $66,314.04 / $76,331.04 | $22.96 / $26.40 / $30.36 / $34.92 | Auto-renew unless notified |
| **Total** | **326,149** | **100.00%** | | | **$330,430.83** | **$3,791,378.02** | **$12.43** | **$664,628.38** | **$613,835.88** | | | | | |

Total Occupied: 304,991 — % Occupied: 93.51%
Total Vacant: 21,166 — % Vacant: 6.49%

SCHEDULE E

List of Service Contracts

None.

<u>SCHEDULE F</u>

<u>Intentionally Omitted</u>

EXHIBIT G

Form of Deed

## BARGAIN AND SALE DEED WITH COVENANT
## AGAINST GRANTOR'S ACTS

This Deed is made on this _____ day of _____, 201__
BETWEEN
_____, with an address _____,
referred to as the Grantor,
AND
_____], a _____ with an address of
_____,
referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

1.      Transfer of Ownership.     The Grantor grants and conveys (transfers ownership of) the property (called the "Property") described below to the Grantee.  This transfer is made for the sum of _____ Dollars ($_____.)  The Grantor acknowledges receipt of this money.

2.      Tax Map Reference.  (N.J.S.A. 46:15-2.1) Municipality of _____, Block No. _____, Lot No. ___, Qualifier No. _____, Account No. _____.
        ☐ No lot and block or account number is available on the date of this Deed.  (check box if applicable.)

3.      Property.  The property consists of the land and all the buildings and structures on the land in the Township of Stafford, County of Ocean and State of New Jersey.  The legal description is:

        ☒  Please see attached Legal Description annexed hereto and made a part hereof. (Check box if applicable).

The street address of the Property is:

4.      Promises by Grantor.  The Grantor promises that the Grantor has done no act to encumber the Property.  This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6).  This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the Property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

5.      Signatures.  The Grantor signs this Deed as of the date at the top of the first page. (Print name below each signature).

**GRANTOR:**

By:_____
Name:_____
Title:_____

**STATE OF NEW JERSEY,**
county of _____ ss.:

**I CERTIFY that on** _____, 20___, _____, who acknowledged
himself to be a _____ of _____ and that he/she, as such officer,
being authorized to do so, personally came before me and stated to my satisfaction that this
person (or if more than one, each person):

(a)     was the maker of this Deed; and
(b)     executed this Deed as his or her own act; and
(c)     made this Deed for $_____ as the full and actual consideration paid or to be
paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
**Notary Public**
**or**
**Attorney at Law of New Jersey**

SCHEDULE H

Form of Assignment and Assumption of Leases

THIS ASSIGNMENT (this "Assignment") made as of _____ ___, 2015 from **AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("Seller") to _____, having an address at _____ ("Purchaser").

W I T N E S S E T H :

WHEREAS, pursuant to that certain Agreement of Sale (the *"Agreement"*) dated March ___, 2015 between Seller and Purchaser (successor by assignment from Hampshire Global Partners, LLC), Seller agreed to sell to Purchaser certain real property, the building and other improvements thereon, described on Exhibit A attached hereto (the *"Property"*);

WHEREAS, capitalized terms used herein, but not defined herein, have the meanings ascribed to them in the Agreement; and

WHEREAS, the Agreement provides, *inter alia,* that on the Closing Date Seller shall assign to Purchaser, and Purchaser shall assume, all right, title and interest of Seller in (i) the Leases identified on Schedule D attached hereto (the *"Leases"*) and all lease guarantees given in connection therewith (the *"Guarantees"*), and (ii) the Intangible Property.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    Defined Terms.  Capitalized terms used herein but not defined have the meanings set forth in the Agreement.

2.    Assignment.  Seller hereby assigns, sets over and transfers to Purchaser all of Seller's right, title and interest in, to and under the Leases, the Guarantees, and the Intangible Property.

3.    Indemnification; Assumption.

(a)    Seller shall indemnify, defend and hold harmless Purchaser from and against any loss, cost, claim, liability or expense of whatever kind or nature under any of the Leases and the Guarantees arising or accruing prior to the date hereof.

