**ROBINSON BROG LEINWAND GREENE**
  **GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
*Attorneys for the Debtor and Debtor in Possession*
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| **AC I INV MANAHAWKIN LLC,** | Case No.: 14-22791 through |
| **AC I MANAHAWKIN MEZZ LLC, and** | 14-22793 (RDD) |
| **AC I MANAHAWKIN LLC,** | (Jointly Administered) |
| Debtors. | |

---------------------------------------------------------X

**AMENDED DISCLOSURE STATEMENT FOR AMENDED PLAN OF
LIQUIDATION OF AC I MANAHAWKIN LLC**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY
COURT FOR FINAL APPROVAL ON JUNE 8, 2015 AT 10:00 A.M. IMMEDIATELY
PRIOR TO THE HEARING ON CONFIRMATION OF THE DEBTOR'S PLAN OF
LIQUIDATION.**

                                        **ROBINSON BROG LEINWAND GREENE**
                                        **GENOVESE & GLUCK P.C.**
                                        **Attorneys for the Debtor**
                                        875 Third Avenue, 9th Fl.
                                        New York, New York 10022
                                        Tel. No.: 212-603-6300

                                        **A. Mitchell Greene, Esq.**

**Dated:** New York, New York
          April 30,June 3, 2015

**DISCLAIMER**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

A glossary of terms frequently used in this disclosure statement, is set forth in Article 1 of the plan of liquidation filed with the Bankruptcy Court.

## SUMMARY

The Debtor, **AC I Manahawkin LLC,** (the "Debtor"), has filed its *Amended Plan of Liquidation of AC I Manahawkin LLC* dated ~~April 30,~~June 3, 2015 (the "Plan"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This *Amended Disclosure Statement for Amended Plan of Liquidation of AC I Manahawkin LLC* (the "Disclosure Statement") is being submitted to the Bankruptcy Court for final approval on June 8, 2015 at 10:00 a.m. immediately prior to the hearing on confirmation of the Plan and copies are being provided to holders of Claims against and Interests in the Debtor pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

In the Debtor's opinion, the treatment of claims under the Plan provides a greater recovery for Creditors than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.

**Accordingly, the Debtor believes that Confirmation of the Plan is in the best interests of Creditors.**

### THE DEBTOR

The Debtor owns and operates the shopping mall known as Manahawkin Commons, which sits on a 48 acre site located in Manahawkin, New Jersey (the "Property"). The Property was originally built in 1993 and is currently 94% leased to a mix of 29 tenants, including anchor leases with national chain tenants Kmart, Staples and Regal Cinemas. The Property also has TJ Maxx, Michaels and Pier One stores.

The Debtor's case is being jointly administered with the chapter 11 cases of its affiliates, AC I Inv Manahawkin LLC ("Inv") and AC I Manahawkin Mezz LLC ("Mezz," together with the Debtor, the "Manahawkin Debtors"). Inv owns a 100% interest in Mezz which in turn owns a 100% interest in the Debtor.

### THE PLAN

The Plan provides for a 100% distribution to the Debtor's creditors on account of their Allowed Claims in accordance with the priorities established by the Bankruptcy Code. The funding from the Plan will come from the proceeds of the sale of the Property to Hampshire Global Partners LLC (the "Purchaser" or "Hampshire"), or its permitted assignee, as supplemented by the Debtor's Available Cash. The Bankruptcy Court approved the Agreement of Purchase and Sale (the "APA") and the sale of the Property to Hampshire for the purchase price of $43,500,000 by order entered on April 16, 2015 (ECF doc. no. 133).

The table below provides a summary of the classification and treatment of Claims under the Plan. The figures set forth in the table below represent the Debtor's best estimate of the aggregate amount of Claims in the Case. These estimates are based on an analysis of the Schedules filed by the Debtor, the Proofs of Claims filed by Creditors, and certain other documents of public record. There can be no assurance that Claims will be allowed by the Bankruptcy Court in the amounts set forth below. The aggregate amount of Allowed Claims may be significantly lowered from the amounts set forth below as the result of objections to claims which may be brought by the Debtor or through stipulations which may be negotiated with various creditors.

| Class and Estimated Amount[1] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| $0.00 | Administrative Claims (excluding Claims for professional compensation and reimbursement and Administrative Tax Claims, but including post-petition ordinary course liabilities) | **Non-Voting.** Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) the Effective Date, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto. |
| $ 0.00 | Administrative Tax Claims | Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, all allowed Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Units on or before the Confirmation Date. |
| Approximately $1,500,000 | Administrative Claims for Professional Compensation and Reimbursement[2] | **Non-Voting.** Each Person seeking an award by the Bankruptcy Court of Professional Fees shall file its final application for approval of its Professional Fees no later than 60 days after the Administrative Bar Date. Each Holder of an |

---

[1] Amounts set forth in this chart are not and should not be deemed admissions by the Debtor as to validity or amount of any scheduled or filed claim. Debtor reserves all rights to object to any scheduled or filed claim in the Debtor's case. The Debtor is in the process of reviewing all claims and determining whether any objections should be filed.

[2] Any agreement with respect to the waiver and/or modification of fees will be disclosed to the Court and the Office of the United States Trustee.

| Class and Estimated Amount1 | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | Allowed Claim for Professional Fees shall receive from the Disbursing Agent, in full satisfaction of such Allowed Claim, Cash in the amount of such Allowed Claim within three days of the entry of a Final Order Allowing such Claim. |
| ~~Approximately~~ Filed in the amount of $~~277,028.36~~62,205.72 | Priority Tax Claims | **Non-Voting.** Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all allowed Priority Tax Claims shall be paid in Cash in full, together with the Applicable Rate of Interest on the Effective Date. |
| Class 1 $33,450,000 | Deutsche Bank Secured Claim | **Unimpaired.** ~~In~~Provided the Closing occurs, in full satisfaction, release and discharge of the Deutsche Bank Allowed Secured Claim, ~~Deutsche Bank~~upon the Closing, Rialto shall receive on behalf of Deutsche Bank payment in accordance with the Deutsche Bank Settlement Stipulation attached to the Plan as Exhibit A, ~~which provides for payment to be made from the Sale Proceeds to Rialto Capital Advisors, LLC, as special servicer,~~. If the Closing does not occur, the Deutsche Bank Allowed Secured Claim and all rights associated therewith, including any and all liens and the rights provided for in the Deutsche Bank Settlement Stipulation, shall continue in full force and effect for the benefit of Deutsche Bank, ~~in an amount equal to: $33,450,000 plus the full amount of any Adequate Protection Payments due under the Cash Collateral Order for the months of March, April, May and June 2015 to the extent not paid by the Debtor, less application of all amounts held by Deutsche Bank in reserves, which amounts shall be retained~~ and shall not be altered by the terms of this Plan, unless otherwise agreed to in writing between the Debtor and ~~applied against the amounts owing Deutsche Bank, and which payment shall be made on or before June 15, 2015.~~Rialto. |
| Class 2 Approximately $1,000.00 | Other Secured Claims | **Unimpaired.** Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at or within 30 days of the Closing Date, or as soon as practicable after each such Other Secured Claim becomes an Allowed Claim, (i) Cash, in the full amount of its Claim, or (ii) such other treatment as to which the Debtor and each Holder of such Allowed Other Secured Claim shall have agreed upon in writing. |
| Class 3 Approximately $~~5,269,709.67~~7,56 | Unsecured Claims | **Unimpaired.** Subject to the provisions of Article 7 of the Plan, with respect to Disputed Claims, in full satisfaction, release and discharge of and in exchange for each Unsecured |

| Class and Estimated Amount1 | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| 2,905.58 in scheduled/filed claims including insider claims3. See attached schedule. | | Claim, the holders of Allowed Unsecured Claims shall receive on the later of : (1) 30 days after the Closing Date; (2) the date an order resolving an objection to claim becomes a final order; or (3) the date an order resolving any pending appeal becomes a final order, Cash in the full amount of their Allowed Unsecured Claim plus such interest as may be legally allowable on such Claim at the Applicable Rate of Interest. Such interest shall accrue from the Petition Date to the date of distribution and be paid in Cash. |
| Class 4 | Allowed Interests | **Unimpaired.** After payment is made in full, (or appropriate amounts reserved for payment in full) an account of all Allowed Claims, and appropriate amounts reserved for Disputed Claims as set forth in Section 7.7 of this Plan, as well as for ongoing expenses of administration of the Estate (estimated to be ~~4350,000~~$350,000), in full satisfaction, release and discharge of and in exchange for its interest in the Debtor, the remaining balance of the Sale Proceeds and the Debtor's Available Cash, if any, shall be distributed to to AC I Manahawkin Mezz LLC, the 100% Interest Holder in the Debtor.   After the Closing, all Interests in the Debtor shall be canceled and of no further force and effect. |

**CONFIRMATION OF THE PLAN**

  Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on **June 8, 2015 at 10:00 a.m.**, Eastern Standard Time, in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.  Objections, if any, to Confirmation of the Plan shall be filed and served on or before **June 1, 2015**.