(b)    Purchaser hereby assumes all of the liabilities and obligations of Seller under the Leases and the Guarantees arising or accruing on or after the date hereof. Purchaser shall indemnify, defend and hold harmless Seller from and against any loss, cost, claim, liability or expense of whatever kind or nature under any of the Leases and the Guarantees arising or accruing on or subsequent to the date hereof.

{00717743.DOC;6 }

H-1

4.    <u>Miscellaneous</u>.  This Assignment and the obligations of the parties hereunder will survive the Closing, will be binding upon and inure to the benefit of the parties hereto, their respective successors and assigns, is governed by the laws of the State of New Jersey, and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

[Remainder of page left blank intentionally.]

IN WITNESS WHEREOF, this Assignment has been entered into on the date first above written.

SELLER:

**AC I Manahawkin LLC,**
a Delaware limited liability company

By: _____
　　　Name:
　　　Title:

PURCHASER:

By: _____
　　　Name:
　　　Title:

<u>SCHEDULE I</u>

<u>INTENTIONALLY OMITTED</u>

SCHEDULE J

Form of Bill of Sale

**AC I Manahawkin LLC**, a Delaware limited liability company, having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("Grantor"), for good and valuable consideration, the receipt and the sufficiency of which is hereby acknowledged, by these presents, does, without representation by, or warranty or recourse against, Grantor, convey, assign, transfer, sell, deliver and set over unto _____ , having an address at _____ ("Grantee"), its successors and assigns, all of Grantor's right, title and interest in and to the personal property transferred pursuant to that certain Agreement of Purchase and Sale between Grantor and Grantee dated _____ ___, 2015 ("Contract"), used by Grantor in connection with the operation of the buildings located in the County of Ocean, Township of Stafford and State of New Jersey, as more particularly bounded and described in Schedule A attached hereto and made a part hereof.

IN WITNESS WHEREOF, Grantor has caused this Bill of Sale to be signed as of this _____ day of _____, 2015.

GRANTOR:

**AC I Manahawkin LLC,**
a Delaware limited liability company

By: _____
        Name:
        Title:

GRANTEE:

By: _____
        Name:
        Title:

## SCHEDULE K

### Form of Estoppel

The undersigned (*"Tenant"*) is a party to a lease (the *"Lease"*) dated _____ ___, _____ between AC I Manahawkin LLC, A Delaware limited liability company (the *"Landlord"*), and Tenant, as tenant, for certain premises located in the shopping center commonly known as Manahawkin Commons Shopping Center in Ocean Township, New Jersey (the *"Property"*), which Landlord intends to sell to **HAMPSHIRE GLOBAL PARTNERS, LLC,** a New Jersey limited liability company (*"Purchaser"*).

Tenant hereby certifies as follows:

1.    Attached hereto is a true, correct and complete copy of the Lease and all amendments thereto.  The Lease is the sole agreement between Landlord and Tenant relating to Tenant's occupancy of the Property.  The Lease is in full force and effect.

2.    The term of the Lease commenced on _____ ___, _____ and expires on _____ ___, _____.  Except as expressly set forth in the Lease, Tenant has no right to extend the term of the Lease.  Except as expressly set forth in the Lease, Tenant has no right to terminate the Lease.

3.    The fixed monthly rent presently payable under the Lease is $_____.  The fixed monthly rent payable under the terms of the Lease has been paid through _____ ___, _____.  The monthly amount currently payable by Tenant under the Lease on account of operating expenses and taxes is $_____, with the last payment of fixed rent paid on _____ and the last payment of operating expenses (including taxes) paid on $_____.

4.    Tenant has no existing defenses, offsets, claims or credits against rent payable under the Lease or against the enforcement of the Lease by Landlord.

5.    Neither Landlord nor Tenant is in default under the terms of the Lease.

6.    No event has occurred which, with the passage of time or the giving of notice, or both, will constitute a default by Landlord or Tenant under the terms of the Lease.