  At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.   The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.

  In accordance with Section 1126(c) of the Bankruptcy Code and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar

---

[3] Amount does not include any dollar amount for the unliquidated claims filed by Gershon and Tibor Klein. Amount also does not account for interest on Acadia's claim from the Petition Date which interest factor shall be calculated at the Federal Judgment Rate of .1% from the Petition Date through January 31, 2017 (assuming final adjudication of the Acadia State Court Litigation and related appeals will conclude no later than January 31, 2017), which equals approximately $15,980.70.

amount and more than one-half (1/2) in number of the Claims of such Class that have timely and properly voted to accept or reject this Plan.  Unless the Bankruptcy Court determines otherwise, there are no Impaired Classes of Claims.

Classes 1, 2 and 3 are Unimpaired by this Plan.  Under Section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and thus the votes of the Holders of such Claims will not be solicited.  Allowed Interests in Class 4 are either unimpaired and therefore deemed to accept the Plan or are impaired and shall be deemed to reject the Plan.  Accordingly, Class 4 Interests are not entitled to vote to accept or reject the Plan.  Therefore, either (a) under Section 1126(f) of the Bankruptcy Code, Holders of such Interests are conclusively presumed to accept this Plan, or (b) under Section 1126(g) of the Bankruptcy Code, Holders of such Interests are deemed to reject this Plan.  Accordingly, the votes of the Holders of such Interests will not be solicited

Unless the Bankruptcy Court determines otherwise, no votes of Holders of Claims or Interests shall be solicited with respect to this Plan.

If all Classes have either accepted the Plan, been deemed to have accepted the Plan or are not entitled to vote, the Debtor shall request the Bankruptcy Court to confirm the Plan under Section 1129(a) of the Bankruptcy Code.

In the event that it is determined that one or more Impaired Classes of Claims or Interests exist, and if any Impaired Class fails to accept this Plan by the requisite statutory majorities, the Debtor reserves the right (i) to confirm this Plan by a "cram-down" of such non-accepting Class pursuant to Section 1129(b) of the Bankruptcy Code and (ii) to propose any modifications to this Plan and to confirm this Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

**The Debtor believes that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**.  See "Requirements for Confirmation" for a description of such requirements.

With the entry of the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise provided in the Plan, the distributions provided for in the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtor or any of its assets or properties, including but not limited to the Property and the Purchased Assets, including any Claim accruing after the Petition Date and before the Confirmation Date.  As of the Effective Date, all holders of Claims shall be precluded from asserting any Claim against the Debtor, its assets or properties or other interests in the Debtor, or the Property based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Plan.  Confirmation makes the Plan binding upon the Debtor, all Creditors and other parties regardless of whether they have accepted the Plan.

**NOTICE TO HOLDERS OF CLAIMS AND INTERESTS**

The Plan is filed with the Bankruptcy Court and is incorporated herein by reference.  Parties in interest may view the Plan on the Internet at http://www.nysb.uscourts.gov.[4]

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO OBJECT TO CONFIRMATION OF THE PLAN PROPOSED BY THE DEBTOR.  PLEASE READ THIS DOCUMENT WITH CARE.**

**NO VOTING – SUMMARY**

**THE PLAN PROVIDES FOR PAYMENT IN FULL TO EACH CLASS OF CREDITORS.  AS EACH CLASS OF CLAIMS IS UNIMPAIRED HOLDERS OF CLAIMS ARE NOT BEING SOLICITED, ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND ARE DEEMED TO HAVE ACCEPTED THE PLAN.**

**ALLOWED INTERESTS IN CLASS 4 ARE EITHER UNIMPAIRED AND THEREFORE DEEMED TO ACCEPT THE PLAN OR ARE IMPAIRED AND SHALL BE DEEMED TO REJECT THE PLAN.  ACCORDINGLY, CLASS 4 INTERESTS ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR.  THE STATEMENTS AND OPINIONS SET FORTH HEREIN ARE THOSE OF THE DEBTOR, AND NO OTHER PARTY HAS ANY RESPONSIBILITY WITH RESPECT THERETO.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY ANY BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The historical information concerning the Debtor has been prepared using the Debtor's books and records and certain filings made with the Bankruptcy Court.  The estimates of Claims set forth herein may vary from the final amounts of Claims allowed by the Bankruptcy

---

[4]  A password is necessary for access to view documents on the Internet.

Court.  While every effort has been made to ensure the accuracy of all such information, except as noted in the Disclosure Statement, the information presented herein is unaudited and has not been examined, reviewed or compiled by the Debtor's independent public accountants.

This Disclosure Statement contains a summary of certain provisions of the Plan and the transactions contemplated thereunder, and may contain descriptions of certain other related documents, if any.  While the Debtor believes that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents.  Reference is made to the Plan and the documents referred to herein and therein, if any, for a complete statement of the terms and provisions thereof.  In the event of any inconsistency between the terms of the Plan and this Disclosure Statement, the terms of the Plan shall be controlling.  In reviewing the Plan and this Disclosure Statement, the reader should give special attention to "RISK FACTORS."  No statements or information concerning the Debtor, the Property, or its other assets, results of business operations or financial condition are authorized by the Debtor other than as set forth in this Disclosure Statement and the exhibits hereto (including the Plan).

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein.  The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

This Disclosure Statement is intended for the sole use of Holders of Claims and Interests to make an informed decision about the Plan.  Each holder of a Claim and Interest should review this Disclosure Statement, the Plan and all exhibits hereto.  Holders of Claims and Interest are urged to consult with their own legal and financial advisors.

While this Plan does not seek to solicit any votes, no solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  No person has been authorized to use or promulgate any information concerning the Debtor or its business or the Plan, other than the information contained in this Disclosure Statement and the exhibits hereto.  You should not rely on any information relating to the Debtor or its business or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

## RECOMMENDATION

In the Debtor's opinion, the treatment of Creditors under the Plan provides a greater recovery than is likely to be achieved under any other alternatives, including liquidation under Chapter 7.  See "ALTERNATIVES TO THE PLAN."  In particular, the Debtor believes that in a Chapter 7 liquidation, administrative costs will be greater, the Deutsche Bank Settlement Stipulation will be rescinded, thereby substantially increasing its claim, and only to the extent the Property was sold for a purchase price in excess of the Allowed Deutsche Bank Secured Claim, Deutsche Bank would only receive a partial payment on account of its Secured

Claim.  In that scenario, the Unsecured Creditors would not receive any distribution on account of their Claims.  Further, the Debtor believes that the value of any distribution in a chapter 7 liquidation case will be discounted by the litigation and delays which will precede any such distribution.

    **THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THE INTEREST HOLDERS.**

## Events Leading to Chapter 11

**Securitization of the Property:**

On or around February 3, 2011, RCG LV Debt IV Non-REIT Assets Holdings, LLC, as Lender ("RCG") made a mortgage loan (the "Mortgage Loan") to the Debtor. The Mortgage Loan was made pursuant to the Loan Agreement, dated February 3, 2011 (as assigned, amended, supplemented or otherwise modified from time to time, including the First Amendment to Loan Agreement and Other Loan Documents, dated May 27, 2011, the "Mortgage Loan Agreement"). The Mortgage Loan is further evidenced by the Promissory Note, dated February 3, 2011, in the original principal amount of $36,630,000.00 (as assigned, amended, supplemented or otherwise modified from time to time, including the Amended and Restated Promissory Note, dated May 27, 2011, in the principal amount of $31,991,789.35, the "Mortgage Loan Note"). On May 27, 2011, the Loan Documents[5] were assigned to and are now held by Deutsche Bank Trust Company Americas, as Trustee for the Registered Holders of the Wells Fargo Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2011-C3 ("Lender"). Rialto Capital Advisors, LLC ("Rialto") is the Special Servicer for the Lender under the Pooling and Servicing Agreement, dated as of June 1, 2011 by and among Wells Fargo Commercial Mortgage Securities, Inc., as depositor, Wells Fargo Bank, National Association, as master servicer, Midland Loan Services, a Division of PNC Bank, National Association, as special servicer, Pentalpha Surveillance LLC, as trust advisor, Wells Fargo Bank, National Association, as certificate administrator, as tax administrator and as custodian, and Deutsche Bank Trust Company Americas, as trustee (the "Pooling Agreement").