7.    Tenant has no option or right to purchase the Property or any part thereof.

8.    All tenant improvement work required to be completed by Landlord has been completed by Landlord in accordance with the Lease and accepted by Tenant.  Landlord has paid in full any and all tenant improvements allowances payable to Tenant under the Lease.

9.    Except as expressly set forth in the Lease, Tenant has no option or right of first refusal to lease additional space from Landlord.

10.     Tenant has not assigned the Lease nor sublet any portion of the Property, except as follows: _____.

11.     The security deposit held by Landlord under the Lease is $_____.

This Certificate may be relied upon by Purchaser and Purchaser's lender and their respective successors and assigns.

Dated: _____ ___, 201__.

_____,
a _____

By:_____
        Name:
        Title:

<u>SCHEDULE L</u>

<u>List of Required Estoppels</u>

Pier 1 Imports (U.S.), Inc.
Staples The Office Superstore East, Inc.
Michaels Stores, Inc.
Hoyts Cinemas Corporation d/b/a Regal Cinema Corporation
The TJX Companies, Inc.
Sears, Roebuck and Co. (K-Mart)
Brown Group Retail, Inc. d/b/a Famous Footwear
Big M, Inc. d/b/a Mandees
McDonald's Corporation
South Jersey Land Development, LLC (TGI Fridays)
Five Below, Inc.

<u>SCHEDULE M</u>

<u>LIST OF MISSING INFORMATION AND DOCUMENTATION</u>

- TJ Maxx Extension beyond 2013
- Top Nails- Confirmation as to whether Tenant exercised renewal option (Lease expires June 30 2015)
- Five Below – Commencement Date Agreement
- Carvel extension
- GameStop extension
- Subway extension
- Great Clips extension
- Pier One – An explanation as to why Pier One did not pay in 2013 RE Taxes.
- Regal Cinema – An explanation why Regal Cinema is paying only the 2013 CAM escrow and not the new 2014 CAM escrow amount for which it is billed.

Exhibit 7.1.6

List of Environmental Reports

- Phase I Environmental Site Assessment Report, dated April 27, 2010, prepared by EFI Global, Inc.

- Phase I Environmental Site Assessment Report, dated January 28, 2011, prepared by EFI Global, Inc.

- Limited Subsurface Investigation Report, dated February 4, 2011, prepared by EBI Consulting.

<u>SCHEDULE N</u>

<u>LIST OF SCHEDULE B-II PERMITTED EXCEPTIONS FROM PURCHASER'S
TITLE REPORT</u>

10. Easements and Setback Lines as shown on Filed Map No. G-2448, H-2805, and J-3297.
Easements, Setback Lines, Conditions and Restrictions as shown on Filed Map No. G-2499.

11. Slope and Drainage Rights as contained in Deed Book 916 Page 164, and Deed Book 2522 Page 103 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

12. Utility Easements as contained in Deed Book 3410 Page 79, Deed Book 3442 Page 455, Deed Book 4882 Page 917, Deed Book 10089 Page 844, and Deed Book 11383 Page 17.

13. Utility Easements as contained in Deed Book 4592 Page 208, and as shown on Filed Maps No. G-2448 and G-2499 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

14. Terms, Conditions, and Rights as contained in Deed Book 5042 Page 217; Supplemental Agreement in Deed Book 5122 Page 905; First Amendment to Shopping Center Reciprocal Easement and Operation Agreement in Official Record Book 11031 Page 43, re-recorded in Official Record Book 11148 Page 1102.

15. Restrictions as contained in Deed Book 5384 Page 683.

16. Utility Easement as contained in Deed Book 5436 Page 994, Deed Book 5560 Page 609, and Deed Book 5667 Page 432.

17. Utility Easement as contained in Official Record Book 11081 Page 142 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

19. Access and Utility Easement as contained in Deed Book 11031 Page 82.

20. Drainage Easement as contained in Deed Book 11081 Page 133 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

21. Sight Triangle Easements as contained in Official Record Book 11081 Page 151, and Official Record Book 11334 Page 333 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

22. Declaration of Restriction as contained in Deed Book 11083 Page 1631 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

23. Declaration of Restrictions as contained in Deed Book 11327 Page 336.

24. Easements as contained in Deed Book 11383 Page 23.

25. Ordinance No. 2007-22 for the acquisition of an easement over a portion of Block 77 Lot 1.20 as contained in Official Record Book 13686 Page 494 as shown on a survey made by Control Point Associates, Inc., dated February 6, 2015.