Before the Petition Date, to secure all indebtedness arising under the Loan Documents, including the Prepetition Mortgage Debt, the Debtor granted to the Lender first priority liens and security interests (the "Prepetition Liens") on and in: (i) the Property; (ii) substantially all the Debtor's assets and properties, whether real or personal, tangible or intangible, and wherever located, and whether now or hereafter acquired; and (iii) all the cash, cash equivalents, proceeds, profits, products, offspring, rents, drafts, certificates, securities, and investment property,

---

[5] The term "**Loan Documents**" shall mean and include, without duplication: (a) the Mortgage Loan Agreement; (b) the Mortgage Loan Note; (c) the Mortgage and Security Agreement, dated February 3, 2011 (the "**Security Instrument**"); (d) the Lockbox-Clearing Account Control Agreement, dated January 2012 (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time); (e) the Conditional Assignment of Management Agreement, dated February 3, 2011 (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time); (f) the Environmental Indemnity Agreement, dated February 3, 2011 (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time); (g) the Assignment of Leases and Rents, dated February 3, 2011 (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time) (the "**AL&R**"); (h) the Intercreditor Agreement between Original Lender and RCG LV Debt Non-REIT Assets Holdings, LLC, as Mezzanine Lender, dated February 3, 2011; (i) any UCC financial statements filed by Lender to perfect its interest in any collateral of the Debtor (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time); and (j) all other documents executed and/or delivered in connection with the Mortgage Loan, including, without limitation, the Guaranty of Recourse Obligations of Borrower, dated February 3, 2011 (as assigned, amended, continued, renewed, supplemented or otherwise modified from time to time).

financial assets, instruments, and other property and the proceeds, products, distributions, dividends and/or substitutions thereon and thereof, including all property constituting  Cash Collateral, in each case as more particularly described in the Security Instrument, the AL&R, and other Loan Documents.  The items described in (i), (ii), and (iii) of the preceding sentence, as well as any other collateral or security as set forth or described in the Loan Documents are collectively referred to herein as the "Collateral").

The Mortgage Loan is secured by, among other things, (i) the Mortgage Loan Agreement, (ii) the ALR, (iii) a Lockbox-Clearing Account Control Agreement and (iv) certain guaranties.

In addition to the Mortgage Loan, on February 3, 2011, Mezz borrowed an additional $370,000 from RCG in the form of a mezzanine loan (the "Mezzanine Loan").

On May 7, 2011, the loans were amended and restated.  The principal amount of the Mortgage Loan was reduced to $31,991,789.35, and the principal amount of the Mezzanine Loan was increased to $4,941,009.59.

The Mezzanine Loan is secured by, among other things, a first priority security interest in all of Mezz's ownership interests in the Debtor.  After a series of defaults by Mezz on the Mezzanine Loan, RCG noticed a foreclosure sale of its pledged membership interests in the Debtor which was scheduled to take place on June 8, 2012.  However, through a series of forbearance agreements, RCG did not immediately foreclose on the pledged membership interests.

Despite the forbearance agreements, Mezz continued to default on the mezzanine loan and other obligations, while the Debtor also defaulted on the Mortgage Loan, triggering additional defaults under the Mezzanine Loan.  Because of these continuing defaults, RCG noticed a second foreclosure sale for October 21, 2013.  Prior to the October foreclosure sale, Mezz filed an action in New York State Court seeking a temporary restraining order and a preliminary injunction to prevent RCG from exercising its foreclosure rights.  The New York State Court denied the temporary restraining order and declined to stay the foreclosure sale, prompting the Debtor and its affiliates to commence a separate action in New Jersey state court, seeking a temporary restraining order enjoining the foreclosure sale pending a hearing on their motion for a preliminary injunction to prevent RCG from foreclosing on its pledged membership interests in the Debtor.  While the New Jersey State Court initially granted the Debtor an its affiliates a temporary restraining order to stay the foreclosure sale, their motion for a preliminary injunction was denied and RCG noticed another foreclosure sale on its pledged membership in the Debtor.

On June 4, 2014, prior to the latest scheduled foreclosure sale, the Debtor and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code to protect their assets and interest in each other as well as the Property.

**Acadia Litigation:**

On June 10, 2013, Acadia Realty Limited Partnership ("Acadia") filed a complaint against Benjamin Ringel and AC Retail Equity Fund I LLC (the "Ringel Defendants") and Tibor Klein to collect on promissory notes and later amended its complaint to allege causes of action for breach of contract, impairment of collateral, and fraudulent conveyance. As part of the amended complaint, Acadia added as parties, *inter alia*, AC I Inv Manahawkin LLC, AC I Manahawkin LLC, and ACI Manahawkin Mezz LLC (hereinafter, the "Manahawkin Defendants"). According to the amended complaint, from 2006 to 2011, Acadia made loans to the Ringel Defendants and Tibor Klein and, pursuant to those loans, the borrowers were obligated to turn over any distributions on account of Manahawkin Commons to Acadia. Acadia never lent money to the Manahawkin Defendants or otherwise obligated those entities to make or guaranty any payments to Acadia. The claims against the Manahawkin Defendants are based solely on a theory of alter ego / reverse veil piercing liability. At the time, these parties were represented by Morrison Cohen LLP ("Morrison"). Subsequently, on or about December 9, 2013, the Court granted Morrison's motion to withdraw as counsel for both the Manahawkin Defendants and the Ringel Defendants.

While the Ringel Defendants and the Manahawkin Defendants were unrepresented, on or about February 11, 2014, the court granted Acadia's motion (i) striking their answer to the Amended Complaint for alleged discovery violations and (ii) imposing a default judgment (the "Default Judgment") against the Ringel Defendants and the Manahawkin Defendants on the breach of contract, fraudulent conveyance, and collateral impairment claims. Thereafter, Morrison reappeared in the case as counsel for the Manahawkin Defendants and the Ringel Defendants and moved to vacate the Default Judgment. On or about June 2, 2014, the court denied defendants' motion to vacate and issued an order on July 14, 2014 (the "Order").

SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

On June 4, 2014, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. The following discussion is intended to highlight some of the more significant events which have occurred during the pendency of the Debtor's case.

MOTIONS TO DISMISS THE CHAPTER 11 CASE

On June 18, 2014, Tibor Klein and Gershon Klein (together, the "Kleins") filed a motion to dismiss the chapter 11 cases filed by the Debtor and its affiliates (collectively, the "Debtors"). The Kleins owned 47.5% of Inv and through this ownership interest claimed to own 47.5% of the Property. The Kleins set forth the argument that the Debtors did not have the corporate authority to file for bankruptcy protection, which was also supported by RCG in its filed response. The Debtors disagreed with the Kleins and RCG's position that there was no

authority to file and also set forth arguments that without bankruptcy protection, the Debtors'
properties, specifically the Property would have been lost, and the Debtors' creditors and estates
would have been unduly harmed.

      Eventually, the Debtors and the Kleins entered into a stipulation, which was filed
on September 5, 2014 which adjourned the motion to dismiss, *sine die*.   Additionally, the
stipulation also provided that the Property would be marketed for sale.   Further the stipulation
appointed GC Realty Advisors as Chief Restructuring Officer ("<u>CRO</u>") of the Debtors.   After
objections to the retention of GC Realty Advisors as CRO were interposed, the CRO motion was
resolved by an order authorizing GC Realty to continue to act as manager for the Debtors.

## CASH COLLATERAL

      The Debtor filed its motion for authorization to utilize cash collateral on July 24,
2014.   The Debtor and Rialto, for the benefit of Deutsche Bank, successfully negotiated an
interim cash collateral stipulation authorizing the Debtor's use of cash collateral which
stipulation was entered on July 31, 2014.   Thereafter, on September 19, 2014, a final order
authorizing Debtor's use of collateral was entered by the Court, which approved the Debtor's use
of cash collateral, but conditioned it upon certain "Sale Milestones" including the retention of a
broker to market and sell the Property and the filing of a plan or sale motion and bidding
procedures in connection therewith.

## ACADIA'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

      On August 28, 2014, Acadia filed a motion to lift the automatic stay to allow Acadia to
liquidate the amount of its default judgment against each of the Debtors, jointly and severally but
not to enforce that judgment against the Debtors.   Objections to the lift stay motion were filed by
the Debtors, RCG, and the Kleins.