26.   Utility Easement as contained in Official Record Book 13863 Page 466, and Official Record Book 13863 Page 472.

33.   Terms and Conditions of the Common Areas Maintenance and Reciprocal Easement Agreement as contained in Deed Book 11959, Page 1209.

34.   Terms and Conditions of Parking Agreement as contained in Deed Book 4471, Page 611.

35.   Utility Easement as contained in Deed Book 3589, Page 407.

## SCHEDULE O

## FORM OF BREAK-UP FEE ORDER

<u>SCHEDULE P</u>

COPIES OF INSURANCE CERTIFICATES FOR ALL PROPERTY POLICIES

**ACORD**

MBANCHERO

## EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

DATE (MM/DD/YYYY)
7/16/2014

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS   PHONE (A/C, No, Ext): (248) 540-3131 | COMPANY NAME AND ADDRESS | NAIC NO: 16535 |
|---|---|---|
| Miami-Alliant Insurance Services, Inc.  20900 NE 30th Ave Ste 801  Aventura, FL 33180 | Zurich American Insurance Company | |

| FAX (A/C, No): | E-MAIL ADDRESS: | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
|---|---|---|
| CODE: | SUB CODE: | POLICY TYPE |
| AGENCY CUSTOMER ID #: ARMSCAP-01   License # 0C38861 | | Commercial Property |

| NAMED INSURED AND ADDRESS | LOAN NUMBER 8104 | POLICY NUMBER CPP817640800 |
|---|---|---|
| AC I Manahawkin, LLC.  909 Third Avenue  New York, NY 10022 | EFFECTIVE DATE 7/17/2014 | EXPIRATION DATE 7/17/2015 | CONTINUED UNTIL TERMINATED IF CHECKED |
| ADDITIONAL NAMED INSURED(S)  Armstrong Capital, LLC | THIS REPLACES PRIOR EVIDENCE DATED: | |

**PROPERTY INFORMATION (Use REMARKS on page 2, if more space is required)**   ☒ BUILDING  OR ☐ BUSINESS PERSONAL PROPERTY

LOCATION / DESCRIPTION
801 Washington Avenue or 733 Rte West, Stafford Twp, NJ 08050, Strip Mall

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

**COVERAGE INFORMATION**   PERILS INSURED   ☐ BASIC   ☐ BROAD   ☒ SPECIAL

| COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: | $ 2,280,000,000 | | | | DED 20,000 | | |
|---|---|---|---|---|---|---|---|
| | YES | NO | N/A | | | | |
| ☒ BUSINESS INCOME  ☒ RENTAL VALUE | X | | | If YES, LIMIT: | | Actual Loss Sustained; # of months: | |
| BLANKET COVERAGE | X | | | If YES, indicate value(s) reported on property identified above: $ | | | |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC | | | |
| IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | | | | | | |
| IS DOMESTIC TERRORISM EXCLUDED? | | | | | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: | 1,000,000 | DED | 20,000 |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | | | | | | | |
| REPLACEMENT COST | X | | | | | | |
| AGREED VALUE | X | | | | | | |
| COINSURANCE | | X | | If YES, | % | | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: | 100,000,000 | DED | 20,000 |
| ORDINANCE OR LAW   - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: | | DED: | |
| - Demolition Costs | X | | | If YES, LIMIT: | | DED: | |
| - Incr. Cost of Construction | X | | | If YES, LIMIT: | 5,000,000 | DED: | |
| EARTH MOVEMENT (If Applicable) | X | | | If YES, LIMIT: | 50,000,000 | DED | 100,000 |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: | 50,000,000 | DED | 100,000 |
| WIND / HAIL INCL   ☐ YES ☐ NO  Subject to Different Provisions: | | X | | If YES, LIMIT: | | DED: | |
| NAMED STORM INCL   ☐ YES ☐ NO  Subject to Different Provisions: | | X | | If YES, LIMIT: | | DED: | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | X | | | | | | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☒ MORTGAGEE | CONTRACT OF SALE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|---|
| ☐ LENDERS LOSS PAYABLE   ☒ LOSS PAYEE | | |
| NAME AND ADDRESS | | |
| RCG LV Dept IV Non-REIT Assets Holdings, LLC, ISAOA  7 Penn Plaza  Suite 512  New York, NY 10001 | | AUTHORIZED REPRESENTATIVE |