      On September 11, 2014, the Bankruptcy Court granted Acadia's motion seeking limited
relief from the automatic stay to permit it to file a post-hearing submission to, and seek a
determination of damages from, this Court.   On September 18, 2014, the Bankruptcy Court
entered its order lifting the stay on that limited basis.   On the same day, new counsel appeared in
the state court action on behalf of the Manahawkin Defendants only.

      On October 1, 2014, the Manahawkin Defendants, pursuant to CPLR 2221, moved to
renew or reargue the Order and for further relief, pursuant to CPLR 5015(a)(1), setting aside the
Default Judgment.   The basis for the Manahawkin Defendants' motion was that, throughout the
course of the above-captioned action and, in particular, in Morrison's efforts to vacate the
Default Judgment, Morrison, by its words and actions, demonstrated repeatedly that it
represented and argued on behalf of the Ringel Defendants only, and failed to represent the
Manahawkin Defendants.   Moreover, the Manahawkin Defendants' new counsel argued that
there was an inherent conflict of interest for Morrison to represent the Ringel Defendants and the
Manahawkin Defendants, whose interests not only were not aligned, but were adverse to each

other.  On or about October 31, 2014, the court:  (i) denied the Manahawkin Defendants' motion to renew; (ii) granted the Manahawkin Defendants' motion to reargue the Order; and (iii) upon reargument, adhered to its prior decision, denying the Manahawkin Defendants' motion to vacate the Default Judgment.

Judicial Hearing Officer Ira Gammerman has recommended that damages on the claims against the Manahawkin Defendants be fixed at $4,622,169.68, and his recommendation is awaiting confirmation by the court.

On February 6, 2015, the Manahawkin Defendants filed a notice of appeal, stating as its grounds for seeking reversal, annulment, or modification that the court erred in finding that the Manahawkin Defendants had not shown a reasonable excuse for the discovery default or a meritorious defense to the underlying action.  The Manahawkin Defendants believe they have strong legal and factual arguments to prevail on appeal.  Counsel for the Manahawkin Entities has been directed to appear for a pre-appeal conference before the New York Appellate Division on April 10, 2015.

Accordingly, the Acadia claim is a Disputed Claim as that term is defined in the Plan.

SALE OF THE PROPERTY

By order entered on January 13, 2015, this Court approved bidding procedures in connection with the sale of the Property and Holliday Fenoglio Fowler, L.P. ("HFF"), the Debtor's retained real estate broker, commenced its marketing of the Property.  After a substantial marketing period, the Debtor received two qualified bids for the Property and a third offer from Hampshire.  The highest offer was submitted by Hampshire who presented a bid of $43,000,000 as the stalking horse bidder.  The second highest offer was submitted in the amount of $42,000,000 as the stalking horse bidder or $40,000,000 as an ordinary bidder and the third bid was in the amount of $37,500,000.  After reviewing each of the bids, the Debtor in consultation with HFF and other parties went back to each bidder to determine which, if any of the qualified bidders, would be prepared to proceed with a private sale of the Property for a purchase price of $44,000,000.  The reason for proceeding in this manner was that based upon the Hampshire stalking horse bid, the next bid increment would require a bid of no less than $44,200,000.  None of the qualified bidders was prepared to increase its bid to this sum.  However, Hampshire was prepared to and increased its bid to $43,500,000 in order to proceed by a private sale scenario.  The other bidders withdrew their bids and their deposits were returned.  In furtherance of the increased Hampshire bid, the Debtor and Hampshire negotiated a form of order approving Hampshire as the highest bidder and providing Hampshire with certain bid protections, including a break-up fee and expense reimbursement (the "Break Up Fee Order").  The Break Up Fee Order was originally served by notice of settlement and filed on February 23, 2015 with a settlement date of February 27, 2015.  The Break Up Fee Order was thereafter modified and re-served by a new notice of settlement which was filed on March 13, 2015 (ECF doc. no. 114) with a settlement date of March 19, 2015.  Simultaneous with the negotiation of the

Break Up Fee Order , and thereafter for a period of several weeks, Debtor and Hampshire negotiated the terms of the APA.

Upon finalizing the APA, on March 19 2015, the Debtor filed, a motion to sell the Property to Hampshire pursuant to the APA.  An order approving the sale of the Property pursuant to the APA was entered on April 16, 2015.

## RETENTION OF PROFESSIONALS

Section 327(a) of the Bankruptcy Code provides that a debtor, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the debtor in carrying out its duties under the Bankruptcy Code.  11 U.S.C. § 327(a).

On October 2, 2014, the Manahawkin Debtors sought authority from this Court to retain the law firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C., as their counsel.  The application was granted pursuant to an order entered on October 6, 2014.

On October 31, 2014, the Debtor sought authority from this Court to retain Holliday Fenoglio Fowler, L.P. as real estate broker to the Debtor.  The application was granted pursuant to an order on November 12, 2014.

On December 1, 2014, the Manahawkin Debtors sought authority from this Court to retain Roth & Company LLP as accountants to the Manahawkin Debtors.  The application was granted pursuant to an order on December 22, 2014.

## BAR DATE

In accordance with the requirements of section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, the Debtor has filed its Schedules of assets and liabilities, including schedules of all of its known creditors and the amounts and priorities of the Claims the Debtor believes are owed to such creditors.  Pursuant to section 501 of the Bankruptcy Code, any creditor may file a Proof of Claim and, unless disputed, such filed Proof of Claim supersedes the amount and priority set forth in the Debtor's schedules.  By order of the Bankruptcy Court dated November 25, 2014, the last day for creditors to file Proofs of Claim in the Debtor's Chapter 11 case was fixed at January 5, 2015.

There can be no assurance that the Allowed Claims as determined by the Bankruptcy Court will be in the amounts and priorities stated in the Schedules filed by the Debtor or the Proofs of Claim filed by the Creditors.

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtor is in the process of preparing operating reports, which it intends to file.  Copies of such reports, once filed, may be obtained (i) from the Bankruptcy Court during normal business hours, (ii) upon written request made to counsel for the Debtor, or (iii) from the Bankruptcy Court's Electronic Case Filing System ("ECF")[6] which may be accessed at the Bankruptcy Court's Internet website at www.nysb.uscourts.gov.

<strong>SUMMARY OF THE PLAN</strong>

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which is filed with the Clerk of the Bankruptcy Court and which is incorporated herein by reference.

**CLASSIFICATION OF CLAIMS AND INTERESTS**

Classification of claims is governed, in part, by sections 1122 and 1123(a) of the Bankruptcy Code.  Section 1123(a) requires that a plan designate classes of claims, requires that the plan specify the treatment of any impaired class of claims, and requires that the plan provide the same treatment for each claim of a particular class, unless the holder of a claim receiving less favorable treatment consents to such treatment.  11 U.S.C.§1123(a)(1), (3) and (4).  Section 1122(a) of the Bankruptcy Code provides, subject to an exception for administrative convenience, that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

Article 3 of the Plan classifies the various Claims against and Interests in the Debtor into five classes of Claims and one class of Interests:

Class 1 – Deutsche Bank Secured Claim
Class 2 - Other Secured Claims
Class 3 - Unsecured Claims
Class 4 - Interests

As set forth in Article 2 of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code, certain Administrative Claims against the Debtor have not been classified. See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims."

**Class 1 – Deutsche Bank Secured Claim.**  Class 1 consists of the Deutsche Bank Secured Claim.

---

[6] Filing documents on the ECF requires a password which an attorney may obtain by contacting the Bankruptcy Court's technical assistance department, Monday through Friday, 9:00 a.m. to 4:00 p.m.

**Class 2 – Other Secured Claims.**  Class 2 consists of Secured Claims other than the Deutsche Bank Secured Claim.

**Class 3 - Unsecured Claims.**  Class 3 consists of all Unsecured Claims.

**Class 4 – Interests.**  Class 4 consists of all interests in the Debtor.

TREATMENT OF CLAIMS CLASSIFIED UNDER THE PLAN

Article 4 of the Plan provide for the treatment of Claims classified in Article 3 of the Plan as follows:

**Class 1 – Deutsche Bank Secured Claim.**  ~~In~~Provided the Closing occurs, in full satisfaction, release and discharge of the Deutsche Bank Allowed Secured Claim, ~~Deutsche Bank~~upon the Closing, Rialto shall receive on behalf of Deutsche Bank payment in accordance with the Deutsche Bank Settlement Stipulation attached to the Plan as Exhibit A~~, which provides for payment to be made from the Sale Proceeds to Rialto Capital Advisors, LLC, as special servicer~~,.  If the Closing does not occur, the Deutsche Bank Allowed Secured Claim and all rights associated therewith, including any and all liens and the rights provided for in the Deutsche Bank Settlement Stipulation, shall continue in full force and effect for the benefit of Deutsche Bank~~, in an amount equal to: $33,450,000 plus the full amount of any Adequate Protection Payments due under the Cash Collateral Order for the months of March, April, May and June 2015 to the extent not paid by the Debtor, less application of all amounts held by Deutsche Bank in reserves, which amounts shall be retained and applied against the amounts owing Deutsche Bank, and which payment shall be made on or before June 15, 2015.~~ and shall not be altered by the terms of this Plan, unless otherwise agreed to in writing between the Debtor and Rialto.