Page 1 of 2    © 2003-2014 ACORD CORPORATION. All rights reserved.

ACORD 28 (2014/01)    The ACORD name and logo are registered marks of ACORD

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

ARMSCAP-01   MBANCHERO

DATE (MM/DD/YYYY)
11/5/2014

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER License # 0C36861 | | CONTACT NAME: Margaret M Banchero | | |
|---|---|---|---|---|
| Miami-Alliant Insurance Services, Inc. 777 Arthur Godfrey Rd Ste 202 Miami Beach, FL 33140 | | PHONE (A/C, No, Ext): (249) 840-3131 | | FAX (A/C, No): |
| | | E-MAIL ADDRESS: MBanchero@alliant.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : LM Insurance Corporation | | 33600 |
| INSURED | | INSURER B : | | |
| BCR Clifton Center Realty, LLC 149 Madison Ave, Suite 801 New York, NY 10016 | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY  ☐ PRO- JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N  ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N / A | WC533S362482024 | 10/04/2014 | 10/04/2015 | ☒ PER STATUTE  ☐ OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
As respects the location at 601 Washington Ave or 733 Rte West, Stafford Twp, NJ, 08050

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ACI Manahawkin DIP c/o GC Realty Advisors LLC 7280 West Palmetto Park Road Suite 106-N Boca Raton, FL 33433 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

{00717743.DOC;6 }

3

ACTIVE 29285058v3 03/12/2015

SCHEDULE Q

K-MART DEFAULT LETTER

**AC! Manahawkin LLC**
**149 Madison Ave., Suite 801**
**New York, NY 10015**

Dec. 19, 2014

Sent Via E-Mail & R.R.R. Mail
Kmart Corporation
3333 Beverly Rd.
Hoffman Estates, IL 60179
Attn:  Vice President, Real Estate
        Department 824RE

Re:    Manahawkin Village, Agreement of Lease, dated as of Aug. 3, 2992, by and between
        AC! Manahawkin LLC, as Landlord, and Kmart Corporation, as Tenant (as same may
        have been amended or supplemented from time to time, the "Lease")

To Whom It May Concern:

Reference is hereby made to the above captioned Lease.  All capitalized terms not
defined herein shall have the meaning ascribed to such terms in the Lease.

**PLEASE TAKE NOTICE,**  that you are in violation of the Lease based on  your failure to
pay your proportionate share of Common Area Maintenance as  more particularly set forth in
the attached spreadsheet with respect to your tenancy.  As noted therein, as of Dec. 19, 2014,
you owe the Landlord the total amount of **$426,450.80.**  These arrears constitute serious
material defaults under the Lease.

Accordingly, Landlord hereby demands that you pay Landlord the total sum of
**$426,450.80** not later than Dec. 26, 2014.  The payment is to be mailed to the following
address:

**AC I Manahawkin LLC**
**PO Box 788755**
**Philadelphia, PA. 19178-8755**

The total arrears noted in this letter do not include any Fixed Minimum Rent, Real Estate Taxes,
or other charges or amounts that will or may become due and owing subsequent to the date of
this letter and in addition do not include any other outstanding charges, which were previously
billed and remain unpaid.