**Class 2 – Other Secured Claims.**  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at or within 30 days of the Closing Date, or as soon as practicable after each such Other Secured Claim becomes an Allowed Claim, (i) Cash, in the full amount of its Claim, or (ii) such other treatment as to which the Debtor and each Holder of such Allowed Other Secured Claim shall have agreed upon in writing.

**Class 3 – Unsecured Claims.**  Subject to the provisions of Article 7 of the Plan, with respect to Disputed Claims, in full satisfaction, release and discharge of and in exchange for each Unsecured Claim, the holders of Allowed Unsecured Claims shall receive on the later of: (1) 30 days after the Closing Date; (2) the date an order resolving an objection to claim becomes a final order; or (3) the date an order resolving any pending appeal becomes a final order, Cash in the full amount of their Allowed Unsecured Claim plus such interest as may be legally allowable on such Claim at the Applicable Rate of Interest. Such interest shall accrue from the Petition Date to the date of distribution and be paid in Cash.

**Class 4 - Interests**.   After payment is made in full, (or appropriate amounts reserved for payment in full) an account of all Allowed Claims, and appropriate amounts reserved for Disputed Claims as set forth in Section 7.7 of the Plan, as well as for ongoing expenses of administration of the Estate (estimated to be $350,000), in full satisfaction, release and discharge of and in exchange for its interest in the Debtor, the remaining balance of the Sale Proceeds and Debtor's Available Cash, if any, shall be distributed to AC I Manahawkin Mezz LLC, the 100% Interest Holder in the Debtor.   After the Closing, all Interests in the Debtor shall be canceled and of no further force and effect.

TREATMENT OF NON-CLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(1) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.   Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

**Administrative Claims.**   Administrative Claims are the costs and expenses of administration of this Case, allowable under section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees.   Administrative Claims include Claims for the provision of goods and services to the Debtor after the Petition Date, the liabilities incurred in the ordinary course of the Debtor's business (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys, appraisers, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Plan.

Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) 30 days after the Closing Date, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Debtor in accordance with the terms and conditions of the  particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

Article 2 of the Plan sets a final date for the filing of Administrative Claims against the Debtor.  The Administrative Bar Date is the first Business Day that is 30 days after the Effective Date.  In the event that the Plan is confirmed, the Debtor shall deliver a notice of such bar date to all parties-in-interest.

**Professionals' Fees.**  Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by a Debtor in a case under the Bankruptcy Code.  In general, "bankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11."  124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

With respect to Professionals' Fees, the Plan provides that, subject to the approval of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Debtor shall pay the Administrative Claims held by Bankruptcy Professionals as follows:

Each Person seeking an award by the Bankruptcy Court of Professional Fees shall file its final application for approval of its Professional Fees no later than 60 days after the Administrative Bar Date.  Each Holder of an Allowed Claim for Professional Fees shall receive from the Disbursing Agent, in full satisfaction of such Allowed Claim, Cash in the amount of such Allowed Claim within three days of the entry of a Final Order Allowing such Claim.

No later than three days prior to the Confirmation Date, each Professional shall provide the Debtor with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code.  Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.  On the Effective Date, the Disbursing Agent shall segregate sufficient cash to pay all such estimated compensation and expenses in full unless otherwise agreed to by the Debtor and such Professionals; *provided, however,* that the failure of a Professional to provide such an estimate shall relieve the Debtor of its obligation to segregate funds for the payment therefore, but shall not relieve the Debtor of the obligation with respect to any allowed compensation and expense reimbursement.

All Professionals shall file final applications for approval of compensation and reimbursement of reasonable and necessary expenses pursuant to section 330 of the Bankruptcy Code no later than the Administrative Bar Date.  Any such application timely filed shall be deemed to be an Administrative Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.  Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Liquidating Debtor in accordance with the Bankruptcy Rules or as may be agreed between the Professional and the objecting party.  Any such objection not timely filed and served shall be deemed to have been waived.

**Administrative Tax Claims.**  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, all allowed Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) within 30 days of the Closing Date, or (ii) upon such

other terms as may be agreed to, in writing, between the Debtor and such Governmental Units on or before the Confirmation Date.

**Priority Tax Claims**.  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all allowed Priority Tax Claims shall be paid in Cash in full, together with the Applicable Rate of Interest within 30 days of the Closing Date.

**Bankruptcy Fees.**  All fees and charges assessed against the Debtor under section 1930 of title 28 of the United States Code and any applicable interest thereon shall be paid in full as required by statute and until the closing, conversion or dismissal of this Case, whichever is earlier, the Debtor shall continue to be responsible for the payment of any such fees and charges.

DISPUTED CLAIMS AND INTERESTS

Except as otherwise explicitly provided in the Plan, nothing shall effect, diminish or impair the Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Unimpaired Claims, or recharacterization of Unimpaired Claims.

Article 7 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtor by any Entity.

**Time to Object.** Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim may be filed no later than the later to occur of (i) 60 days after the Effective Date or (ii) 60 days after the date proof of such Claim or Interest or a request for payment of such Claim is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, Claims shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (ii) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been listed in the Schedules.

Debtor does not intend to file a formal objection to the claim filed by Acadia, however, Debtor deems the pending appeal and its continued opposition to the State Court proceedings as its objection to and dispute of the Acadia claim and will treat Acadia's claim as disputed with respect to any distribution.

Debtor deems the scheduled and/or filed claims of Armstrong Management Corp. (filed in the amount of $297,787.24), Klara Ringel (scheduled in this Debtor's Schedule F in the amounts of $250,000; $450,000 and $60,000, but filed in the INV case in the amount of $450,000) and Marsyll Maintenance Corp. (scheduled in the amount of $215,891.68) to be insider claims.  In lieu of the Debtor pursuing litigation against Armstrong Management Corp

and Marsyll Maintenance Corp. for claims the Debtor has against these insiders, the scheduled and/or filed claims are being treated as claims not entitled to any distribution in connection with the Debtor's Plan.  The Klara Ringel claim filed in the INV case will be the controlling claim of insider Klara Ringel.  If necessary, Debtor will file motions objecting to these scheduled and/or filed claims.

The claims filed by Tibor Klein and Gershon Klein which claims were filed in each of the Debtor and its affiliated cases, were filed in unliquidated amounts and therefore Debtor has not and will not escrow amounts on account of these claims.  The first component of the Klein claims relates to the Deutsche Bank Allowed Secured Claim which will be satisfied at Closing.  The second component of the Klein claims relates to the claim of RCG which is a claim that is properly asserted in the Mezz chapter 11 case.  The third component of the Klein claims relates to the Acadia disputed claim.  Debtor submits that the disputed claim reserve to be established will include a sum attributable to the Acadia disputed claim.  To the extent the Debtor prevails on its appeal, the Klein claims in connection with the Acadia disputed claim will be resolved.  To the extent Acadia prevails, the sums escrowed to satisfy the Acadia disputed claim will be released to Acadia.  The foregoing is without prejudice to Acadia's rights to apply such payments as it determines and for any party to object to said application and seek a determination by a court of competent jurisdiction with respect thereto.  All parties rights with respect to the application of funds released to Acadia, if any, shall be preserved.

DISTRIBUTIONS UNDER THE PLAN

Article 7 contains provisions governing the making of distributions on account of Claims.  In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim shall be deemed to be timely made if made on or within ten days following the later of (i) the expiration of any applicable objection deadline with respect to Disputed Claims or (ii) such other times provided in the Plan.  All Cash payments to be made by the Debtor pursuant to the Plan shall be made by wire transfer or check drawn on a domestic bank.  To the extent that any distribution is not paid on the Closing Date, funds in an amount necessary to satisfy any such unpaid claim shall be maintained in an escrow account for distribution thereafter.

**Disbursing Agent.**  Robinson Brog Leinwand Greene Genovese & Gluck P.C. shall be the Disbursing Agent and other than the payments to be made at the Closing, shall make distributions under the Plan. The Disbursing Agent may employ or contract such third parties as may be necessary to assist in or perform the distribution of the property under the Plan.  Pending the final distribution of all sums distributable under the terms of the Plan (including the delivery to the Debtor of unclaimed distributions pursuant to section 7.14 of the Plan), the Disbursing Agent shall have full authority to sign checks on any bank account of the Post-Effective Date Debtor to the extent necessary to make any payment or distribution contemplated by the Plan.

**Timing of Distributions Under the Plan.**  Subject to sections 7.6 and 7.8 of the Plan, any payments, distributions or other performance to be made pursuant to the Plan on

account of any Disputed Claim, shall be deemed to be timely made if made on or within ten days following the later of (i) the expiration of any applicable objection deadline with respect to such Disputed Claim or (ii) such other times provided in the Plan.

**Method of Payment.**  Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by wire transfer of check drawn on a domestic bank.

**Claims Objection Deadline.**  Unless otherwise ordered by the Bankruptcy Court, the Debtor or the Post-Effective Date Debtor may file and serve any objection to any Claim or Interest at any time, but in no event after the later to occur of (i) 60 days after the Effective Date, or (ii) 60 days after the date proof of such Claim or Interest or a request for payment of such Claim is filed.

**Prosecution of Objections.**  After the Confirmation Date, only the Post-Effective Date Debtor shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claim. The Post-Effective Date Debtor may ~~comprise~~compromise any objections to Disputed Claims without further order of the Court.

**No Distribution Pending Allowance.**  Notwithstanding any other provision of the Plan, no payment or distribution of any kind shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order.

**Escrow of Cash Distributions.**  (a) On any date that distributions are to be made under the terms of the Plan, the Post-Effective Date Debtor shall make available any and all funds required under the Plan to be disbursed on that date, and the Disbursing Agent shall deposit in one or more segregated accounts, Cash equal to 100% of the Cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as Administrative Claims or as Priority Non-Tax Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (ii) claims of Governmental Units for any tax, (iii) any disputed Cure Amount, ~~and~~ (iv) Disputed Claims in Class 3, including, but not limited to the Acadia claim, and (v) any amount due but not payable on the Effective Date on account of Administrative Claims or claims entitled to priority pursuant to section 503 and 507 of the Bankruptcy Code.  The Disbursing Agent shall also segregate any interest, dividends or other proceeds of such Cash.  Such Cash together with any interest, dividends or proceeds thereof, be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

(b)  The Post Effective Date Debtor shall have the right to seek an Order of the Bankruptcy Court, after notice and hearing, estimating or limiting the amount of Cash that must be so deposited on account of any Disputed Claim.  Any Creditor whose Claim is so estimated shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other Entity or Property if the Allowed Claim of that Creditor as determined by Final Order

exceeds the amount so deposited.  Such Creditor shall have recourse to the undistributed assets in the Disputed Claims Reserve (on a Pro Rata basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order, or not yet resolved.

(c)  Acadia's recovery, if any, as against the Manahawkin Defendants shall be limited to the amount escrowed in accordance with subsection (a) above

**Distribution After Allowance.**  Within 15 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.

**Investment of Segregated Cash.**  To the extent practicable, the Disbursing Agent may invest any Cash segregated on account of a Disputed Claim, disputed Interest, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment or (ii) in any manner permitted by section 345 of the Bankruptcy Code; *provided, however,* that the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash or proceeds.  Segregated Cash shall be maintained in an authorized depository.

**Distribution After Disallowance.**  Subject to section 7.7 of the Plan, the Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof, if any, remaining after all Disputed Claims have been resolved by Final Order shall revert to the Post-Effective Date Debtor and thereafter shall be distributed to AC I Manahawkin Mezz LLC, the Debtor's 100% Interest Holder.

**Surrender of Instruments; Execution of Satisfactions and Releases.** (a) Notwithstanding any other provision of the Plan, no Creditor that holds a note or other instrument evidencing such Creditor's Claim may receive any distribution with respect to such Claim unless and until the original note or other original instrument evidencing such Claim shall have been validly surrendered to the Disbursing Agent at the sole cost and expense of such Creditor.

(b)  Any Cash or property to be distributed pursuant to the Plan on account of any such Claim shall, pending surrender, be treated as an undeliverable distribution pursuant to section 7.13 of the Plan.

(c)  In the event any Creditor is unable to surrender a note or other instrument evidencing a Claim against the Debtor that has been destroyed, lost or stolen, such entity may receive a distribution with respect to such Claim by presenting to the Disbursing Agent, in a form acceptable to the Disbursing Agent:  (i) proof of such entity's title to such Claim; (ii) an affidavit to the effect that the same has been lost and after diligent search cannot be located; and

(iii) such indemnification as may be required by the Disbursing Agent and all other entities deemed appropriate by the Disbursing Agent from any loss, action, suit or any claim whatsoever which may be made as a result of such entity's receipt of a distribution under the Plan.

(d)  All questions as to the validity, form or eligibility of any note or other instrument evidencing a Claim so surrendered shall be resolved by Final Order of the Bankruptcy Court.  The Disbursing Agent shall not be under any duty to give notification of defects in such tender or shall incur liability for failure to give notification of such defects.

**Delivery of Distributions.**  Except as provided in sections 7.13, 7.14 and 7.15 of the Plan, distributions to Holders of Allowed Claims and Allowed Interests shall be made: (1) at the addresses set forth on the respective Proofs of Claim or Proofs of Interests Filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address.

**Undeliverable Distributions.**  (a) If the distribution to the Holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address.  Undeliverable distributions shall remain in the possession of the Disbursing Agent until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan.

(b)  Until such time as an undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan, within 30 days after the end of each calendar quarter following the Effective Date, the Disbursing Agent shall make distributions of all Cash and other property that has become deliverable during the preceding quarter.  Each such distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such distribution would have been due had it then been deliverable to the date that such distribution becomes deliverable.

(c)  Nothing contained in the Plan shall require the Post-Effective Date Debtor or Disbursing Agent to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

**Unclaimed Distributions.**  Any Cash or other assets to be distributed under the Plan shall revert to the Post-Effective Date Debtor and thereafter shall be distributed to AC I Manahawkin Mezz LLC, the Debtor's 100% Interest Holder, if it is not claimed by the entity entitled thereto before the later of (i) one year after the Effective Date; (ii) one year after such scheduled payment to such entity under Article 4 of this Plan; or (iii) one year after an Order allowing the Claim of that entity becomes a Final Order, and such entity's claim shall be reduced to zero.

**Set-offs.**  The Disbursing Agent may, but shall not be required to, set-off against the distributions to be made pursuant to the Plan the claims, obligations, rights, causes of action and liabilities of any nature that the Liquidating Debtor may hold against the Holder of an Allowed Claim, *provided, however,* that neither the failure to effect such a set-off nor the allowance of any claim hereunder shall constitute a waiver or release by the Post-Effective Date Debtor (or the Disbursing Agent) of any such claims, obligations, rights, causes of action and liabilities that the Debtor or the Disbursing Agent has or may have against such Holder.  To the extent the Disbursing Agent elects to effectuate a set-off, the Disbursing Agent shall notify the Holder of the Allowed Claim in writing at least ten (10) days prior to effectuating the set-off.  To the extent the Holder of an Allowed Claim objects to the set-off, a written objection shall be provided to the Disbursing Agent no later than three (3) days prior to the set-off date or the objection shall be waived.

### COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements provided, however, that the transfer of any Cash, property or other interest under the Plan shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

### EFFECTIVE DATE

The Effective Date of the Plan shall be the first business day after the Confirmation Order becomes a Final Order.

### CONDITIONS TO THE EFFECTIVE DATE

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied or waived in full:

(a)    The Confirmation Order shall have been entered in this case and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by this Plan and the Confirmation Order shall not have been modified or vacated on appeal; and

(b)    the Closing has occurred.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the Effective Date, all Executory Contracts and Unexpired Leases to which Debtor is a party and which were set forth on Schedule D to the APA, shall be assumed by the Debtor and thereafter upon the Closing Date, assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code and the Sale Approval Order.  All other Executory

Contracts and Unexpired Leases to which Debtor is a party, including, but not limited to any management agreements with Armstrong Management and/or Marsyll Maintenance Corp. shall be rejected as of the Effective Date.  Upon rejection, Armstrong Management and Marsyll Maintenance Corp. shall turn over all records in their possession that pertain to the Debtor and the Property.

In accordance with the Sale Approval Order at paragraph 15 thereof, and other than the agreement with the TJX Companies, Inc., as set forth at paragraph 16 of the Sale Approval Order, there are no assumption cure payments due in connection with the Leases to be assumed and assigned to Purchaser

**Rejection Claims.** Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as Unsecured Claims.

A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Disbursing Agent not later than 30 days after the earlier of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Effective Date.  Any such Proof of Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the property of the Estate, the Debtor, the Liquidating Debtor, or the Disbursing Agent, or their successors or their respective properties.

### IMPLEMENTATION OF THE PLAN

**Implementation.**  The Plan shall be implemented by the Closing and thereafter the distribution of the Sale Proceeds.  The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of equity of the Debtor required by the Plan and to perform any act, including the satisfaction of any lien, that is necessary for the consummation of the Plan.

**Plan Funding.**  Funding for the Plan shall be from the Sale Proceeds and the Debtor's Available Cash on hand on the Closing Date.

**Vesting of Assets.**  Except as otherwise provided in the Plan, on the Closing Date the Property and the Purchased Assets as that term is defined in the APA shall vest in the Purchaser free and clear of all Liens, Claims and encumbrances. On the Closing Date, any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan or the Sale Approval Order shall be deemed extinguished as of such date. Any remaining property of

the Estate shall re-vest in the Post-Effective Date Debtor who may operate, buy, use, acquire, and dispose of the property of the Estate and may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

**Execution of Documents.**    (a) On the Effective Date, the Debtor, and any necessary party thereto, shall execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan.

(b)    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtor shall be authorized to execute, in the name of any necessary party any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance (including, any Lien, Claim or encumbrance that is to be released and satisfied upon the Debtor's compliance with the provisions of article 4 of the Plan) not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

**Filing of Documents.**    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

**Distributions**.    Except as set forth elsewhere in the Plan, and except for payments to be made at the Closing, all payments required to be made under the Plan shall be made by the Disbursing Agent for disbursement in accordance with the terms of the Plan.

**Preservation of Rights of Action.**    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Post-Effective Date Debtor shall retain, and in accordance with its determination of the best interest of the estate, may enforce any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Debtor's Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

As the Plan provides for a 100% distribution, or appropriate escrow for payment on account of Allowed Claims, Debtor does not presently anticipate pursuing any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Debtor's Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity

Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or claims are

provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity, allowance, or amount of any such claim, document or agreement. The Debtor and the Post-Effective Date Debtor expressly reserve the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

**Transfer Taxes.** In furtherance of the Sale Approval Order and this Plan, and pursuant to N.J.S.A. 46:15-10 and section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan, (including any instrument executed in furtherance of the transactions contemplated by the Plan), shall be exempt and shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Tax, mortgage recording tax or similar tax, in connection with or in furtherance of the Plan and the funding requirements contained herein, and to the extent provided by 1146(a), if any, shall not be subject to any state, local or federal law imposing such tax.

**Post-Effective Date Debtor.** The Debtor shall continue in existence as the Post-Effective Date Debtor who shall continue to be managed by GC Realty Advisors LLC and whose activities shall be limited to matters related to the implementation of this Plan and matters reasonably incidental thereto. The Post-Effective Date Debtor will have all of the rights, powers and duties necessary to carry out its responsibilities under this Plan. As soon as practicable after the Closing, the Post-Effective Date Debtor shall take all necessary steps to effectuate its dissolution in accordance with applicable law.

## MISCELLANEOUS PROVISIONS

### MODIFICATION AND REVOCATION OF THE PLAN

The Plan may be altered, amended or modified by the Debtor, at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Section 1127 of the Bankruptcy Code authorizes the proponent of a plan of reorganization to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain technical requirements of sections 1122 and 1123 of the Bankruptcy Code with respect to the classification of Claims and Interests and the contents of a plan. Prior to Confirmation, if a proponent files modifications to a plan, pursuant to section 1127(a) "the plan as modified becomes the plan." No order of the Court is required to modify the Plan under the terms of section 1127(a); however, the proponent of a modification to a plan must comply with section 1125 of the Bankruptcy Code with respect to the plan as modified. In other words, if a modification materially alters the treatment of any Creditor who has accepted the Plan, the Debtor will be required to make additional disclosures to those Creditors whose treatment has been materially and adversely altered and give such Creditors an opportunity to change their votes.

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against or any interest in, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor or any other party, or its Estate.

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

i)   Insure that the Plan is consummated, and to enter any Order pursuant to section 1142(b) of the Bankruptcy Code, to compel the Debtor, its Interest Holder and any other necessary party, to take such action and execute such documents to effectuate the Plan;

ii)   Consider any modification of the Plan proposed pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019;

iii)   Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense, the resolution of any and all objections to the allowance or priority of Claims or Interests, and the resolution of any adversary proceeding;

iv)   Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Effective Date;

v)   Resolve any motions pending on the Effective Date to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all Claims arising therefrom;

vi)   Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished in accordance with the provisions of this Plan;

vii)    Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

viii)    Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Case, including, but not limited to any Order necessary to enforce the provisions of article 7 of the Plan;

ix)    Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

x)    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

xi)    Remedy any defect or omission or reconcile any inconsistency in any Order, the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

xii)    Issue any injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

xiii)    Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

xiv)    Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order.

xv)    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement; and

xvi)    Enter an Order or Final Decree concluding the Case.

RISK FACTORS

Although the Debtor believes that it will be able to meet all of the obligations that it is undertaking pursuant to the Plan there can be no assurance that future events will not cause the Debtor to default on one or more of its obligations under the Plan or that the Closing will occur.

**CONFIRMATION OF THE PLAN**

All distributions to Creditors are contingent on the Plan being confirmed by this Court.  Otherwise, the Debtor is not obligated, in any way, to make the payments required hereunder.

**RISK OF SUBSEQUENT REORGANIZATION OR LIQUIDATION**

The Plan provides for the liquidation of the Debtor, thereby eliminating the risk associated with the need for further financial reorganization of the Debtor.

CONFIRMATION

**CONFIRMATION HEARING**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan.  The Confirmation Hearing is scheduled to commence on **June 8, 2015 at 10:00 a.m.** in the United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street, White Plains, New York.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

Any party in interest may object to Confirmation of the Plan by filing a written objection, setting forth their identity and standing and the facts and authorities upon which any objection is based, in the Office of the Clerk of the Bankruptcy Court, no later than June 1, 2015 and by delivering a courtesy copy to the Chambers of the presiding judge.  Copies of all objections must also be served upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, New York 10022, Attn.: A. Mitchell Greene, and (ii) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014 so that they are received no later than June 1, 2015. Any objection that is not timely filed and served as required will not be considered by this Court at the Confirmation Hearing.

**REQUIREMENTS FOR CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  These requirements include

determinations by the Bankruptcy Court that: (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interest" of all Creditors, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances.    The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.**   The so-called "best interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such entity would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code. Because all Creditors are receiving agreed upon payment or full payment on account of their Allowed Claims, and the Interest Holder is to receive the balance of the Sale proceeds and Available Cash, if any, after payment of or reserve for payment of all Allowed Claims,  there are no impaired classes and the "best interest" test is not applicable.  To the extent it is determined that the equity class is impaired, Debtor submits that the "best interest" test is satisfied.

To determine what the holders in each Impaired Class of Claims or Interests would receive if the Debtor was liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in a chapter 7 liquidation case.   The amount that would be available for satisfaction of Allowed Claims against the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the cash held by the Debtor at the commencement of the chapter 7 case.  Such amount would be reduced by the amount of any Claim or Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may have accrued.  Such value is then juxtaposed against the amount creditors are receiving under the Plan to determine if the value each impaired creditor is receiving is the same or more than such creditor would receive from a chapter 7 liquidation on the Confirmation Date.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation.  Such costs would include the fees payable to a chapter 7 Trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such a Trustee may engage to assist in the liquidation.  In addition, chapter 7 costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation.  Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in chapter 11.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time the Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor or any official committee appointed pursuant to section 1102 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution including  (i) whether the sale to Hampshire would close and whether Hampshire would be entitled to a break up fee, (ii)  the increased costs and expenses of a chapter 7 liquidation arising from fees payable to a Trustee in bankruptcy and professional advisors to such Trustee, (iii) the erosion in value of the Debtor's assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iv) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of general Unsecured Creditors, and (v) the substantial increase in the amount of secured claims in this case in the event the Deutsche Bank Secured Claim is not paid on or before June 15, 2015, the Debtor believes that holders of Unsecured Claims would receive substantially less than the 100% distribution provided for in the Plan, and interest holders would receive no distribution.

**Liquidation Analysis.**  The Debtor has concluded that the Plan provides to each Creditor recovery with a present value at least equal to the present value of the distribution which such person would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan provides for payment to all Creditors and Administrative Claimants in full or in an agreed upon amount on account of their Allowed Claims.  The Sale Proceeds and the Debtor's Available Cash will be utilized to fund distributions under the Plan.

The Debtor believes that in the event its assets were sold in chapter 7 liquidation, all of the proceeds would go to pay priority tax claims, chapter 7 administrative claims, bankruptcy fees, chapter 11 administrative claims, the break up fee to Hampshire (if authorized pursuant to the Break Up Fee Order), and the Deutsche Bank Secured Claim. In such event, nominal funds would be remaining for distribution to Unsecured Creditors. As such, the Debtor believes that no Creditors or interest holders would receive a distribution in a Chapter 7 case which is greater than the one they may be entitled to under the Plan.

The Debtor further believes that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate and (ii) decrease the funds available for non-administrative creditors.

The liquidation values stated herein assume that all assets of the Debtor would be liquidated in the context of a chapter 7 case and assumes the present values of such liquidation values as of May 2015.  The assumptions utilized in the analysis considered the estimated liquidation value of the assets and estimated amount of Claims that would be allowed, together with an estimate of certain administrative costs and other expenses which would likely result during the liquidation process.  While the Debtor believes the assumptions underlying the

Liquidation Analysis are reasonable, the validity of such assumptions may be affected by the occurrence of events, and the existence of conditions not now contemplated or by other factors, many of which will be beyond the control of the Bankruptcy Court, the Debtor and any trustee appointed for the Debtor.  The actual liquidation value of the Debtor may vary from that considered herein and the variations may be material.

    The Debtor has assumed that the Property would be sold within six months in a Chapter 7 liquidation.  It is assumed that cash proceeds of liquidating the Property would total approximately $39,250,000 (which is the second highest ordinary bid, less adjustments in accordance with the APA) taking into account the negative impact on values attributed to the Chapter 7 process.

    The Debtor believes that the total cash which would be administered in a hypothetical Chapter 7 case would aggregate approximately $39,250,000 in proceeds from the liquidation sale of the Property as Deutsche Bank would utilize any Available Cash it holds in reserve to apply to its claim.  Upon consultation with its advisors, the Debtor assumes for the purposes of this analysis that the cash would be distributed as follows:

**Available for distribution**                                                                               **$39,250,000**
**To the payment of:**

  Priority Tax Claims:                                                                     $~~277,028.36~~62,205.72

  Chapter 7 Administrative Claims:

    Chapter 7 trustee commissions and expenses                 $1,177,500
    (approximately 3% of $39,250,000)

    Chapter 7 trustee's professionals                               $750,000
    (attorneys, appraisers, auctioneers
    accountants, etc.)

  Deutsche Bank Secured Claim                                              $34,650,000

  Other Secured Claims                                                            $1,000

  Chapter 11 Administrative Claims                                      <u>$1,500,000</u>

    Remaining Available Cash                                 $~~894,472~~1,109,294.28

  General Unsecured Claims                                         $~~5,269,709.67~~7,562,905.58
Resulting in a distribution of approximately .~~16~~15%

**In a liquidation, there would be insufficient funds to satisfy claims of Allowed Unsecured Creditors in full.**

**This analysis also presumes the Deutsche Bank Secured Claim increases due to default rate interest applied retroactively and until a sale occurs, which is estimated to take approximately 6 months to close.**

The Plan contemplates payment to all classes of creditors and for the balance of the Sale Proceeds and Debtor's Available Cash to flow to Mezz, its Interest Holder.  In a chapter 7 liquidation there would insufficient funds to satisfy in full all of the unsecured creditors and no funds flowing to equity. Accordingly, the Debtor believes that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation.

**Feasibility.**  For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation is set forth in the Plan. The Plan calls for the distribution of Sale Proceeds and after the Closing, the dissolution of the Post-Effective Date Debtor.

Based on the Summary of the Plan, the Plan meets the feasibility requirements of the Bankruptcy Code.

## EFFECT OF CONFIRMATION

### INJUNCTION

**Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtor as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtor, from the Property, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Property and any property of the Estate that has been or is to be, distributed under the Plan.  Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtor, from the Property, or from property of the Estate, any claim, any obligation or debt that was held against the Debtor by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan. The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.**

**Nothing contained herein shall preclude the continuation of the Acadia State Court Litigation commenced by Acadia against the Ringel Defendants, and, as amended, as against the Manahawkin Defendants, and the appeals filed in connection therewith through their final adjudication.**

RELEASE

Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holder ever had or now have through the Effective Date in connection with their Claim or Interest (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan).

**Nothing contained herein shall be deemed a release by the Debtor of any claims the Debtor has against insiders as that term is defined in Section 101(31) of the Bankruptcy Code, including but not limited to claims against Armstrong Management Corp., Marsyll Maintenance Corp., Tibor Klein, Gershon Klein, Benjamin Ringel and Klara Ringel.**

**Nothing contained herein shall be deemed a release with respect to the Acadia State Court Litigation and any related appeal by any of the parties thereto.**

LIMITATION OF LIABILITY

To the extent permitted under Section 1125(e) of the Bankruptcy Code, neither the Released Entities nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.   Nothing in this Section

**8.2 shall limit the liability of the Debtor's professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct. Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.**

### ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court, the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; (b) the formulation, promulgation and confirmation of an alternative plan of reorganization premised upon a sale to an alternative purchaser; or (c) dismissal of the Debtor's case.  In the case of dismissal, RCG would be allowed to proceed with a foreclosure sale of its pledged membership interests in the Debtor and seek to take ownership of the Property.

The Debtor believes that the Plan provides a recovery to all Creditors equal to or greater than would be obtainable in a chapter 7 liquidation.

The Debtor believes that the Plan enables Creditors to realize the most value under the circumstances.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. Federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Claim. Each holder of an Allowed Claim is urged to consult his own tax advisors. This summary does not cover all potential U.S. federal income tax consequences that could possible arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Allowed Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

The Debtor has not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters nor will the Debtor, with respect to the federal income tax consequences of the Plan, obtain any opinion of counsel. Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. The Debtor offers no statements or opinions that are to be relied upon by the creditors as to the treatment of creditors' claims under the Plan. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim or Equity Interest

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. Holders of Allowed Claims should consult their own tax advisors as to the Plan's specific federal, state, local and foreign income and other tax consequences.

The tax consequences to Creditor and Interest Holders will differ and will depend on factors specific to each Creditor and Interest Holder, including but not limited to: (i) whether the Claim or Interest (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Claim or Interest; (iii) the type of consideration received by the Creditor and Interest Holder in exchange for the Claim; (iv) whether the Creditor and Interest Holder is a United States person or foreign person for tax purposes; (v) whether the Creditor and Interest Holder reports income on the accrual or cash basis method; (vi) whether the Creditor and Interest Holder has taken a bad debt deduction or otherwise recognized loss with respect to a Claim.

**THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH CREDITOR AND INTEREST HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT EACH CREDITOR AND INTEREST HOLDER OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AND INTEREST HOLDER AS A RESULT OF THE PLAN.**

**THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR AND INTEREST HOLDER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH CREDITOR AND INTEREST HOLDER SHOULD SEEK ADVICE BASED UPON THE CREDITOR AND INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Ballots and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtor's counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, New York 10022, Attn.: A. Mitchell Greene (212) 603-6399.

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in these cases are on file in the Office of the Clerk of the United States Bankruptcy Court at 300 Quarropas Street, White Plains, New York, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 4:00 p.m. and are also available for viewing on the Internet at http://www.nysb.uscourts.gov.

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors and should be confirmed.

**Dated:**  New York, New York
~~April 30,~~ June 3, 2015

**AC I MANAHAWKIN, LLC**
**By its manager, GC Realty Advisors LLC**

**By: /s/ David Goldwasser**
**David Goldwasser,**
**Managing Member of GC Realty Advisors LLC**

**ROBINSON BROG LEINWAND**
**GREENE GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.:  (212) 603-6300

**By: /s/ A. Mitchell Greene**
**A. Mitchell Greene**

Document comparison by Workshare Professional on Wednesday, June 03, 2015
4:51:24 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\MAIN01\docs\CLIDOCS\101097\0000\~VER\1\00724232.DOC |
| Description | 00724232 |
| Document 2 ID | file://\\MAIN01\docs\CLIDOCS\101097\0000\00724232.DOC |
| Description | 00724232 |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 47 |
| Deletions | 25 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 72 |